CH

# RECEIVED

JAN 2 5 2008
Jan 25 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **HUSSEIN H. MANN and**<br>**DEBRA HOUSTON-MANN,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) 08CV 555 |
| **v.** | ) JUDGE COAR |
| | ) MAGISTRATE JUDGE  DENLOW |
| **CALUMET CITY, ILLINOIS,** | ) |
| | ) |
| **Defendant.** | ) |

**MEMORANDUM OF LAW SUPPORTING
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Marcia B. Gevers
MARCIA B. GEVERS & ASSOCIATES
19710 Governors Highway, Suite 8
Flossmoor, IL 60422
Ph:     (708) 957-2720
Fax:   (708) 957-2720

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.     STATEMENT OF FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    Point of Sale Inspection Ordinance . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    Deconversion Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    C.    The Rental Dwelling Inspection Ordinance . . . . . . . . . . . . . . . . . . . . . 11

II.    THE PROPERTY OWNERS ARE ENTITLED TO INJUNCTIVE RELIEF . . . . 12

    A.    The Property Owners Have A Strong Likelihood of Success
          on The Merits  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        1.    The Point of Sale Inspection Ordinance Violates The
              Fourth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

            a.    The Absence of A Warrant Provision Renders The
                  Point of Sale Inspection Ordinance Unconstitutional . . . . 13

            b.    The Point of Sale Inspection Ordinance Is
                  Unconstitutional Because It Places No Restrictions
                  on The Scope of Searches  . . . . . . . . . . . . . . . . . . . . . . 15

            c.    The Point of Sale Inspection Ordinance Violates
                  The Fourth Amendment Because It Does Not Require
                  Tenant Consent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        2.    The Deconversion Provisions Violate the Fifth and Fourteenth
              Amendments  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

            a.    When Property Owners Cannot Afford Deconversion,
                  The Deconversion Provisions Constitute A Taking
                  and A Deprivation of Property Without Due Process . . . . 18

            b.    Even When Property Owners Can Afford To Deconvert,
                  The Deconversion Provisions Result In A Taking Without
                  Just Compensation  . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

            c.    The Deconversion Provisions Violate The Equal
                  Protection Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

       3.    The Rental Inspection Ordinance Violates The Fourth
           Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

B.    Without Injunctive Relief, The Property Owners and Citizens of The
      City Will Be Denied Their Constitutional Rights – An Irreparable
      Harm for Which There Is No Adequate Remedy at Law . . . . . . . . . . . 26

C.    The Irreparable Harm That Will Be Suffered Absent The Requested
      Relief Outweighs The Irreparable Harm That The City May Suffer If
      Relief Is Granted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

D.    The Public Interest Will Be Served If The Injunctive Relief Is
      Granted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

# TABLE OF AUTHORITIES

**Page**

**Cases**

Abbott Lab. v. Mead Johnson & So., 971 F.2d 6, 11-12 (7th Cir. 1992).................. 12

Agins v. City of Tiburon, 447 U.S. 255, 260 (1980)................................................. 19

Baja Contractors, Inc. v. Chicago, 830 F.2d 667, 675 (7th Cir. 1987),
    cert. denied, 485 U.S. 993 (1988)................................................................ 12

Black v. Village of Park Forest, 20 F. Supp. 2d 1218, 1228-30
    (N.D. Ill. 1998)........................................................................................ 16-17

Bordelon v. Chicago Sch. Reform Bd. Of Tr., No. 98 C 1932, 1998 U.S.
    Dist. Lexis 7287 at *19 (May 8, 1998)........................................................ 26

Camara v. Mun. Court of the City and County of San Francisco, 387 U.S.
    523 (1967)........................................................................................ 13-16, 27

Chapman v. United States, 365 U.S. 610, 616-17 (1961) ..................................... 17, 25

Chicago Bd. of Realtors v. City of Chicago, 819 F.2d 732, 740 (7th Cir. 1987)...... 24

City of Cleburne, Texas v. Cleburne Living Center, Inc., 473 U.S. 432,
    439-40 (1985)............................................................................................. 24

City of Springfield v. Allphin, 74 Ill. 2d 117, 130-31 (1977) ................................... 19

Cosmopolitan Nat'l Bank of Chicago v. City of Chicago, 27 Ill. 2d 578, 584
    (1963)..................................................................................................... 20, 23

Elrod v. Burns, 427 U.S. 347, 373-74 (1976)........................................................ 26

Hanna v. City of Chicago, 331 Ill. App. 3d 295 (Ct. App. Ill. 202) ........................ 19

Hometown Co-Operative Apartments v. City of Hometown, 495 F. Supp. 55
    (N.D. Ill. 1980)...................................................................................... 13-14

In re Adoption of K.L.P., 198 Ill. 2d 448, 466 (2002)............................................ 24

International Kennel Club, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1084
    (7th Cir. 1988)............................................................................................. 12

Jak Prod. Inc. v. Wiza, 986 F.2d 1080, 1084 (7th Cir. 1993)................................... 12

Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1016 (1992) ............... 19

Makula v. Village of Schiller Park, No. 95 C 2400, 1995 WL 755305
    (N.D. Ill. Dec. 14, 1995).............................................................................. 15

McCoy v. City of Knoxville, 41 Ill. App. 2d 378 (Ct. App. Ill. 1963)........................ 20, 23

Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 142 (1978) ........... 18-19

Pennsylvania Coal v. Mahon, 260 U.S. 393, 415 (1922)....................................... 18, 27

Segers v. Indus. Comm'n, 191 Ill. 2d 421 (2000)................................................... 24

Tim Thompson, Inc. v. Vill. Of Hinsdale, 247 Ill. App. 3d 863, 883
    (Ct. App. Ill. 1993)..................................................................................... 21

United States v. Chaidez, 919 F.2d 1193, 1201 (7th Cir. 1990)............................. 17, 25

United States v. General Motors Corp., 323 U.S. 373 (1945)................................ 18

Village of Lake Bluff v. Horne, 24 Ill. App. 2d 343, 352-53 (Ct. App. Ill. 1960)...... 20

Village of Oak Park v. Gordon, 32 Ill. 2d 295, 298 (1965)..................................... 20, 22-23

Western Theological Seminary v. City of Evantson, 325 Ill. 511, 525 (1927)........ 23

**Statutes**

65 ILCS 5/11-13-14.................................................................................................. 21

**Ordinances**

Section 14-1 et seq. Of Municipal Code of Calumet City........................................ passim

Section 14-572 of Municipal Code of Calumet City................................................. 6

Section 14-711 of Municipal Code of Calumet City.............................................. 1, 11

Section 82-325 of Municipal Code of Calumet City.............................................. 4

Section 82-327 of Municipal Code of Calumet City.............................................. 4

Section 82-328 of Municipal Code of Calumet City.............................................. 4

Calumet City Zoning Ordinance........................................................................... 20

**Other**

Op. Ill. Att'y. Gen. No. 94-014 (Oct. 25, 1994), 1994 WL 601863.......................... 19

## INTRODUCTION

Plaintiffs HUSSEIN H. MANN and DEBRA HOUSTON-MANN, owners of property located at 514 Forsythe, Calumet City, Illinois (the "Property Owners"), bring this action against Calumet City, Illinois (the "City") for injunctive and declaratory relief, to redress the deprivation, under the color of law, of rights guaranteed to the Property Owners and the citizens of the City by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 6 and 15 of the Constitution of the State of Illinois. Verified Complaint ("Comp.") at ¶ 1 (attached as Exhibit 1).

More specifically, the Property Owners seek declarations that (i) Section 14-1 of Article I of Chapter 14 of the Municipal Code of Calumet City, Illinois (the "Code"), codified through Ordinance No. 05-52, enacted July 28, 2005, entitled "Point of Sale Inspection Requirement" (the "Point of Sale Inspection Ordinance"), is unconstitutional under the Fourth Amendment to the United States Constitution and Article I, § 6 of the Illinois State Constitution, (ii) portions of the Point of Sale Inspection Ordinance that require sellers of lawfully-owned multi-family residences to "deconvert" them into structures with fewer income-producing rental units (the "Deconversion Provisions") are unconstitutional under the Fifth and Fourteen Amendments to the United States Constitution and Article I, § 15 of the Illinois State Constitution, and (iii) Section 14-711 of Division 2 of Article X of the Code entitled the "Rental Dwelling Inspection Ordinance" is unconstitutional under the Fourth Amendment to the United States Constitution and Article I, § 16 of the Illinois State Constitution.  Comp. at ¶¶ 2-6.

The Property Owners' challenges to the Code can be summarized as follows:

1.      The Point of Sale Inspection Ordinance, which requires inspections of single

family dwellings and multi-family apartment houses whenever a property owner desires to sell his property, is unconstitutional because it (i) contains no warrant provisions, thus forcing sellers to allow warrantless, standardless, and limitless searches of property in order to obtain the transfer stamp necessary to sell or to transfer property, (ii) places no restrictions on the scope of permissible searches, and (iii) does not require tenant or non-owner occupant consent to the searches. Comp. at ¶ 2.

2.    The Deconversion Provisions, which require sellers of lawfully-owned multi-family residences to "deconvert" their legal nonconforming property to structures with fewer income-producing rental units, are unconstitutional because they (i) force property owners to deconvert their legal nonconforming property, resulting in a taking of property without just compensation, (ii) unlawfully prohibit the sale of property when the property owner cannot afford to deconvert his nonconforming property, resulting not only in a taking of the property without just compensation but also a deprivation of property without due process of law, and (iii) violate the Equal Protection Clause of the Fifth Amendment by targeting a specific and limited group of nonconforming property owners (i.e., only those who want to sell their property), thereby effectively and unconstitutionally dividing nonconforming property owners into two separate and unequal classes with no rational basis. Comp. at ¶¶ 3-5.

3.    The Rental Dwelling Inspection Ordinance, which requires the annual inspection of multi-family apartment houses, is unconstitutional because it (i) fails to require the consent of tenants or non-owner occupants prior to an inspection but rather allows the "responsible party authorized to rent a rental dwelling" to consent to the search and (ii) penalizes the "responsible party" if he does not allow warrantless government access to

2

tenant apartments.  Comp. at ¶ 6.

By this Motion, the Property Owners seek immediate injunctive relief to end the irreparable harm which has been and will continue to be inflicted upon the Property Owners and City citizens as a result of the City's enforcement of the Point of Sale Inspection Ordinance, the Deconversion Provisions and the Rental Dwelling Inspection Ordinance. Comp. at ¶ 7.

Below*, Section I summarizes the operative facts.  Section II demonstrates that the Property Owners are entitled to injunctive relief because (A) the Property Owners have a strong likelihood of success on the merits; (B) without injunctive relief, the Property Owners and the citizens of the City will be denied Constitutional rights – an irreparable harm for which there is no adequate remedy at law; (C) the irreparable harm that the Proper Owners and the City's citizens will suffer absent the requested relief outweighs the irreparable harm the City may suffer if relief is granted; and (D) the public interest will be served if the injunctive relief is granted.  Comp. at ¶¶ 44-76.  In this Motion, the Property Owners focus on the claims that arise under the United States Constitution and reserve for later briefing its claims under the Illinois Constitution.

## I.    STATEMENT OF FACTS.

Below, we summarize the key aspects of the (A) Point of Sale Inspection Ordinance and related Code provisions, (B) Deconversion Provisions and (C) Rental Dwelling Inspection Ordinance.  Copies of these Code provisions are attached as Exhibits A (the Point of Sale Inspection Ordinance including the Deconversion Provisions) and B (the Rental Dwelling Inspection Ordinance to the Property Owners' Verified Complaint.

### A.    Point of Sale Inspection Ordinance.

3

To sell property in the City, a seller must obtain a "transfer stamp" from the City. See Code Section 82-325 (transfer stamps, which evidence the payment of a tax due upon transfer of real estate, must be "affixed to the fact [sic] of the deed or instrument transferring the beneficial interest"); Code Section 82-328 ("No deed conveying real property within the corporate limits of the city shall be entitled to recordation by the recorder of deeds or the registrar of titles of the county, unless such deed shall bear either a city real estate transfer tax stamp or an exemption mark from the city clerk"). Comp. at ¶ 18.

The only way for a seller of property in the City to obtain a transfer stamp is to obtain a "certificate of compliance" which, in turn, can only be obtained by allowing the City to conduct a "point of sale inspection" of his property. Comp. at ¶¶ 2, 16. Section 14-1(c) of the Code states:

> Transfer stamps, as required by sections 82-321 et seq. of the Calumet City Municipal Code, shall not be issued by the clerk until a point of sale inspection has been completed and a certificate of compliance...is issued.[1]

See also Code Section 14-1(a) ("point of sale inspection shall be required relative to any transfer of any interest in property, which is subject to this section..."). Comp. at ¶ 14.

To obtain a "certificate of compliance" a seller of property must allow the City to

---

[1]Code Section 82-327(b) contains a similar provision:

> The city clerk shall issue no stamps for the transfer of any dwelling, structure, commercial or industrial building unless the grantor/seller presents a "certificate of compliance" or other certificate indicating compliance with appropriate city ordinances and/or codes signed by an authorized signatory of the department of inspectional services.

4

conduct a search of his property so that the City can verify, among other things, that (i) the structure is in "a good state of repair as to general building maintenance, ...including any nonconforming use structures, and in full compliance with city building and zoning ordinances, including any property maintenance codes adopted by the city," and (ii) [a]ll units, whether single-family and/or multiple-family units...[are] in compliance with all current building codes, housing codes and fire code requirements and regulations." See Code Section 14-1(b)(2)-(3). Comp. at ¶¶ 15, 27.

The Point of Sale Inspection Ordinance does not include a provision whereby a seller of property can require the City to obtain a warrant to conduct the point of sale inspection. To the contrary, a seller of property is coerced to consent to a search of his property without a warrant if he wants to sell it. Comp. at ¶¶ 21-22.

The Point of Sale Inspection Ordinance does not restrict, in any way, the scope of a search conducted pursuant to the ordinance. Comp. at ¶ 23. For instance, the Point of Sale Inspection Ordinance allows the City inspector to search for any violation of the City's codes (regardless of whether the violation is related to the health, safety or welfare of the citizens of the City) and the ordinance does not contain any limitations on where or for how long the inspector may search (e.g., there is no limitation on the inspector searching a citizen's bedroom, closets, desk or other areas where private or personal property may be stored). Id. In sum, the City inspector has unfettered discretion to search where he wants, for as long as he wants and wherever he wants. Id. A seller of property, of course, can do nothing to stop an overly intrusive search because, if he does not allow it, he will not be able to obtain a "certificate of compliance" which is required to obtain a "transfer stamp."

Finally, as noted, point of sale inspections are required for both single family homes

5

and multi-family dwellings. Comp. at ¶ 24. With respect to multi-family dwellings, the Point of Sale Inspection Ordinance does not require prior tenant or non-owner occupant consent to allow an inspection. Indeed, the Code purports to grant the City the right to enter all dwellings without even having to seek consent. See Code Section 14-572 ("For purposes of enforcing the provisions of this chapter, the building commissioner is hereby authorized to enter, examine and survey at all reasonable times all dwelling units"); Comp. at ¶ 24. Once inside, the City has unfettered access to do as it pleases because, as noted above, the Point of Sale Inspection Ordinance contains no limitations on the scope of permissible searches. Comp. at ¶ 24.

## B. Deconversion Provisions.

The Point of Sale Inspection Ordinance also contains Deconversion Provisions which require sellers of legal nonconforming property to "deconvert" their property to fewer units to comply with current zoning codes. Comp. at ¶ 33. If sellers do not deconvert, they are unable to obtain a certificate of compliance necessary to obtain a transfer stamp. See Section I.A., above.

More specifically, to obtain a certificate of compliance, a property owner must prove that "any nonconforming use structures...[are] in full compliance with city building and zoning ordinances." Code Section 14-1-(b)(2); Comp. at ¶ 15. This requirement applies to all legal nonconforming properties, even if a change in zoning laws was enacted after the property was converted to a multi-family dwelling pursuant to a permit issued by the City, and even if the property has been inspected and approved by the City for many years. Comp. at ¶¶ 36-40. Code Section 14-1(b)(7) states:

> Any structure containing one or more residential units not conforming

6

> to its original use, including those approved for occupancy on the
> yearly inspection date and registered with the housing department, that
> contains a nonconforming use shall be returned to the proper use
> compatible with the city zoning code.

Code Section 14-1(b)(8) gives the City discretion to waive compliance with the

Deconversion Provisions but contains no guidelines as to how the City should or will

exercise that discretion. Comp. at ¶¶ 15, 29. Additionally, property sellers have no right

to appeal a decision by the City to enforce the Deconversion Provisions. Comp. at ¶ 29.

Further, despite the discretion to waive the Deconversion Provisions, the City regularly

enforces them. Id.

The Deconversion Provisions, when enforced by the City, result in either (i) a seller

deconverting the property – with a resulting significant loss of value, or (ii) an owner being

prohibited from selling his property because he cannot afford the deconversion. Comp. at

¶¶ 33-34. The Deconversion Provisions, however, do not include a method to compensate

owners of legal nonconforming property in either situation. Comp. at ¶ 33.

The Deconversion Provisions allow the City to require deconversions of legal

nonconforming multi-family residences even if (i) the structure is in excellent condition and

in compliance with all applicable code provisions relating to health and safety or (ii) the City

was aware of and had approved of such properties by issuing building permits and/or

performing annual inspections of the structures for a fee. Comp. at ¶ 25.

The Deconversion Provisions (i) deprive property sellers of justifiably expected rights

under zoning ordinances – rights they enjoyed before they decided to sell their properties,

(ii) frustrate investment-based expectations, (iii) decrease property values through

overburdensome and unconstitutional regulation, and (iv) deprive property owners who

7

cannot afford the deconversion of the fundamental right to sell their property, resulting in nonconsensual continued and mandatory ownership of property. Comp. at ¶¶ 26, 33-35, 44-64.

In their Verified Complaint, the Property Owners have provided examples of how the Deconversion Provisions have recently resulted in the irreparable harm to the Property Owners and other owners of legal nonconforming property in the City. Comp. at ¶¶ 36-40. For ease of reference, we restate those examples here.

The property Owners planned to sell their property located at 514 Forsythe, Calumet City, Illinois, as a legal nonconforming property and had scheduled the real estate closing on October 30, 2006. The property was purchased eight (8) years ago from a Calumet City official. The previous owner owned and operated the property as a multiple-family dwelling. At the time of purchase, the Property Owners were not informed that the property was not legal nonconforming or that it would have to be deconverted.

Although the City had, on prior occasions, confirmed that the property was legal nonconforming, the City refused to issue the certificate of occupancy stating that the buyer could not occupy the property until the property was deconverted. The City warned the buyer of the property that if the buyer closed on the property, the City would eventually demand deconversion of the property. Without the certificate of occupancy, the buyer did not want to close on the property on October 30, 2006. Although the City agreed to issue a certificate of occupancy prior to deconversion later, the buyer refused to go forward with the purchase because of the City's threats regarding deconversion of the property. Also, the buyer could no longer afford to close on the sale as a result of the delay by the City.

As a result of the City's actions, the Property Owners have suffered emotional and

8

financial hardship. The Property Owners had packed all of their belongings and put money down on a new place to live. The Property Owners borrowed money for repairs on their home, that they planned to pay off with the proceeds from the closing. The Property Owners cannot sell their home due to the deconversion ordinance, which they were unaware of when they purchased the property. The failed sale has caused the Property Owners severe financial, mental, physical and emotional stress. Lost costs include wages, the negotiated settlement amount for the property's second mortgage, the cost of work and inspections required for closing and the security deposit for the intended new home. Foreclosure is likely as the Property Owners are behind on their mortgage payments. As a result of the City's conduct, the Property Owners were directly and adversely affected.

To further illustrate the City's unlawful conduct, the Property Owners provide the following examples where the City has unconstitutionally required property owners to deconvert their property before they were allowed to sell:

a.     On information and belief, elderly owners of a four dwelling property located at 107 155th Place in the City sought to sell their property in August of 2005, and retained a realtor to assist them. The owners purchased their property 35 years ago and, with the approval of, and pursuant to a permit issued by, the City converted the building from a two unit building to the current four unit building. The building has been subject to and passed rental inspections every year since the owners purchased it. When the property owners sought to sell the property, the City informed them that they would have to deconvert the building from four units to two units. As a result of the City's conduct, the owners have been unable to either sell the property or make the necessary

9

deconversion, and they have been directly and adversely affected. When the City learned that the owners were unable to afford the deconversions, the City has told the property owners that, in lieu of deconversion, the property owners could sell the property to the City at an amount much lower than the market value of the property as it exists in its legal nonconforming state. Id.

b.     On information and belief, the owner of a seven flat building located at 247 153rd Place in the City was listed for sale. All known records show that the building is legal nonconforming and that all units had passed inspection in preceding years. The City required the seller to deconvert the building to a four flat. The owner could not afford the deconversion and, as a result, the property was transferred to the mortgagee in lieu of foreclosure, without compensation by the City to the owner.

Also, elderly owners of a four dwelling property located at 107 155th Place in the City sought to sell their property in August of 2005 and retained a realtor to act as their agent. The owners purchased their property 35 years ago and, with the approval of, and pursuant to a permit issued by, the City converted the building from a two unit building to the current four unit building. The building has been subject to and passed rental inspections every year since the owners purchased it. When the property owners sought to sell the property, the City informed them that they would have to deconvert the building from four units to two units. As a result of the City's conduct, the owners have been unable to either sell the property or make the necessary deconversion. When the City learned that the owners were unable to afford the deconversions, the City has told the property owners that, in lieu of deconversion, the property owners could sell the property to the City at an amount much

10

lower than the market value of the property as it exists in its legal nonconforming state.  Id.

Further, the owner of a seven flat building located at 247 153rd Place in the City was listed for sale.  All known records show that the building is legal nonconforming and that all units had passed inspection in preceding years.  The City required the seller to deconvert the building to a four flat.  The owner could not afford the deconversion and, as a result, the property was transferred to the mortgagee in lieu of foreclosure, without compensation by the City to the owner.

Every legal nonconforming building in the City is subject to the City's unconstitutional and improper conduct once it is put on sale.  Comp. at ¶ 41.  The Deconversion Provisions, however, have no application to legal nonconforming property owners who do not attempt to sell their property.  Comp. at ¶ 70.  Such owners are entitled to continued use of such legal nonconforming property.

## C.    The Rental Dwelling Inspection Ordinance.

The Code requires annual inspections of rental properties.  The Code does not require the City to obtain the consent of tenants prior to such inspections.  Comp. at ¶ 6. Rather, the Code provides that the consent to search tenant apartments is to be obtained exclusively from "[t]he responsible party authorized to rent a dwelling," i.e., the landlord. Comp. at ¶¶ 20, 42.  Code Section 14-711 states:

> (a)    No owner, agent or person (hereinafter referred to as responsible party) in charge of a one-family, two-family or multiple-family dwelling (hereinafter referred to as rental dwelling), as those terms are defined in the property maintenance code, shall allow any person to occupy the same as a tenant or lessee or for valuable consideration unless said dwelling or structure shall have been inspected and determined to be in compliance with all of the provisions of the property maintenance code as well as all health and building ordinances as evidenced by a certificate of occupancy issued

11

by the building official as of March 1, 1989. Thereafter, all rental properties shall be inspected annually and an updated certificate of occupancy issued.

(b)    The responsible party authorized to rent a rental dwelling shall, upon notice from the building department and agreeable to both parties, allow the building official to inspect said dwelling.

The Code also provides for a monetary penalty if the landlord does not allow the

City to search tenant apartments. See id. at Inspection Fee Schedule, ¶ 4; Comp. at ¶ 43.

## II.    THE PROPERTY OWNERS ARE ENTITLED TO INJUNCTIVE RELIEF.

To obtain a temporary restraining order or preliminary injunction, the Property

Owners must demonstrate each of the following:

A.    The Property Owners have a strong likelihood of success on the merits (for a temporary restraining order, the Property Owners need only demonstrate a "better than negligible chance of succeeding");

B.    Without injunctive relief, the Property Owners and the citizens of the City will suffer irreparable harm for which there is no adequate remedy at law;

C.    The irreparable harm the Property owners and citizens of the City will suffer absent the requested relief will outweigh the irreparable harm the City will suffer if the relief is granted (measured over the length of time that the relief will be in force). The more likely it is that the Property Owners will succeed on the merits, the less the balance of irreparable harms need weigh toward its side. Abbott Lab. v. Mead Johnson & So., 971 F.2d 6, 11-12 (7th Cir. 1992); and

D.    The public interest will be served if injunctive relief is granted (in terms of the consequences to non-parties). Jak Prod. Inc. v. Wiza, 986 F.2d 1080, 1084 (7th Cir. 1993); Abbott Lab. v. Mead Johnson & So., 971 F.2d 6, 11-12 (7th Cir. 1992); International Kennel Club, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1084 (7th Cir. 1988); Baja Contractors, Inc. v. Chicago, 830 F.2d 667, 675 (7th Cir. 1987), cert. denied, 485 U.S. 993 (1988).

The Property Owners can readily satisfy each of these requirements with respect

to each of its challenges to the Code provisions. Comp. at ¶¶ 44-76.

**A.**     **The Property Owners Have A Strong Likelihood of Success on The Merits.**

    **1.**     **The Point of Sale Inspection Ordinance Violates The Fourth Amendment.**

        **a.**     **The Absence of A Warrant Provision Renders T e Point of Sale Inspection Ordinance Unconstitutional.**

The United States Supreme Court has held that municipal ordinances authorizing or requiring administrative searches of private property must comply with the Fourth Amendment. Camara v. Mun. Court of the City and County of San Francisco, 387 U.S. 523 (1967) (addressing an ordinance requiring routine annual inspections of rental property). Particularly relevant here, the Supreme Court has held that, to comply with the Fourth Amendment, such municipal ordinances must contain procedures for the city to obtain a warrant to conduct the administrative search:

> [W]e hold that administrative searches...are significant intrusions upon the interests protected by the Fourth Amendment, [and] that such searches when authorized and conducted without a warrant procedure lack the traditional safeguards which the Fourth Amendment guarantees to the individual...

Id. at 534.

In Hometown Co-Operative Apartments v. City of Hometown, 495 F. Supp. 55 (N.D. Ill. 1980), this Court applied Camara to invalidate and enjoin enforcement of a point of sale inspection ordinance because it did not contain a warrant provision. In Hometown, owners of property sought an injunction against the enforcement of a point of sale inspection ordinance on the grounds that it violated the Fourth Amendment. The ordinance made it unlawful to sell residential property without first obtaining a "Certificate of Housing Inspection." Id. at 56. To obtain such a certificate, the owner of property was required to

13

allow the city to inspect his property "for compliance with...building, housing, property maintenance and zoning codes." Id. The Hometown ordinance did not prohibit the sale of property in the absence of the issuance of a certificate, but did impose fines for failure to obtain one. Id. at 56-57. The ordinance did not contain a procedure for requiring the city to obtain a warrant prior to conducting the inspection.

The property owners in Hometown argued that the inspection ordinance violated their Fourth Amendment rights because the property owners "either must submit their private property to a warrantless search, refrain from selling or leasing their property, or face the threat of criminal penalty." Id. at 57. The Court agreed with the property owners and granted them summary judgment on the following grounds:

> The second issue before the Court involves the conflict between a municipality's power to enforce its municipal codes by requiring an administrative inspection of private property at the point fo sale and the privacy interests of the property owner or occupant. The thrust of plaintiff's argument in support of its motion for summary judgment is that the ordinance is unconstitutional because it authorizes warrantless inspections before sale in violation of the Fourth Amendment to the United State Constitution...[Supreme Court] cases provide that under the fourth amendment warrantless searches presumptively are unreasonable. Beginning with Camara...the Court held that a warrantless search of residential property by a municipal inspector violated the Fourth Amendment... In holding the ordinance unconstitutional, the Court rejected the arguments that the ordinance provided enough protections for occupants without a warrant and that the warrant process could not function effectively in the area of municipal inspections....
>
> These principles have been applied to point of sale inspection ordinances in other municipalities....
>
> [U]nder the principles of Camara, the ordinance is unconstitutional insofar as it fails to provide for a warrant procedure.

Id. at 58-60.

Like the ordinance in Hometown, the Point of Sale Inspection Ordinance does not

14

contain a warrant procedure. Comp. at ¶¶ 2, 21-22. Thus, under the reasoning of Hometown, and Camara, this Court should rule that the Point of Sale Inspection Ordinance violates the Fourth Amendment. At the very least, the Court should conclude now that the Property Owners have a substantial likelihood of success on its argument that the Point of Sale Inspection Ordinance violates the Fourth Amendment. See also Makula v. Village of Schiller Park, No. 95 C 2400, 1995 WL 755305 (N.D. Ill. Dec. 14, 1995) (holding unconstitutional an ordinance that required owners of multi-family buildings to have a license to operate buildings where issuance of the license was contingent on forced consent to an inspection).

      **b.**    **The Point of Sale Inspection Ordinance Is Unconstitutional Because It Places No Restrictions on The Scope of Searches.**

The Point of Sale Inspection Ordinance contains no restrictions or limitations on the scope of permissible searches. Comp. at ¶¶ 2, 23. Instead, the Point of Sale Inspection Ordinance grants the City unrestricted and unfettered access to private residences (e.g., there is no restriction on the government searching any areas of a citizen's home or furniture or fixtures) and the right to search for any violation of applicable codes, regardless of whether the violation is related to the health, safety or welfare of the citizens of the City. Id.

Municipal ordinances allowing for administrative searches of private property that lack restrictions on the scope of permissible searches violate the Fourth Amendment. Camara, 387 U.S. at 532 (holding inspection ordinance unconstitutional in part because "the occupant has no way of knowing whether enforcement of the municipal code involved

15

requires inspection of his premises, no way of knowing the lawful limits of the inspector's power to search, and no way of knowing whether the inspector himself is acting under proper authorization"); Black v. Village of Park Forest, 20 F. Supp. 2d 1218, 1228-30 (N.D. Ill. 1998) (inspection ordinance held unconstitutional because it did not limit the discretion of the searching official and did not inform the citizens of the scope of a permissible search).

Park Forest, which interpreted and applied the portion of Camara quoted in the parenthetical above to a plaintiff's challenge to an inspection ordinance, is very much on point. There, like here, the Ordinance contained no restrictions on the scope of the search. The plaintiffs there were not challenging specific searches conducted, but rather, like here, argued that "the inspection program runs afoul of Camara because it does not contain reasonable legislative and administrative standards and thus both fails to cabin the discretion of searching officials and fails to inform residents of the appropriate extent of the searches." Id. at 1229.

In embracing this argument, the Court stated: "Criteria for the frequency and scope of the inspections are an essential component of the legislative and administrative standards of which Camara speaks....Without such standards...an official conducting a search has no standards to guide his conduct, and a court reviewing the reasonableness of a search cannot determine if the search was property limited." Id. (emphasis added). The Court continued:

> This Court views...Camara as meaning at a minimum that the authorizing legislation, ordinance or regulation must contain a clear indication of the evils sought to be prevented by the inspection program (presumably supported by some legislative findings

16

indicating that the evils in question exist) and some indication of appropriate parameters for the searches.

Id. at 1230. The Court then ruled that the ordinance there was unconstitutional because the Court can find nothing that limits in any way the scope of inspections." Id.

The reasoning of Park Forest plainly applies to the Point of Sale Inspection Ordinance because it too contains no restrictions on the scope of the mandated searches. Without this "essential component" the ordinance violates the Fourth Amendment. Again, at a minimum, the Property Owners have established a very high likelihood of success on this argument.

### c.    The Point of Sale Inspection Ordinance Violates the Fourth Amendment Because It Does Not Require Tenant Consent.

The Point of Sale Inspection Ordinance does not require prior tenant or non-owner occupant consent to search a dwelling. Comp. at ¶ 24. The government's attempts to search tenant dwellings by obtaining landlord consent without also obtaining tenant consent have long been held unconstitutional. Chapman v. United States, 365 U.S. 610, 616-17 (1961) (search of rented property by state police officers, in absence of the tenant's consent and without a warrant, violated the Fourth Amendment); United States v. Chaidez, 919 F.2d 1193, 1201 (7th Cir. 1990) (citing Chapman and holding that "[a] landlord does not have authority to permit a search of his tenant's leasehold, and the same holds for a tenant and his sub-tenant"); Park Forest, 20 F. Supp. 2d at 1221-22 (accord). Thus, the Property Owners have established a high likelihood of success on this claim.

### 2.    The Deconversion Provisions Violate the Fifth and Fourteenth Amendments.

a.    **When Property Owners Cannot Afford Deconversion, The Deconversion Provisions Constitute A Taking and A Deprivation of Property Without Due Process.**

Often, property owners cannot afford to make the deconversions ordered by the City pursuant to the Deconversion Provisions. In their Complaint, the Property Owners provided examples of when this recently occurred. Comp. at ¶ 36-40. In those situations, and in every other situation where an owner cannot afford to deconvert his property, the owner is forced to maintain ownership of his property and is prohibited from selling it. This non-consensual continued and mandatory ownership of property violates the Constitution.

"[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." Pennsylvania Coal v. Mahon, 260 U.S. 393, 415 (1922). The Supreme Court has frequently emphasized that the term "property" as used in the Takings Clause includes the entire 'group of rights inhering in the citizen's [ownership].'" Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 142 (1978) (Renquist, J. dissenting), quoting, United States v. General Motors Corp., 323 U.S. 373 (1945). These groups of rights include the right to "dispose of [property]." Id. at 143, quoting, General Motors Corp., 323 U.S. at 377-78. Moreover, the Supreme Court has held that a government ordinance that "frustrate[s] distinct, investment-backed expectations" can amount to a taking. Penn Central, 438 U.S. at 105.

Here, when sellers cannot afford to deconvert, the Deconversion Provisions deprive property owners of the right to sell their property. Comp. at ¶ 34. The City has eviscerated *all* investment-backed expectations of property owners who legally purchased legal nonconforming property. This is a "taking" of property for which the City provides no

18

compensation. Thus, the Deconversion Provisions violate th Fifth Amendment. Penn Central, 438 U.S. at 149 (Renquist, J. dissenting) ("[T]he inability of the owner to make a reasonable return on his property requires compensation under the Fifth Amendment."); Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1016 (1992) ("As we have said on numerous occasions, the Fifth Amendment is violated when land-use regulation 'does not substantially advance legitimate state interests or denies an owner economically viable use of his land.'") (emphasis original), quoting, Agins v. City of Tiburon, 447 U.S. 255, 260 (1980).

When owners cannot afford to deconvert, the Deconversion Provisions also result in the deprivation of property without due process of law in violation of the Fourteenth Amendment. Hanna v. City of Chicago, 331 Ill. App. 3d 295 (Ct. App. Ill. 202) (sustaining cause of action for the deprivation of property without due process when zoning change eliminated potential use of property); see also Op. Ill. Att'y. Gen. No. 94-014 (Oct. 25, 1994), 1994 WL 601863 ("Municipalities are authorized, under Article 11 of the Municipal Code (65 ILCS 5/11-1-1 et seq.) to adopt a number of ordinances and codes designed to protect public health and safety, and are authorized to enforce such codes by requiring permits, fees, and fines....Further, municipalities may impose various fees for other services relating to real property. In no instances, however, are municipalities authorized to limit the alienability of property in order to enforce such codes.") (emphasis added); City of Springfield v. Allphin, 74 Ill. 2d 117, 130-31 (1977) (Attorney General opinions are not binding; however, "a well-reasoned opinion of the Attorney General is entitled to considerable weight").

19

      **b.**     **Even When Property Owners Can Afford To Deconvert,
The Deconversion Provisions Result In A Taking Without
Just Compensation.**

"The right to continue an established nonconforming use has been recognized...as

a valuable property right." Village of Oak Park v. Gordon, 32 Ill. 2d 295, 298 (1965); see

also Cosmopolitan Nat'l Bank of Chicago v. City of Chicago, 27 Ill. 2d 578, 584 (1963) ("it

is a well-established principle that one who buys land has a right to rely upon the

classification which existed at the time the purchase was made, and upon the rule of law

that the classification will not be changed unless the change is required for the public

good"); McCoy v. City of Knoxville, 41 Ill. App. 2d 378 (Ct. App. Ill. 1963); Village of Lake

Bluff v. Horne, 24 Ill. App. 2d 343, 352-53 (Ct. App. Ill. 1960) ("[t]he right to a

nonconforming use is a property right and a governmental body is not authorized to take

away or limit a person's right to make any use of the property which was lawful at the time

it was acquired, except in such ways as may be necessary for the public health, comfort,

safety or welfare").[2]

---

[2]These cases are consistent with the City's Zoning Ordinance.  The Zoning
Ordinance defines a "nonconforming use" as:

> Any building or structure and the use thereof or the use of land that
> does not conform with the regulations of this ordinance or any
> amendment hereto...but conformed with all of the codes, ordinances,
> and other legal requirements applicable at the time such building or
> structure was erected, enlarged, or altered, and the use thereof or the
> use of land was established.

Zoning Ordinance, § III, 3.2.  Section IV, 4.2 "Scope of regulations" provides that lawful
nonconforming uses existing before the enactment of the Zoning Ordinance may continue:

> Nonconforming buildings, structures, and uses.  Any lawful building,
> structure or use existing at the time of the enactment of the zoning
> ordinance may be continued, even though such building, structure or

The right to continued use or legal nonconforming property includes, among other things, the right to (i) earn rental income and (ii) through sale of the property, recover the value of the property including the benefits of the nonconforming uses. As the above cases make clear, the City cannot deprive property owners of these expectations and rights unless such action is *required* to substantially advance a state interest concerning public health, safety and welfare. Even then, however, the deprivation of the property right must be gradual, not immediate (see 65 ILCS 5/11-13-14), and cannot deny an owner economically viable use of his land. <u>Lucas</u>, 505 U.S. at 1015-16, n.7; <u>Tim Thompson, Inc.</u> <u>v. Vill. Of Hinsdale</u>, 247 Ill. App. 3d 863, 883 (Ct. App. Ill. 1993) ("a municipal zoning authority's police powers should not deprive a property owner of its *actual* use, as opposed to its intended or contemplated use, of the property as it existed at the time of the enactment of the zoning ordinance").

Here, the Deconversion Provisions were not enacted as the result of a comprehensive community land use plan with public input and hearings. Comp. at ¶ 5. There is no evidence whatsoever that the Deconversion Provisions advance any substantial governmental interest related to health, safety or welfare. Indeed, the evidence

---

use does not conform to the provisions herein for the district in which it is located, and whenever a district shall be changed hereafter, the then existing lawful use may be continued, subject to the provisions of Section XIV, nonconforming buildings, structures, and uses.

<u>Id</u>. at § IV. 4.2. The Zoning Ordinance nowhere provides for the elimination of nonconforming uses upon the sale of properties.

is to the contrary. The City indisputably allows owners of legal nonconforming property who do not attempt to sell their property to continue to enjoy use of their property without deconversion. Comp. at ¶¶ 26, 70. Similarly, the City actually forces the continued existence of legal nonconforming property when a seller cannot afford to deconvert. Comp. at ¶¶ 4, 57. Thus, there is no substantial governmental interest served by the Deconversion Provisions.

The most apposite case is Village of Oak Park v. Gordon, 32 Ill. 2d 295 (1965). There, the Illinois Supreme Court held that an ordinance that required a landlord who owned a legal nonconforming property to deconvert his property from four units to two units was unconstitutional. Id. at 297. The ordinance there required owners of legal nonconforming property to deconvert within five years. Id. at 296. The property owner argued that the statute was unconstitutional because "in order to comply with the amortization ordinance he would either have to make expensive alterations to convert the upstairs for use by two roomers or discontinue renting two rooms which would result in a loss of over $1,200 income annually." Id. at 297. The Court held that the ordinance was unconstitutional:

> The record in this case...contains no evidence whatsoever that the public interest would be subserved in any way by requiring defendant to alter his property to accommodate two roomers instead of four. On the other hand, it is undisputed that defendant would suffer a financial loss if he were required to comply with the ordinance. The right to continue an established nonconforming use has been recognized by this court as a valuable property right...and an ordinance which seeks to deprive defendant of that right without any apparent public need therefore, cannot be upheld.

> We conclude that the municipal court of Oak Park correctly found that the Oak Park ordinance here in question was unconstitutional and invalid as applied to defendant's property.

22

Id. at 298.

Gordon does not state whether it held the ordinance unconstitutional under the Fifth Amendment.  However, the rationale of the opinion fully applies to the Property Owners' challenge to the Deconversion Provisions.  Indeed, the Deconversion Provisions are even more egregious because, unlike the ordinance in Gordon which granted nonconforming property owners five years to deconvert, they require immediate deconversion if the owner wants to sell.  Thus, the Court should find that the Deconversion Provisions are unconstitutional.  See also Cosmopolitan Nat'l Bank, 27 Ill. 2d at 585-86 (enjoining the implementation of a regulation because it did not serve a valid public purpose); Western Theological Seminary v. City of Evantson, 325 Ill. 511, 525 (1927) (finding that the destruction of the property owners' right to make use of property which was lawful at the time it was acquired, without demonstrating an appreciable danger to the public health, safety, and welfare, was an arbitrary and unreasonable use of the police power); McCoy, 41 Ill. App. 2d at 383 (finding that "the right to a nonconforming use is a property right and any provision of an ordinance which takes away that right in an unreasonable manner, or in a manner not grounded on the public welfare would be invalid").

As noted in Section 1, Code Section 14-1(b)(8) gives the City discretion to permit a legal nonconforming building to be sold without deconversion, but this provision does not make the Deconversion Provisions constitutional.  Comp. at ¶ 15.  The Code contains no guidelines which govern how the City exercises the discretion under Section 14-1(b)(8).  Comp. at ¶ 29.  The Code also does not provide for appeals if the City elects to not allow the sale of a legal nonconforming building without deconversion.  Id.  Moreover, as explained above and in the examples included in the Property Owners' Complaint, the City

23

regularly requires deconversion instead of allowing the as-is sale of legal nonconforming property.  Comp. at ¶¶ 36-40.

      **c.**    **The Deconversion Provisions Violate The Equal Protection Clause.**

The Fourteenth Amendment guarantees that all citizens are entitled to "equal protection of the laws."  The essential test of equal protection is whether the government deals with similarly situated individuals in a similar manner.  <u>City of Cleburne, Texas v. Cleburne Living Center, Inc.</u>, 473 U.S. 432, 439-40 (1985); <u>In re Adoption of K.L.P.</u>, 198 Ill. 2d 448, 466 (2002).  A classification of similarly situated individuals that implicates economic rather than fundamental rights is entitled to judicial deference, however, it is not entitled to deference when it is patently arbitrary or irrational, <u>i.e.</u>, where there is not a conceivable basis to support the classification.  <u>City of Cleburne</u>, 473 U.S. at 446; <u>Chicago Bd. of Realtors v. City of Chicago</u>, 819 F.2d 732, 740 (7th Cir. 1987); <u>Segers v. Indus. Comm'n</u>, 191 Ill. 2d 421 (2000).  In <u>City of Cleburne</u>, the Supreme Court found that a special permit requirement for a residence for the mentally disabled violated the Equal Protection Clause because other multiple dwelling residences in the City were not required to obtain a special permit.  Although the City stated several reasons justifying the ordinance, including that the ordinance aimed to avoid a concentration of population and to lessen street congestion, the Court found that "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuate as to render the distinction arbitrary or irrational" and that the Ordinance did not rationally relate to a legitimate public interest.  <u>City of Cleburne</u>, 473 U.S. at 446.

The Deconversion Provisions create two separate and unequal classes of

nonconforming property owners: those who attempt to sell their properties and those who do not. Comp. at ¶ 69. This classification is patently arbitrary and irrational. Indeed, the classification perpetuates the existence of nonconforming property – the alleged evil the Deconversion Provisions are supposed to remedy – by forcing property sellers to maintain property when they cannot afford to deconvert the property. Moreover, the City's treatment of nonconforming property owners differs radically based not on public health or safety reasons, but on the fortuity of when someone must, or decides to, sell the property. Comp. at ¶ 70. Such a classification system cannot withstand constitutional scrutiny.

In sum, the Property Owners have established that it has a high likelihood of success on its claims that the Deconversion Provisions violate the Fifth and Fourteenth Amendments.

### 3. The Rental Inspection Ordinance Violates The Fourth Amendment.

The Rental Inspection Ordinance does not require prior tenant or occupant consent to search a dwelling. Comp. at ¶ 74. As discussed above in Section II.A.1.c, the City's grant unto itself the authority to search tenant dwellings with only the landlord's consent plainly violates the Fourth Amendment. Chapman, 365 U.S. at 616-17; Chaidez, 919 F.2d at 1201. Thus, the Property Owners have established a high likelihood of success on the merits of its claim that the Rental Dwelling Inspection Ordinance violates the Fourth Amendment.

**B.      Without Injunctive Relief, The Property Owners and Citizens of The City Will Be Denied Their Constitutional Rights -- An Irreparable Harm for Which There Is No Adequate Remedy at Law.**

The deprivation of a constitutional right is in itself an "irreparable injury" as a matter of law. Elrod v. Burns, 427 U.S. 347, 373-74 (1976); Bordelon v. Chicago Sch. Reform Bd. Of Tr., No. 98 C 1932, 1998 U.S. Dist. Lexis 7287 at *19 (May 8, 1998) ("irreparable harm is presumed to flow from a constitutional violation which is not fully compensable by monetary damages"). Moreover, there is no adequate remedy at law for the deprivation of a constitutional right. Money damages delayed until these claims are fully adjudicated would be wholly inadequate to remedy the immediate and ongoing loss of rights guaranteed under the United States Constitution.

Unless the court grants injunctive relief, the City will continue to deprive the Property Owners and City property owners and tenants of their constitutional rights, an irreparable harm for which there is no adequate remedy at law.  Comp. at ¶¶ 1-6.

**C.      The Irreparable Harm That Will Be Suffered Absent The Requested Relief Outweighs The Irreparable Harm That The City May Suffer If Relief Is Granted.**

As explained above, the Property Owners and City property owners and tenants have suffered and will continue to suffer tremendous immediate and irreparable harm. Such irreparable harm substantially outweighs any harm to the City if immediate relief is granted. Indeed, by not enforcing the Point of Sale Inspection Ordinance, Deconversion Provisions, and Rental Dwelling Inspection Ordinance the City will only be forced to comply with the Constitution. Thus, the balance of harms favors the Property Owners.

**D.      The Public Interest Will Be Served If The Injunctive Relief Is Granted.**

There is a significant public interest in protecting the Property Owners and the City

26

citizens through the rights guaranteed under the Fourth, Fifth and Fourteenth Amendments. First, there is a significant public interest in protecting private property from unreasonable searches. Camara, 387 U.S. at 534. Allowing the City to search property without a valid warrant, to conduct standardless searches of the property, and to do so without prior tenant or occupant consent undermines the public interest. Comp. at ¶¶ 2, 22-24.

Second, although municipalities may regulate property to a certain extent, such regulation must further a public purpose and when it does not substantially further such a purpose, it is in the public interest to compensate the owner for his loss. The Supreme Court has emphasized the importance of this interest, "[w] are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for a change." Pennsylvania Coal, Co. v. Mahon, 260 U.S. 393, 416 (1922). To require the deconversion of property without compensation is an impermissible "short cut" that does not serve the public interest. Further, when a property owner refuses to permit this "short cut," it does not serve the public interest to allow the City to prevent the sale of such property.

Third, there is a strong public interest to require prior tenant or occupant consent to the search of his property. Allowing the City officers to conduct property inspections without such consent undermines the public interest.

For these reasons, the public interest will be served if the requested relief is granted.

27

## CONCLUSION

All factors favor the granting of injunctive relief.  The Property Owners pray that the Court enter a preliminary injunction providing the relief set forth in the accompanying motion.

Dated: _____, 2008

Respectfully submitted,

HUSSEIN  H.  MANN  and  DEBRA HOUSTON-MANN

By: _____

Marcia  B.  Gevers,  Attorney  for Plaintiffs

Marcia B. Gevers
MARCIA B. GEVERS & ASSOCIATES
19710 Governors Highway, Suite 8
Flossmoor, IL 60422
Ph:   (708) 957-2700
Fax:   (708) 957-2720