IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HUSSEIN H. MANN<br>and DEBRA HOUSTON-MANN, | ) ) ) | |
| *Plaintiffs,* | ) ) | Case No. 08 CV 555 |
| v. | ) ) ) | Judge David H. Coar<br>Magistrate Judge Morton Denlow |
| CALUMET CITY, ILLINOIS, | ) ) ) | |
| *Defendant.* | ) ) | |

**MOTION OF MAINSTREET ORGANIZATION**
**OF REALTORS® AND AYANNA WALKER FOR LEAVE TO INTERVENE**

Mainstreet Organization of Realtors® ("Association") and Ayanna Walker

("Walker"), by their attorneys Grippo & Elden LLC, hereby move, pursuant to Rule 24(a)(2)

and/or Rule 24(b)(1)(B) of the Federal Rules of Civil Procedure, for leave to intervene in this

action. In support of its motion, Association and Walker state as follows:

1.      In this action, Plaintiffs purport to challenge the constitutionality of

Defendant Calumet City's ("City") Point of Sale Inspection Ordinance. Plaintiffs have also filed

a motion for preliminary injunction purporting to seek to enjoin enforcement of the ordinance

(which has been stricken by the Court for failure to comply with procedural rules). As explained

further below, the constitutionality of City's Point of Sale Inspection Ordinance has been the

subject of litigation filed by Association and Walker against City, which has been pending before

Judge Shadur for nearly two years. Indeed, Walker is the lead plaintiff in class action litigation

pending before Judge Shadur that addresses the constitutionality of City's Point of Sale

Inspection Ordinance. Association and Walker move to intervene to file a motion to stay this

litigation to protect their interests in the class action litigation pending before Judge Shadur

because it is apparent that Plaintiffs in this action are not capable of adequately representing

146386v3

those interests or the interests of the prospective class (*i.e.*, all property owners in City) in this litigation. In compliance with Rule 24(c), the proposed motion to stay is attached as Exhibit A. *See Hyland v. Harrison*, No. Civ.A. 05-162-JJF, 2006 WL 288247, at *6 (D. Del. Feb. 7, 2006) (granting motion to intervene to permit filing of a motion to stay).

2.      Association is an association of real estate brokers and salespersons licensed by the State of Illinois. Members' professional activities include the listing and sale of private property. Their seller clients own properties in City. Their buyer clients seek to own such properties. Members' livelihoods derive from the commissions they earn listing and selling residential property. Members are bound to follow City's Point of Sale Inspection Ordinance if they want to conduct business in City.

3.      In April 2006, Association (then called the Realtor Association of West/South Suburban Chicagoland) filed suit against City, *Realtor Association of West/South Suburban Chicagoland*, 06 C 2271, seeking a declaration that City's Point of Sale Inspection Ordinance was unconstitutional because it, among other things, unreasonably interfered with the right to freely transfer property. Association's case was assigned to Judge Shadur, who granted Association a preliminary injunction which enjoined enforcement of City's Point of Sale Inspection Ordinance. Ex. B. That preliminary injunction was vacated on appeal because the Seventh Circuit determined that, while Association had Article III standing, it did not have "prudential standing" to challenge the constitutionality of the Point of Sale Inspection Ordinance. *Mainstreet Org. of Realtors v. Calumet City*, 505 F.3d 742, 745, 748 (7th Cir. 2007). In its opinion, the Seventh Circuit stated that the procedurally proper way to challenge City's Point of Sale Inspection Ordinance was for "all the homeowners in Calumet City [to] be joined in a class action, since all will have suffered a possible diminution in the value of their property as a result

2

of the ordinance." *Id.* at 747. Association has filed a Petition for a Writ of Certiorari with the United States Supreme Court challenging the Seventh Circuit's prudential standing ruling. See Ex. C.

4.      Walker is a property owner in City. Prior to the Seventh Circuit's decision in the Association's lawsuit against City, Walker was added as a Plaintiff. After the Seventh Circuit ruled, Walker, following the suggestion of the Seventh Circuit, filed a class action lawsuit against City in November 2007 challenging the constitutionality of City's Point of Sale Inspection Ordinance. *See* Ex. D (*Walker* Complaint, without exhibits). That case, *Walker v. Calumet City*, No. 1:07-cv-6148, is pending before Judge Shadur. In her class action lawsuit, Walker seeks a declaration that City's Point of Sale Inspection Ordinance is facially unconstitutional because it unreasonably interferes with the right to freely transfer property and because it lacks due process.

5.      Since Association first sued City in April 2006, City has amended its Point of Sale Inspection Ordinance three times, twice in 2006 and most recently on January 31, 2008. Despite these multiple amendments, in their complaint in this case Plaintiffs purport to attack the version of the Point of Sale Inspection Ordinance that was in force as of April 2006. Plaintiffs' complaint and motion for preliminary injunction thus address an ordinance that is no longer the law and raise issues (*e.g.*, the lack of a warrant procedure in the ordinance) that City has addressed through amendment to the ordinance.

6.      All issues regarding the constitutionality of the current Point of Sale Inspection Ordinance are currently before Judge Shadur in the *Walker* litigation. In that litigation, Judge Shadur has indicated that he wants to resolve class certification issues before he considers Walker's motion for a preliminary injunction. Importantly, in the *Walker* litigation,

3

City has represented to the Court that it will not enforce its Point of Sale Inspection Ordinance until Judge Shadur rules on Walker's motion for preliminary injunction. Ex. E (excerpt of November 21, 2007 hearing).

7.     By this motion, Association and Walker seek leave to intervene in this action to protect their interests and those of all City property owners. More specifically, Association and Walker seek to stay this litigation because Plaintiffs in this case are not competent to protect Association's and Walker's interests, which could be materially affected by any substantive rulings by the Court. By way of example, Plaintiffs' complaint in this action is fatally flawed because it purports to attack an ordinance that is no longer the law in City. In addition, Association and Walker seek to file a motion to stay this litigation because there is no need for this Court to consider any renewed motion for a preliminary injunction filed by Plaintiffs because (a) not only does the motion address an ordinance that is no longer law, but also (b) City has represented to the Court in the class action litigation pending before Judge Shadur that it will not enforce its actual Point of Sale Inspection Ordinance until Judge Shadur rules on a motion for a preliminary injunction in that case. *Id.*

8.     An applicant for intervention as of right pursuant to Rule 24(a)(2) must establish four elements: (1) the application is timely; (2) the applicant has an interest in the property or transaction which is the subject of the action; (3) disposition of the action may impede or impair the applicant's ability to protect that interest; and (4) no existing party adequately represents the applicant's interest. *Security Ins. Co. of Hartford v. Schipporeit, Inc. et al.*, 69 F.3d 1377, 1380 (7th Cir. 1995). Here, Association and Walker satisfy all elements.

9.     First, Association's and Walker's motion is timely. *NAACP v. New York*, 413 U.S. 345, 365-66 (1973) (timeliness is determined by all the circumstances in a case and is

4

determined by the court in the exercise of its sound discretion); *United States v. South Bend Comm. Sch. Bd.*, 710 F.2d 394, 396 (7th Cir. 1983) (although Rule 24 does not "specify rigid time limits . . . As soon as a prospective intervenor knows or has reason to know that his interests might be adversely affected by the outcome of the litigation he must move promptly to intervene"). On March 12, 2008, during a hearing in the *Walker* litigation, City informed Walker and Judge Shadur that Plaintiffs had filed this suit. That was the first time Walker (or Association) learned of the present action. This motion to intervene was filed nine days later, before this Court has held its first status hearing and before the Court has made any substantive rulings. Accordingly, intervention will not cause undue prejudice or delay and is timely.

        10.    As to the second and third elements, it is plain that Association and Walker have substantial interest in the matters raised by this litigation, including any determination of whether City's Point of Sale Inspection Ordinance is constitutional. Association and/or Walker have been litigating the issues raised by Plaintiffs' complaint for the last two years. Association successfully argued before Judge Shadur that it had a "high likelihood of success" on its claims that the Point of Sale Inspection Ordinance is unconstitutional and obtained an injunction against the then in force version of the ordinance. Ex. B. A determination by this Court on that constitutional question will undoubtedly impact the rights of Association, Walker and thousands of City property owners. As a practical matter, resolution of this action could potentially impair or impede Association's and Walker's rights unless they are permitted to intervene. Intervention will also promote the efficient and consistent determination of whether City's Point of Sale Inspection Ordinance is unconstitutional. Judge Shadur is intimately familiar with the issues regarding the ordinance and will promptly rule on Walker's motion for a preliminary injunction once class certification is finalized. Denial of

146386v3

intervention, on the other hand, will result in inefficiency (two judges considering the same issues at the same time) with possibly conflicting results. *Schipporeit,* 69 F.3d at 1381-1382 (affirming intervention as of right because intervention enabled court to address important issues at once, with fairness and finality).

           11.     The Seventh Circuit's ruling that Association lacks "prudential standing" to challenge the constitutionality of the ordinance does not have any bearing on whether Association ought to be allowed to intervene in this case because the Seventh Circuit concluded that Association does have Article III standing to challenge City's Point of Sale Inspection Ordinance. *Calumet City*, 505 F.3d at 745. At most, that is all that is needed. *See also Korczak v. Sedeman*, 427 F.3d 419, 422 (7th Cir. 2005) (the predominant rule is that an intervenor need not otherwise have independent standing to file a motion to intervene).

           12.     As to the fourth factor, it is apparent that Plaintiffs in this action are not capable of adequately representing the interests of Association, Walker and property owners in City. Plaintiffs' failure to even address the *current* Point of Sale Inspection Ordinance or to follow procedural rules in filing their motion for a preliminary injunction demonstrate their inability to competently represent the interests of Association, Walker and other City property owners.

           13.     Similarly, intervention is appropriate under Rule 24(b)(1)(B) because Walker and Association have claims that share with this action common questions of fact and law. *Schipporeit*, 69 F.3d at 1381.

           14.     Finally, it is appropriate to allow intervention to allow an applicant to file a motion to stay. *Hyland*, 2006 WL 288247 at *6 (granting motion to intervene for purposes of filing motion to stay); *Petrik v. Reliant Pharm., Inc.*, No. 8:07-cv-1462-T-24, 2007 WL 3283170

6

at * 2 (M.D. Fla. Nov. 5, 2007) (granting motion to intervene to allow intervenor to seek a stay of litigation).

        15.    For the reasons set forth above, Association requests that the Court grant it leave to intervene and grant it leave to file the motion to stay attached as Exhibit A.

        WHEREFORE, Association and Walker respectfully request that the Court grant them leave to intervene.

DATED:  March 21, 2008

Respectfully submitted,

**MAINSTREET ORGANIZATION OF REALTORS® and AYANNA WALKER**

By:/s/ Patrick T. Nash_____
           One of Their Attorneys

Philip C. Stahl
Patrick T. Nash
Maggie M. Hanel
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, IL 60606
Phone: (312) 704-7700
Fax: (312) 558-1195

7

146386v3

## CERTIFICATE OF SERVICE

I, Patrick T. Nash, certify that on this 21st day of March, 2008, I served the

foregoing **MOTION OF MAINSTREET ORGANIZATION OF REALTORS® AND**

**AYANNA WALKER FOR LEAVE TO INTERVENE and APPENDIX OF**

**UNPUBLISHED AUTHORITIES IN MOTION OF MAINSTREET ORGANIZATION OF**

**REALTORS® AND AYANNA WALKER FOR LEAVE TO INTERVENE,** to the following

by Electronic Mail Transmission via the ECF System upon:

> Mark H. Sterk
> ODELSON & STERK, LTD.
> 3318 West 95th Street
> Evergreen Park, IL  60805
>
> John B. Murphey
> ROSENTHAL, MURPHEY & COBLENTZ
> 30 North LaSalle Street
> Suite 1624
> Chicago, IL  60602
>
> Marsha B. Gevers
> MARCIA B. GEVERS & ASSOCIATES
> 19710 Governors Highway, Suite 8
> Flossmoor, IL  60422

> /s/ Patrick T. Nash
> Patrick T. Nash

146386v3

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HUSSEIN H. MANN and DEBRA HOUSTON-MANN, | ) ) ) | |
| *Plaintiffs,* | ) ) | Case No. 08 CV 555 |
| v. | ) ) ) | Judge David H. Coar Magistrate Judge Morton Denlow |
| CALUMET CITY, ILLINOIS, | ) ) | |
| *Defendant.* | ) ) | |

## MOTION OF INTERVENORS MAINSTREET ORGANIZATION OF REALTORS® AND AYANNA WALKER TO STAY

Intervenors, Mainstreet Organization of Realtors® ("Association") and Ayanna Walker ("Walker"), by their attorneys Grippo & Elden LLC, hereby move the Court to stay the proceedings in this matter pending Judge Shadur's ruling in *Walker v. Calumet City, Illinois,* No. 1:07-cv-6148 on whether to preliminarily enjoin City's Point of Sale Inspection Ordinance. In support of its motion, Association and Walker state as follows:

1.      In this action, Plaintiffs purport to challenge the constitutionality of Defendant Calumet City's ("City") Point of Sale Inspection Ordinance. Plaintiffs have also filed a motion for preliminary injunction purporting to seek to enjoin enforcement of the ordinance (which has been stricken by the Court for failure to comply with procedural rules). As explained further below, the constitutionality of City's Point of Sale Inspection Ordinance has been the subject of litigation filed by Association and Walker against City, which has been pending before Judge Shadur for nearly two years. Indeed, Walker is the lead plaintiff in class action litigation pending before Judge Shadur that addresses the constitutionality of City's Point of Sale Inspection Ordinance. In that class action litigation, Judge Shadur will soon rule on whether to preliminarily enjoin City's Point of Sale Inspection Ordinance.

146540v2

2.      Association is an association of real estate brokers and salespersons licensed by the State of Illinois. Members' professional activities include the listing and sale of private property. Their seller clients own properties in City. Their buyer clients seek to own such properties. Members' livelihoods derive from the commissions they earn listing and selling residential property. Members are bound to follow City's Point of Sale Inspection Ordinance if they want to conduct business in City.

3.      In April 2006, Association (then called the Realtor Association of West/South Suburban Chicagoland) filed suit against City, *Realtor Association of West/South Suburban Chicagoland*, 06 C 2271, seeking a declaration that City's Point of Sale Inspection Ordinance was unconstitutional because it, among other things, unreasonably interfered with the right to freely transfer property. Association's case was assigned to Judge Shadur, who granted Association a preliminary injunction which enjoined enforcement of City's Point of Sale Inspection Ordinance. Ex. B to Motion to Intervene. That preliminary injunction was vacated on appeal because the Seventh Circuit determined that, while Association had Article III standing, it did not have "prudential standing" to challenge the constitutionality of the Point of Sale Inspection Ordinance. *Mainstreet Org. of Realtors v. Calumet City*, 505 F.3d 742, 748 (7th Cir. 2007). In its opinion, the Seventh Circuit stated that the procedurally proper way to challenge City's Point of Sale Inspection Ordinance was for "all the homeowners in Calumet City [to] be joined in a class action, since all will have suffered a possible diminution in the value of their property as a result of the ordinance." *Id.* at 747.

4.      Walker is a property owner in City. Prior to the Seventh Circuit's decision in the Association's lawsuit against City, Walker was added as a Plaintiff. After the Seventh Circuit ruled, Walker, following the suggestion of the Seventh Circuit, filed a new class action lawsuit against City challenging the constitutionality of City's Point of Sale Inspection

2

Ordinance. *See* Ex. D to Motion to Intervene. That case, *Walker v. Calumet City*, No. 1:07-cv-6148, is pending before Judge Shadur. In her class action lawsuit, Walker seeks a declaration that City's Point of Sale Inspection Ordinance is facially unconstitutional because it unreasonably interferes with the right to freely transfer property and because it lacks due process.

    5.  Since Association first sued City in April 2006, City has amended its Point of Sale Inspection Ordinance three times, twice in 2006 and most recently on January 31, 2008. Despite these multiple amendments, in their complaint in this case Plaintiffs purport to attack the version of the Point of Sale Inspection Ordinance that was in force as of April 2006. Plaintiffs' complaint and motion for preliminary injunction thus address an ordinance that is no longer the law and raise issues (*e.g.*, the lack of a warrant procedure in the ordinance) that City has addressed through amendment to the ordinance.

    6.  All issues regarding the constitutionality of the current Point of Sale Inspection Ordinance are currently before Judge Shadur in the *Walker* litigation. In that litigation, Judge Shadur has indicated that he wants to resolve class certification issues before he considers Walker's motion for a preliminary injunction. However, Association and Walker expect Judge Shadur to decide in the very near future whether to preliminarily enjoin the Point of Sale Inspection Ordinance. Judge Shadur is intimately familiar with the legal challenges to the ordinance and has already granted injunctive relief once.

    7.  By this motion, Association and Walker seek to stay this action to avoid concurrent litigation in more than one federal forum. As a matter of judicial economy, the *Walker* litigation should be resolved first. Walker not only filed her claim several months before Plaintiffs but her class action litigation is pending before Judge Shadur, who is intimately familiar with the issues because he has been presiding over related litigation for approximately two years. A district court has broad discretion to stay litigation "for reasons of wise judicial

3

administration ... whenever it is duplicative of a parallel action already pending in another

federal court." *Serlin v. Arthur Andersen & Co.,* 3 F.3d 221, 223 (7th Cir. 1993) (citations

omitted); *Landis et al. v. North Am. Co.,* 299 U.S. 248, 254 (1936) (affirming stay of proceedings

challenging the constitutionality of a statute in certain district courts pending resolution of the

issue in another district court; stating: "the power to stay proceedings is incidental to the power

inherent in every court to control the disposition of the causes on its docket with economy of

time and effort for itself, for counsel, and for litigants"); *Texas Indep. Prod. & Royalty Owners

Ass'n., et al.,* 410 F.3d 964, 980 (7th Cir. 2005); *Trippe Mfg. Co. v. Am. Power Conversion

Corp.,* 46 F.3d 624, 629 (7th Cir. 1995) ("Federal district courts have the inherent power to

administer their dockets so as to conserve scarce judicial resources," and therefore have "'an

ample degree of discretion' in deferring to another federal proceeding involving the same parties

and issues to avoid duplicative litigation") (internal citations omitted).

        8.      As between federal district courts, the general principle is to avoid

duplicative litigation. *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.,* 342 U.S. 180, 183 (1952)

(permitting a district court to stay a declaratory judgment action in the District of Delaware in

favor of underlying patent infringement action in the Northern District of Illinois to avoid

duplicative litigation); *Missouri v. Prudential Health Care Plan, Inc.,* 259 F.3d 949, 953-54 (8th

Cir. 2001); *Serlin,* 3 F.3d at 223. When two duplicative actions are filed, preference is given to

the court in which the related claim was first filed. *Schwarz v. Nat'l Van Lines, Inc.,* 317 F.

Supp. 2d 829, 833 (N.D. Ill. 2004).

        9.      Generally a suit is duplicative of another "if the claims, parties and

available relief do not significantly differ between the two actions." *Serlin,* 3 F.3d at 223

(internal citation omitted). A court may stay an action in deference to an earlier suit even if the

parties and issues are not identical. *Landis,* 299 U.S. at 254; *Radio Corp. of Am. v. General Elec.*

4

*Co.*, 217 F.2d 218, 220 (7th Cir. 1955) ("The power to order that proceedings be stayed to abide proceedings in another court is not limited to situations were the parties to the two causes are the same and issues identical").

        10.    When determining whether to enter a stay, the court may consider the prejudice to non-moving parties. *Landis*, at 299. In this action, there will be no prejudice to either Plaintiffs or City if this action is stayed. City has represented to the Court in the *Walker* class action litigation pending before Judge Shadur, that it will not enforce its Point of Sale Inspection Ordinance until Judge Shadur rules on a motion for a preliminary injunction in that case. Ex. E to Motion to Intervene. As such, Plaintiffs' interests will not be prejudiced by a stay because City will not enforce its ordinance against them until Judge Shadur rules. City also will not be prejudiced by a stay because it will only be required to defend its ordinance in one forum instead of two. In addition, even if there was some minimal prejudice – which there is not – the stay requested by Association and Walker is quite short in duration – only until Judge Shadur decides whether to preliminarily enjoin the ordinance, an issue Association and Walker expect he will decide in the very near future. In contrast, denying the stay could potentially seriously harm Association, Walker and City property owners because Plaintiffs in this case are not competent to protect the interests of City property owners (*e.g.,* they are not even attacking an ordinance that is in force in City), which could be materially affected by any substantive rulings by this Court.

        11.    In sum, this Court should exercise its discretion to stay this action until Judge Shadur decides whether to preliminarily enjoin City's Point of Sale Inspection Ordinance. This action and *Walker* are duplicative. Association and/or Walker have been litigating the issues raised by Plaintiffs' complaint against City for the last two years before Judge Shadur. A stay will promote the efficient and consistent determination of whether City's Point of Sale

146540v2

Inspection Ordinance is unconstitutional. Judge Shadur is intimately familiar with the issues regarding the ordinance and will promptly rule on whether to preliminarily enjoin the ordinance once class certification is finalized. Denial of a stay, on the other hand, will result in inefficiency (two judges considering the same issues at the same time) with possibly conflicting results. Finally, no prejudice will result from the stay.

WHEREFORE, for the reasons discussed above, Association and Walker respectfully request that the Court stay this action until Judge Shadur rules on whether to preliminarily enjoin City's Point of Sale Inspection Ordinance in *Walker v. Calumet City, Illinois*, No. 1:07-cv-6148.

DATED: March __, 2008

Respectfully submitted,

**MAINSTREET ORGANIZATION OF REALTORS® and AYANNA WALKER**

By:_____
           One of Their Attorneys

Philip C. Stahl
Patrick T. Nash
Maggie M. Hanel
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, IL 60606
Phone: (312) 704-7700
Fax: (312) 558-1195

146540v2

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

REALTOR® ASSOCIATION OF WEST/ )
SOUTH SUBURBAN )
CHICAGOLAND, )            Case No. 06 C 2271
            *Plaintiff,* )
 )
    v. )
 )            Judge Milton I. Shadur
CALUMET CITY, ILLINOIS, )
 )
            *Defendant.* )
 )

## ORDER GRANTING PRELIMINARY INJUNCTION

This matter has come on to be heard on the motion of plaintiff ("Association") for a preliminary injunction, with due notice having been given and this Court being fully advised in the premises. For the reasons set forth on the record at the hearing of this matter on August 2, 2006 and at other hearings, and based on the written submissions of the parties, this Court finds that as to Association's claims that the Deconversion Provisions and the Amended Point of Sale Inspection Ordinance (as defined below) are facially unconstitutional:

1.    Association has established associational standing.

2.    Association has established a high likelihood of success on the merits.

3.    There is no adequate remedy at law, and Association and its Members will suffer irreparable harm if injunctive relief is not granted.

4.    Such irreparable harm that Association and its Members will suffer if injunctive relief is wrongfully denied substantially outweighs any irreparable harm that defendant Calumet City ("City") will suffer if injunctive relief is wrongfully granted.

5.    Granting injunctive relief will not disserve the public interest – indeed, will serve the public interest – in terms of the consequences to non-parties.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.    City and its agents, employees, officers, successors and members (collectively included within "City," though treated for convenience as a singular noun in this Order), is prohibited and enjoined from enforcing (a) Section 14-1 of Chapter 14, Article I of the Calumet City Code, as amended by Ordinance No. 06-68 (the "Amended Point of Sale Inspection Ordinance"), including but not limited to any provisions of the Amended Point of Sale Inspection Ordinance that require sellers of legal nonconforming property to "deconvert" them into structures with fewer income-producing rental units (the "Deconversion Provisions"), and (b) Section 327(b) of Chapter 82, Article X of the Calumet City Code ("Section 327(b)"). This Order shall not prohibit City from attempting to collect unpaid water bills by lawful means other than pursuant to Section 327(b).

2.    City is prohibited and enjoined from (a) conducting inspections pursuant to the Amended Point of Sale Inspection Ordinance; (b) prohibiting the sale of property and refusing to issue transfer stamps in the absence of a point of sale inspection and/or issuance of a "certificate of compliance" or "conditional certificate of compliance;" and (c) ordering the deconversion of legal nonconforming property. City shall allow the sale or transfer of property without requiring point of sale inspections or deconversions of legal nonconforming property.

3.    This order shall remain in effect until the trial on the merits, unless modified by this Court.

4.    Because no costs or damages will be incurred or suffered by City if the requested injunction is issued, this Court deems it proper that, pursuant to Fed. R. Civ. P. 65(c), no security need be given by Association.

2

5.    This Court's August 8, 2006 Order Granting Preliminary Injunction as to an earlier version of the now-Amended Point of Sale Ordinance is now moot, and the injunction granted thereby is dissolved.

Dated:        December 8, 2006            ENTERED:

_Judge Milton I. Shadur_

3

# EXHIBIT C

No. _____

---

𝔍𝔫 𝔗𝔥𝔢

## 𝕾𝖚𝖕𝖗𝖊𝖒𝖊 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝖙𝖍𝖊 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘

———————◆———————

MAINSTREET ORGANIZATION OF REALTORS®,
successor by name change to REALTOR® ASSOCIATION
OF WEST/SOUTH SUBURBAN CHICAGOLAND,

*Petitioner,*

v.

CALUMET CITY, ILLINOIS,

*Respondent.*

———————◆———————

**On Petition For A Writ Of Certiorari
To The United States Court Of Appeals
For The Seventh Circuit**

———————◆———————

**PETITION FOR A WRIT OF CERTIORARI**

———————◆———————

PHILIP C. STAHL, ESQ.
*Counsel of Record*
PATRICK T. NASH, ESQ.
DONALD P. BUNNIN, ESQ.
MAGGIE M. HANEL, ESQ.
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, Illinois 60606
(312) 704-7700 Telephone
(312) 558-1195 Facsimile

*Attorneys for Petitioner
MainStreet Organization
of Realtors®*

i

# QUESTIONS PRESENTED

1.   Does due process require a Court of Appeals to give an appellee the opportunity to brief whether it has "prudential standing" prior to deciding that issue adversely to it where (a) the appellant chose not to raise prudential standing on appeal, (b) without prior notice, the Court of Appeals raised the issue *sua sponte* during oral argument, (c) appellee, by motion immediately thereafter, asked the Court of Appeals to allow it to file a supplemental brief, and (d) two prior decisions of the Court of Appeals held that a court could not raise prudential standing *sua sponte*?

2.   If an appellant chooses not to raise prudential standing on appeal, after the issue had been considered and decided by the district court, may a Court of Appeals consider prudential standing *sua sponte*?

3.   Does an association of real estate brokers, whose members enter into exclusive right to sell contracts with their clients, satisfy the associational standing requirements of *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977) and the prudential standing requirements of *Singleton v. Wulff*, 428 U.S. 106 (1976) so that the association may prosecute a case to protect the brokers' home-selling clients' constitutional rights to sell their home?

ii

## PARTIES TO THE PROCEEDING

**Petitioner (plaintiff and appellee below):**

MAINSTREET ORGANIZATION OF REALTORS®, successor by name change to REALTOR® ASSOCIATION OF WEST/SOUTH SUBURBAN CHICAGOLAND

> Represented by Philip C. Stahl, Esq., Patrick T. Nash, Esq., Donald P. Bunnin, Esq., and Maggie M. Hanel, Esq., GRIPPO & ELDEN LLC, 111 South Wacker Drive, Chicago, Illinois 60606

**Respondent (defendant and appellant below):**

CALUMET CITY, ILLINOIS

> Represented by Mark H. Sterk, Esq., ODELSON & STERK, LTD., 3318 West 95th Street, Evergreen Park, Illinois 60805

> and

> John B. Murphey, Esq., ROSENTHAL, MURPHEY & COBLENTZ, 30 North LaSalle Street, Suite 1624, Chicago, Illinois 60602

iii

## SUPREME COURT RULE 29.6
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Supreme Court Rule 29.6, Petitioner MainStreet Organization of REALTORS® states that there are no parent corporations or publicly-held companies owning 10% or more of its stock.

iv

## TABLE OF CONTENTS

Page

QUESTIONS PRESENTED .................................. i

PARTIES TO THE PROCEEDING ....................... ii

SUPREME COURT RULE 29.6 CORPORATE
    DISCLOSURE STATEMENT............................. iii

TABLE OF CONTENTS......................................... iv

TABLE OF AUTHORITIES .................................. vii

CITATIONS FOR OPINIONS BELOW ................. 1

BASIS FOR JURISDICTION IN THIS COURT.... 1

CONSTITUTIONAL AND STATUTORY PROVI-
    SIONS AT ISSUE.............................................. 1

STATEMENT OF THE CASE................................ 3

REASONS FOR GRANTING THE PETITION..... 10

I.   The Seventh Circuit Violated Association's
     Due Process Rights By Deciding Prudential
     Standing Issues Adversely To Association
     After Raising The Issues *Sua Sponte* And
     Without Allowing Association An Opportu-
     nity To Brief The Issues................................ 10

II.  There Are Express Conflicts In The Cir-
     cuits On Whether A Court Of Appeals May
     Raise Prudential Standing *Sua Sponte* Af-
     ter An Appellant Waives Or Concedes The
     Issue On Appeal ........................................... 17

v

TABLE OF CONTENTS – Continued

Page

III.  The Seventh Circuit's Decision Conflicts
     With This Court's Decisions In *Hunt* And
     *Singleton*; Association Has Met The Re-
     quirements Of Associational And Pruden-
     tial Standing .................................................  22

     A.  Closeness of Relationship.......................  25

     B.  Existence of Obstacles............................  28

CONCLUSION .......................................................  31

APPENDIX

Opinion of the Seventh Circuit Court of Ap-
  peals, dated October 17, 2007 (*MainStreet
  Organization of REALTORS® v. Calumet
  City, Illinois*, 505 F.3d 742 (7th Cir. 2007)).....App. 1

Judgment of Seventh Circuit Court of Appeals,
  dated October 17, 2007 ...................................App. 27

Notice of Issuance of Mandate of Seventh
  Circuit Court of Appeals, dated November
  21, 2007 ..........................................................App. 29

Order of the Seventh Circuit Court of Appeals
  denying motion for leave to inform the court
  of material developments in the district court
  and to file supplemental brief, dated October
  18, 2007 ...........................................................App. 31

Order Granting Preliminary Injunction of the
  U.S. District Court for the Northern District
  of Illinois, dated December 8, 2006 ...............App. 33

vi

TABLE OF CONTENTS – Continued

Page

Order of the Seventh Circuit Court of Appeals
    denying petition for rehearing and petition
    for rehearing *en banc*, dated November 13,
    2007 ..................................................................App. 36

Calumet City, Illinois Point of Sale Inspection
    Ordinance, No. 06-68 ......................................App. 38

vii

## TABLE OF AUTHORITIES

Page

### CASES

*Acosta v. Artuz*, 221 F.3d 117 (2d Cir. 2000) .............. 11

*Allen v. Wright*, 468 U.S. 737 (1984) .......................... 21

*Animal Legal Defense Fund, Inc. v. Espy*, 29 F.3d 720 (D.C. Cir. 1994) ......................................... 18

*Arizona v. California*, 530 U.S. 392 (2000) ................ 20

*Barrows v. Jackson*, 346 U.S. 249 (1953) .................. 20

*Bender v. Williamsport Area School Dist.*, 475 U.S. 534 (1986) ................................................. 17, 19

*Burns v. United States*, 501 U.S. 129 (1991) ....... 10, 15

*Caplin & Drysdale v. United States*, 491 U.S. 617 (1989) ........................................................ 27, 29

*Community First Bank v. National Credit Union Admin.*, 41 F.3d 1050 (6th Cir. 1994) .......... 18

*Council of Ins. Agents & Brokers v. Juarbe-Jimenez*, 363 F. Supp. 2d 47 (D.P.R. 2005), *aff'd*, 443 F.3d 103 (1st Cir. 2006) .......................... 28

*Craig v. Boren*, 429 U.S. 190 (1976) ............... 17, 27, 29

*Day v. McDonough*, 547 U.S. 198 (2006) ......... 4, 10, 11

*Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977) ........................ *passim*

*International Union, United Auto., Aerospace and Agr. Implement Workers of America v. Brock*, 477 U.S. 274 (1986) ...................................... 30

*Lewis v. New York*, 547 F.2d 4 (2d Cir. 1976) ............. 12

viii

## TABLE OF AUTHORITIES – Continued

Page

*Lindley v. Sullivan*, 889 F.2d 124 (7th Cir. 1989) ........................................................18

*Lugo v. Keane*, 15 F.3d 29 (2d Cir. 1994) .............11, 12

*MacLauchlan v. Prudential Ins. Co. of America*, 970 F.2d 357 (7th Cir. 1992) ................................3, 17

*Mathews v. Eldridge*, 424 U.S. 319 (1976).................10

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950)...................................................15

*Neitzke v. Williams,* 490 U.S. 319 (1989)...................13

*Pennsylvania Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278 (3d Cir. 2002), *cert. denied*, 537 U.S. 881 (2002).......7, 23, 25

*Perez v. Ortiz*, 849 F.2d 793 (2d Cir. 1988).................12

*Pershing Park Villas Homeowners Ass'n v. United Pac. Ins. Co.*, 219 F.3d 895 (9th Cir. 2000) .........................................................................18

*Powers v. Ohio,* 499 U.S. 400 (1991) ...........................28

*Singleton v. Wulff*, 428 U.S. 106 (1976) .............*passim*

*Snider v. Melindez*, 199 F.3d 108 (2d Cir. 1999) ..............................................................11, 12, 16

*Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 760 F.2d 1347 (2d Cir. 1985).............12

*Thompson v. County of Franklin*, 15 F.3d 245 (2d Cir. 1994)...........................................................18

ix

## TABLE OF AUTHORITIES – Continued

Page

*United Food & Commercial Workers Union
Local 751 v. Brown Group, Inc.*, 517 U.S. 544
(1996).........................................................................21

*United States v. Burke*, 504 U.S. 229 (1992) .............20

*United States v. Raines*, 362 U.S. 17 (1960).............20

*United Transp. Union-Illinois Legislative Bd. v.
Surface Transp. Bd.*, 183 F.3d 606 (7th Cir.
1999) ..................................................................3, 17

*Warth v. Seldin*, 422 U.S. 490 (1975)...................16, 19

STATUTES

225 Ill. Comp. Stat. 454/5-15 (2008) ...........................25

225 Ill. Comp. Stat. 454/15-15(a)(5) (2008) ...............25

28 U.S.C. § 1254(1) ......................................................1

42 U.S.C. § 1983 ...........................................................1

U.S. Const. amend. V ...................................................2

U.S. Const. amend. XIV, § 1.........................................2

1

## CITATIONS FOR OPINIONS BELOW

The opinion of the Seventh Circuit Court of Appeals (Appendix ("App.") 1-26) is reported at 505 F.3d 742. The order of the District Court granting a preliminary injunction (App. 33-35), the order of the Seventh Circuit denying Petitioner MainStreet Organization of REALTORS®' ("Association") petition for rehearing *en banc* (App. 36-37), and the order of the Seventh Circuit denying Association's motion to file a supplemental brief (App. 31-32) are unreported.

————————◆————————

## BASIS FOR JURISDICTION IN THIS COURT

The Seventh Circuit's judgment was entered on October 17, 2007. (App. 27-28) The Seventh Circuit denied Association's petition for rehearing *en banc* on November 13, 2007. (App. 36-37) 28 U.S.C. § 1254(1) confers jurisdiction on this Court to review on writ of certiorari the opinion of the Seventh Circuit.

————————◆————————

## CONSTITUTIONAL AND STATUTORY PROVISIONS AT ISSUE

Association brought the underlying action pursuant to 42 U.S.C. § 1983, which states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or

2

other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

Association alleges that a Point of Sale Inspection Ordinance adopted by Respondent Calumet City, Illinois ("City") (App. 38-54) is facially unconstitutional because it, among other things, deprives property owners of the right to freely alienate their property without due process of law. In making such arguments, Association invokes the Fifth and Fourteenth Amendments to the United States Constitution which state, in relevant part:

> **Fifth Amendment**: No person . . . shall be . . . deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

> **Fourteenth Amendment**: No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the

3

United States; nor shall any State deprive any person of life, liberty, or property, without due process of law.

———————◆———————

## STATEMENT OF THE CASE

## SUMMARY OF ISSUES

On two occasions before oral argument in this case, the Seventh Circuit ruled that a court of appeals may not raise the issue of whether a plaintiff has "prudential standing" *sua sponte. See MacLauchlan v. Prudential Ins. Co. of America*, 970 F.2d 357, 359 n.1 (7th Cir. 1992); *United Transp. Union-Illinois Legislative Bd. v. Surface Transp. Bd.*, 183 F.3d 606, 611 (7th Cir. 1999). In this case, City challenged Association's standing in the District Court. The District Court ordered the parties to address standing and decided to allow Association's case to proceed. After extended proceedings, the District Court granted Association's motion for a preliminary injunction. City appealed from the entry of the preliminary injunction, but did not argue that Association lacked prudential standing in its opening appellate brief. As a result of City's concession and in light of the cases cited above, Association did not brief prudential standing. During oral argument, however, the Seventh Circuit raised prudential standing *sua sponte* and then decided the issue against Association without permitting Association to brief the issue (despite repeated requests by Association).

4

The first issue presented by this petition is whether the conduct of the Seventh Circuit complies with due process. Association submits that the answer to that question is plainly no. As the Court has previously recognized, although a court in some instances may raise issues *sua sponte*, before a court can act on its own initiative, it must accord the parties fair notice and an opportunity to present their positions. *See, e.g., Day v. McDonough*, 547 U.S. 198, 210 (2006).

The second issue presented by this petition is the threshold issue of whether a Court of Appeals should be permitted to raise prudential standing *sua sponte* if an appellant fails to raise, or expressly concedes, it on appeal. There is a split of authority amongst the Circuits on this issue. Prior to this case, the Seventh Circuit held that prudential standing objections, if not appealed, were waived and consideration of prudential standing *sua sponte* was impermissible. The Ninth Circuit similarly held that a failure to raise prudential standing in the district court bars consideration at the appellate level. The Second, Sixth, and D.C. Circuits have taken contrary positions. The disagreement between the Circuits has given rise to confusion and uncertainty that the Court should dispel. The Court should rule that if an appellant fails to raise, or expressly concedes, prudential standing on appeal, a Court of Appeals should not be permitted to revive the issue *sua sponte*.

The third issue presented is whether an association of real estate brokers, whose members enter into

5

exclusive contracts to sell their clients' property, has associational and prudential standing to prosecute a lawsuit involving the constitutional rights of the brokers' home-selling clients to freely alienate their real property. Association submits that it plainly satisfies the requirements of associational and prudential standing.

————————◆————————

## PROCEEDINGS IN DISTRICT COURT

Association is an association of real estate brokers and salespersons licensed by the State of Illinois. As noted in its By-laws, Association's objectives include: (1) furthering the interest of home and other real property ownership; (2) safeguarding and advancing the interests of real estate owners, occupants or users, and those engaged in the real estate profession; (3) ensuring strict compliance by federal, state and local governments or their agencies, with the Constitution of the United States and the Illinois State Constitution; and (4) protecting, securing, and vindicating through petition and, if necessary, litigation, the rights of owners, occupants or other users of real estate and real estate professionals, secured by the Constitution of the United States and the Illinois State Constitution. Members' professional activities include the listing and sale of private property. Their seller-clients own properties in City and their buyer-clients seek to own such properties. Members' livelihoods derive from the commissions they earn listing or selling real estate (*e.g.*, if the sale of property does

6

not close, they earn nothing; if the property sells at a
reduced price, they earn less).

By this suit, Association seeks to permanently
enjoin enforcement of City's Point of Sale Inspection
Ordinance ("Ordinance") (App. 38-54) because it
unconstitutionally restrains a property owner's right
to sell his property without due process of law. Pur-
suant to the Ordinance, property can only be sold if
City issues transfer stamps. In all but one instance
not relevant here, transfer stamps issue only after a
seller obtains a final or conditional "Certificate of
Compliance" from City and pays any outstanding
water bill (even if disputed). A Certificate of Compli-
ance will issue only if City decides that the property
"passed" a point of sale inspection. To "pass," a prop-
erty owner must make all repairs ordered by City
even if such repairs are cosmetic in nature (e.g.,
painting, replacing soap dishes). The Ordinance does
not restrict the scope of searches, or the type of
repairs that City can force property owners to make
as a condition of their right to sell. The Ordinance
has no due process safeguards of any kind and no
appeal process to challenge City's refusal to issue a
Certificate of Compliance or the repair order issued
by an inspector.

In addition, the Ordinance permits City to order
the "deconversion" of "illegally converted" property. It
contains no due process protection, however, against
City improperly ordering the deconversion of *legal
nonconforming* property. There is no hearing at which
property owners are permitted to be represented by

7

counsel and to submit evidence that the property is
"legal." Similarly, property owners cannot appeal a
decision by City's inspector that the property is
"illegal."

Association filed suit on April 24, 2006 and
immediately filed a motion for a preliminary injunc-
tion seeking to enjoin enforcement of the Ordinance.
At the initial hearing on the motion for preliminary
injunction, the District Court raised the issue of
whether Association had standing. The parties sub-
mitted multiple briefs and attended multiple hear-
ings at which the issue of Association's standing was
thoroughly addressed. In its briefs and at the court
hearings, City argued that Association lacked asso-
ciational standing under *Hunt v. Washington State
Apple Advertising Comm'n*, 432 U.S. 333 (1977).
Under *Hunt*, an association may bring suit where: (a)
its members would otherwise have standing to sue in
their own right, (b) the interests it seeks to protect
are germane to Association's purpose, and (c) neither
the claim asserted nor the relief requested requires
the participation of individual members in the law-
suit. 432 U.S. at 343. Because Association was, in
part, asserting that the Ordinance violated the con-
stitutional rights of City home owners, the first prong
of *Hunt* necessarily included the question of whether
Association Members had "prudential standing" to
assert the rights of third parties under *Singleton v.
Wulff*, 428 U.S. 106 (1976). *See, e.g., Pennsylvania
Psychiatric Soc'y v. Green Spring Health Servs., Inc.,*
280 F.3d 278, 291 (3d Cir. 2002), *cert. denied,* 537 U.S.
881 (2002) (associational standing can be established

8

if the association's members have standing to assert a third-party's rights under *Singleton*). Thus, the parties' briefs also addressed standing under *Singleton*.

After thorough consideration of the parties' written submissions and oral arguments, the District Court found that Association had standing. The District Court then considered Association's motion for injunctive relief, determined that such relief was necessary to prevent ongoing violations of the Constitutional rights of City property owners and issued a preliminary injunction that enjoined enforcement of the Ordinance. (App. 33-35)

City appealed. In its opening brief to the Seventh Circuit, City did not raise any prudential standing issues (*i.e.*, the first prong of *Hunt*). In fact, City (at p. 21 of its brief) expressly informed the Court that it was not challenging whether Association satisfied the first two requirements of *Hunt*:

> Since this matter is in the early stages of litigation, this Court must accept all well-pleaded facts as true. As such, this Court must assume that based upon the allegations contained in the complaint, Association meets the first two prongs of the *Hunt* analysis.

Given the District Court's findings and City's concession, Association's Seventh Circuit brief did not address any issues related to the first two prongs of *Hunt* (including prudential standing), save for a brief

9

footnote in which Association simply stated its
agreement with City's concession.

Despite holding in two prior cases that a Court of
Appeals cannot raise prudential standing *sua sponte*
if a defendant does not raise the issue on appeal,
during oral argument on September 7, 2007, the
Seventh Circuit did just that and questioned whether
Association's Members have prudential standing.
Association's counsel answered the Court's questions
as well as he could, but because no one contemplated
that the issues could be raised at argument, on Sep-
tember 18, 2007, Association filed a motion in the
Seventh Circuit seeking leave to file a supplemental
brief addressing prudential standing.

On October 17, 2007, without ruling on Associa-
tion's request to brief the issue, the Seventh Circuit
issued its opinion and entered its judgment. (App. 1-
28) The Seventh Circuit ruled that the Association
did not meet the prudential standing requirements,
vacated the injunction issued by the District Court,
and dismissed Association's suit. Importantly, the
Seventh Circuit found that Association satisfied the
standing requirements of Article III. (App. at 2, 5) In
making its ruling that Association lacked prudential
standing, the Seventh Circuit relied on arguments,
assumptions and statements of fact that were not
part of the record before it. *See* Section I, below. The
day after entering judgment, on October 18, 2007, the
Seventh Circuit denied Association's motion for leave
to file a supplemental brief, along with three other
pending motions (pursuant to which Association had

10

attempted to inform that Court of developments in the District Court affecting standing). (App. 31-32)

On October 30, 2007, Association filed its Petition for Rehearing *En Banc*, in which it, among other things, again requested the opportunity to brief the issue of prudential standing. The Seventh Circuit denied the Petition. (App. 36-37)

———————◆———————

## REASONS FOR GRANTING THE PETITION

I.   **The Seventh Circuit Violated Association's Due Process Rights By Deciding Prudential Standing Issues Adversely To Association After Raising The Issues *Sua Sponte* And Without Allowing Association An Opportunity To Brief The Issues.**

Due process requires "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). The Court has recognized that this basic tenet of due process jurisprudence must be followed when a court raises dispositive issues *sua sponte* and has held that, "before acting on its own initiative, a court must accord the parties fair notice and an opportunity to present their positions." *Day*, 547 U.S. at 210 (holding that a court can *sua sponte* raise whether a state prisoner's petition for a writ of habeas corpus is timely but "of course" must give the petitioner an opportunity to brief the issue); *Burns v. United States*, 501 U.S. 129, 137-38 (1991) (court

11

must provide prior notice and an opportunity for the defendant to brief issues if the court *sua sponte* deviates from mandatory sentencing guidelines).

The Court has not yet ruled on whether this rule should be applied where a court *sua sponte* raises the issue of prudential standing. The rationale of the rule requiring a court to allow parties to brief dispositive issues prior to decision, however, is fully applicable to the present situation. In *Day*, the Court cited *Acosta v. Artuz*, 221 F.3d 117, 124-25 (2d Cir. 2000), in support of its conclusion that, "of course," the court must give the litigants the chance to brief dispositive issues raised *sua sponte*. *Acosta*, 221 F.3d at 122, 124, cogently addressed why this must be the rule in our adversarial legal system:

> If the court chooses to raise *sua sponte* the affirmative defense of failure to comply with the [ ] statute of limitations, however, the court must provide the petitioner with notice and an opportunity to be heard before dismissing on such ground. Here, we apply the well-established principle that "a person is entitled to notice before adverse judicial action is taken against him." [quoting *Lugo v. Keane*, 15 F.3d 29, 30 (2d Cir. 1994)]. * * * Although the courts below had the authority to raise the [ ] statute of limitations defense on their own motion, the judgments must nevertheless be vacated because the courts dismissed without affording the petitioners notice and an opportunity to be heard. *See Snider v. Melindez*, 199 F.3d 108, 112 (2d Cir.

12

1999) ("The problem with the court's dis-
missal was not that it was done on the
court's own motion, but rather that it was
done without affording [petitioner] notice
and opportunity to be heard."). The long-
standing general rule is that a court may not
dismiss an action without providing the ad-
versely affected party with notice and an op-
portunity to be heard. *See Lugo*, 15 F.3d at
30; *Perez v. Ortiz*, 849 F.2d 793, 797 (2d Cir.
1988); *Square D Co. v. Niagara Frontier Tar-
iff Bureau, Inc.*, 760 F.2d 1347, 1365 (2d Cir.
1985) ("'Failure to afford an opportunity to
address the court's *sua sponte* motion to dis-
miss is, by itself, grounds for reversal.'")
(quoting *Lewis v. New York*, 547 F.2d 4, 5-6 &
n.4 (2d Cir. 1976)).

The rationale for the rule is also explained in *Snider*,
199 F.3d at 113:

Providing the adversely affected party with
notice and an opportunity to be heard plays
an important role in establishing the fair-
ness and reliability of the order. It avoids the
risk that the court may overlook valid an-
swers to its perception of defects in the plain-
tiff's case. Furthermore, denying a plaintiff
an opportunity to be heard may tend to pro-
duce the very effect the court seeks to avoid –
a waste of judicial resources – by leading to
appeals and remands.

This rationale is entirely on point here and the
Court should grant this petition to make it clear that
if a court is permitted to raise "prudential standing"

13

*sua sponte* (see Section II, below for a discussion as to why a court should *not* be permitted to raise the issue *sua sponte*), the court must give parties the opportunity to brief the issues prior to the court's decision. It is fundamentally unfair and inconsistent with our adversarial legal system that Association's suit was dismissed without Association being given any notice, any opportunity to be heard, or any opportunity to develop a record on an issue that City conceded on appeal. Association submits that the proper role of the court is "to call balls and strikes, and not to pitch or bat." Transcript of Hearings on the Nomination of John G. Roberts, Jr. to be Chief Justice of the United States, September 12, 2005 at p. 56. Here, the Seventh Circuit refused to accept City's "intentional walk" on prudential standing and called Association "out," without even involving the litigants. *See also Neitzke v. Williams*, 490 U.S. 319, 330 (1989) (limiting courts' authority to *sua sponte* dismiss *in forma pauperis* complaints as frivolous and recognizing that the "adversarial process also crystallizes the pertinent issues and facilitates appellate review of a trial court dismissal by creating a more complete record").

The Seventh Circuit's decision was not the result of an adversarial process. (Nor was it based on anything in the appellate record). Rather, the Seventh Circuit raised and decided the issues itself, without input from the parties, and advanced justifications for its decision that neither party had argued. For example, the Seventh Circuit decided that Association Members should not be permitted to advance the

14

rights of their home owner clients because it thought
– despite the complete absence of evidence on the
point – that home owners, rather than Association
Members, were "the potential plaintiffs with the first-
hand information about the operation of the ordi-
nance." (App. at 6) In fact, contrary to the Seventh
Circuit's contention (which was not based upon
anything in the record), Association Members have
knowledge far superior to property owners regarding
how the Ordinance works and is enforced, including
how it unreasonably and unconstitutionally interferes
with the right to sell property without due process.
While an average person may buy or sell real estate,
at most, a few times during his lifetime, Association
Members process thousands of sales through City's
inspection process each year. Indeed, that is why the
vast majority of sellers (more than 80% in Northern
Illinois) engage the services of licensed real estate
brokers. In each transaction, Association Members
are forced to deal with the Ordinance and City's
unlawful interference with the sale of private prop-
erty. Property owners have little, if any, information
regarding the Ordinance until they want to sell.
Association, through its Members, has information
regarding thousands of sales transactions, including
how City refuses to permit sales of private property
unless owners make cosmetic repairs to their prop-
erty ordered by City. Brokers also know, better than
any individual seller, the adverse effects of City's
Ordinance on sales and values. For example, brokers
have access to proprietary databases – not accessible
to property owners – that contain current and historic

15

information from which brokers can determine the adverse financial effect of the Ordinance. By making its decision without input from Association, the Seventh Circuit not only denied Association due process, but also based its ruling on an incorrect premise. (In any event, the "facts" underlying all court of appeals' decisions should be based on evidence submitted in, and facts found by, the District Court.)

It cannot be said that Association was provided due process because it was given fifteen minutes during oral argument to address the prudential standing issues raised *sua sponte* by the Seventh Circuit. Because City had conceded the issue and because two prior decisions of the Seventh Circuit (cited above at p. 3) held that a court could not raise prudential standing issues *sua sponte*, there is no conceivable basis to conclude that Association was afforded due process and the opportunity to be heard before its suit was dismissed. *Burns*, 501 U.S. at 136 ("'The right to be heard has little reality or worth unless one is informed' that a decision is contemplated") (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950)). Nor was Association given an adequate opportunity to develop the issue further in the District Court, which decided standing issues in favor of Association, before the Seventh Circuit dismissed its suit. If the Seventh Circuit had concerns about prudential standing, it should have identified them and remanded the case to the District Court so that Association (and City) could develop a

16

more complete factual and legal record, and the District Court could "find" the facts necessary to decide the issue. *Warth v. Seldin*, 422 U.S. 490, 501 (1975) (noting that if a district court has concerns about standing, it should "require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing"). If given an opportunity to brief the issue, Association would have argued and shown the Seventh Circuit that remand was the appropriate course of action. Association, of course, was never given that opportunity because the Seventh Circuit denied all of Association's many requests to brief the issue, *after* issuing its opinion and dismissing the suit. (App. 31-32, 36-37)

As detailed below in Section III, the Seventh Circuit's conduct is particularly damaging because, if given an opportunity, Association could present evidence and "valid answers" that unequivocally demonstrate that the Seventh Circuit's "perceptions of defects" regarding Association's standing are erroneous. *Snider*, 199 F.3d at 113. Because the Seventh Circuit's conduct deprived Association of due process, the Court should grant this petition and decide whether a Court of Appeals must at least allow an appellee to file a brief if the court raises prudential standing *sue sponte* – after the issue has been conceded by the appellant.

17

## II. There Are Express Conflicts In The Circuits On Whether A Court Of Appeals May Raise Prudential Standing *Sua Sponte* After An Appellant Waives Or Concedes The Issue On Appeal.

The Court has not yet decided whether a Court of Appeals is permitted to raise prudential standing *sua sponte* if, after addressing the issue in the district court, an appellant chooses not to appeal it. There is a split among the Circuits regarding the issue.[1] Prior to its decision in this matter, the Seventh Circuit had twice held that prudential standing issues, if not appealed, were waived and consideration of prudential standing *sua sponte* was inappropriate. *See MacLauchlan*, 970 F.2d at 359 n.1 (although defendant argued plaintiff lacked standing in the district court, defendant did not challenge standing on appeal and the appellate court "may not raise prudential standing issues *sua sponte*"); *United Transp.*, 183 F.3d at 611 (because the defendant did not raise the issue of prudential standing before the appellate court, it has waived any argument based on that doctrine).

---

[1] The Court has given mixed signals as to whether waiver of prudential standing is permissible. *See, e.g., Craig v. Boren*, 429 U.S. 190, 192-94 (1976) (rejecting as untimely contention that prudential considerations militated against third-party standing); *but see, Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 546 n.8 (1986) ("The rules of standing, whether as aspects of the Art. III case-or-controversy requirement or as reflections of prudential considerations defining and limiting the role of the courts, are threshold determinations of the propriety of judicial intervention.").

18

Also prior to this case, the Seventh Circuit held that a failure to raise prudential standing in the district court bars consideration by an appellate court. *Lindley v. Sullivan*, 889 F.2d 124, 129 (7th Cir. 1989). The Ninth Circuit has reached the same conclusion. *See Pershing Park Villas Homeowners Ass'n v. United Pac. Ins. Co.*, 219 F.3d 895, 899 (9th Cir. 2000) (a party waives objections to prudential standing not properly raised before the district court). Conversely, the Second, Sixth, and D.C. Circuits have taken the opposite position. *See, e.g., Thompson v. County of Franklin*, 15 F.3d 245, 248 (2d Cir. 1994) (appellate court has an independent obligation to examine standing under arguments not raised in the district court, including when the parties fail to raise the issue on appeal); *Community First Bank v. National Credit Union Admin.*, 41 F.3d 1050, 1053 (6th Cir. 1994) (rejecting argument that individual parties may waive prudential standing requirements if they fail to raise standing as an issue on appeal after losing on the standing issue raised in the district court); *Animal Legal Defense Fund, Inc. v. Espy*, 29 F.3d 720, 723 n.2 (D.C. Cir. 1994) (appellate court bound to conduct an independent inquiry on appeal of constitutional and prudential standing even though standing was not challenged in, or ruled on by, the district court).

Under what circumstances, if any, a Court of Appeals may consider prudential standing *sua sponte* is a recurring issue on which at least five circuits have now taken sides. Further, as evidenced by the

19

confusion in this case, it is apparent that there is an urgent need for the Court to address the issue to resolve the conflict. The issue is ripe for consideration by this Court.

Upon consideration of the issue, the Court should conclude that, if a district court has considered prudential standing and an appellant does not raise the issue on appeal, the Court of Appeals may not consider the issue *sua sponte*. The justification for such a rule is plain. Prudential standing considerations require fact-intensive analyses that are best conducted by the district courts based upon evidence presented by the parties. *Warth*, 422 U.S. at 501. District courts are best able to handle such inquiries and, to the extent prudential standing considerations are not raised by the parties, could be raised by the district courts *sua sponte*, again with the benefit of an evidentiary record created through the adversarial process. *Id.* As the gate keepers to the federal court system, district courts are fully able, and the best equipped, to ensure that Article III and prudential standing requirements are met and third party rights are adequately protected. If, after such inquiry and decision in the district court, an appellant chooses not to raise the issue on appeal, there is no reason to permit the Court of Appeals to do so.

Unlike Article III limitations on standing, which courts are obliged to address because it is a predicate to their subject matter jurisdiction (*Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 546 n.8 (1986)), the doctrine of prudential standing is a

20

judge-made "rule of practice" that is not "ordained by the Constitution." *United States v. Raines*, 362 U.S. 17, 22 (1960) (quoting *Barrows v. Jackson*, 346 U.S. 249, 257 (1953)). As such, "exceptions to [prudential standing] where there are weighty countervailing policies have been and are recognized." *Id.* There is no good reason why express waiver by an appellant – after an unfavorable decision by the district court – ought not be one of these exceptions.

The Court has historically disfavored courts raising non-jurisdictional defenses *sua sponte* where a party chooses not to raise them because such conduct is inconsistent with our adversarial legal system. *See Arizona v. California*, 530 U.S. 392, 412-13 (2000) ("[C]ourts must be cautious about raising a preclusion bar *sua sponte*, thereby eroding the principle of party presentation so basic to our system of adjudication."); *United States v. Burke*, 504 U.S. 229, 246 (1992) (Scalia, J., concurring) ("The rule that points not argued will not be considered is more than just a prudential rule of convenience; its observance, at least in the vast majority of cases, distinguishes our adversary system of justice from the inquisitorial one.").

The Court should apply such well-established reasoning here and hold that a Court of Appeals cannot raise prudential standing *sua sponte* if an appellant does not raise it on appeal after the district court has decided the issue. Unlike Article III standing, "the prudential doctrine of standing has come to encompass 'several judicially self-imposed limits on

21

the exercise of federal jurisdiction.'" *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 551 (1996) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). Given that the constitutional mandates of Article III are not applicable to the "judicially self-imposed rules of practice," the reasoning supporting the impermissibility of waiver or concession of Article III standing does not apply to a determination of whether prudential standing may be waived or conceded. For example, where, as here, it is undisputed that a party such as Association has Article III standing, there may be instances where an appellant would prefer to appeal important issues in one case with an association representing the interests of third-parties rather than litigating the same issues in multiple lawsuits before different judges brought by an ad hoc collection of plaintiffs (here, individual property owners). Appealing important issues in one case against a well-represented association will almost certainly be more efficient than litigating issues on an ad hoc basis. There is no good reason why a court should not permit an appellant to choose not to raise prudential standing on appeal after losing standing issues before the district court. Indeed, allowing a Court of Appeals to raise the issue *sua sponte* after waiver by an appellant presents an opportunity for judicial activism (albeit, to foreclose access to federal court). That is inconsistent with our judicial system.

Accordingly, this Court should grant this petition and hold that, where an appellant fails to raise or

22

concedes prudential standing on appeal, after raising the issue in the district court, a Court of Appeals may not consider prudential standing *sua sponte*.

### III. The Seventh Circuit's Decision Conflicts With This Court's Decisions In *Hunt* and *Singleton*; Association Has Met The Requirements Of Associational And Prudential Standing.

The Court has not yet decided whether an association of real estate brokers has standing to litigate issues involving the constitutional rights of the brokers' home owner clients. If the Court concludes that the Seventh Circuit acted properly by raising and deciding prudential standing *sua sponte* without giving Association the opportunity to brief the issue and/or without remanding to the District Court, the Court should nonetheless grant this petition to correct the Seventh Circuit's decision that Association does not have associational and prudential standing to litigate issues involving the constitutional rights of their home owner clients. The Seventh Circuit's decision is plainly inconsistent with *Hunt* and *Singleton*. The Court should grant this petition to prevent the Seventh Circuit's opinion from being used as precedent to erode principles of associational and third-party standing that the Court has established and repeatedly upheld over the last 30 years. Needless to say, abandoning well-established precedent should be done only in limited circumstances by the Court – and never by a Court of Appeals.

23

Under *Hunt*, "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." 432 U.S. at 343. It is plain that Association satisfies the second and third prongs of *Hunt*. As shown by its By-laws (quoted at p. 5, above), the interests of City home owners that Association seeks to protect – namely the right to freely alienate property without unconstitutional governmental interference – are germane, indeed central, to Association's purpose. In addition, Association seeks only injunctive relief. As such, participation of its Members is unnecessary. (Again, the District Court proceeded without an Association Member plaintiff and entered a preliminary injunction. The District Court plainly was in a superior position to determine whether Member participation is "required" to adjudicate the constitutional claims.)

The first prong of the *Hunt* analysis, which City conceded on appeal, can be satisfied by meeting the requirements of the test set forth in *Singleton*. *See, e.g., Pennsylvania Psychiatric Soc'y,* 280 F.3d at 291 (associational standing can be established if the association's members have standing to assert a third-party's rights under *Singleton*).

Under *Singleton,* (1) Association's brokers must allege "'injury in fact' . . . to [establish] Art. III

24

jurisdiction"; and (2) the court must determine whether, "as a prudential matter," Association's brokers are "proper proponents of the particular legal rights on which [Association's brokers] base their suit." 428 U.S. at 112. As found by both the District Court and the Seventh Circuit, Association satisfied the standing requirements of Article III. (App. at 2, 5) As detailed *infra*, it is plain that Association also satisfies *Singleton's* mandates regarding prudential standing.

Under *Singleton*, the general rule that "one may not claim standing in this Court to vindicate the constitutional rights of some third-party" should not be applied where "two factual elements" exist to show that the "underlying justifications [for the general rule] are absent." 428 U.S. at 114. Those factual elements are:

> [T]he relationship of the litigant to the person whose right he seeks to assert. If the enjoyment of the rights is inextricably bound up with the activity the litigant wishes to pursue, the court at least can be sure that its construction of the right is not unnecessary in the sense that the right's enjoyment will be unaffected by the outcome of the suit. Furthermore, the relationship between the litigant and third-party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter. *Id.* at 114-15.

> [and]

25

[T]he ability of the third-party to assert his own right. Even where the relationship is close, the reasons for requiring persons to assert their own rights will generally still apply. If there is some genuine obstacle to such assertion, however, the third-party's absence from court loses its tendency to suggest that his right is not truly at stake, or truly important to him, and the party who is in court becomes by default the right's best available proponent. *Id.* at 115-16.

As detailed below, the prudential elements weigh in favor of Association.

## A. Closeness of Relationship.

In order for Association to satisfy the "close relationship" test, the relationship must permit Association to operate "fully, or very nearly, as effective a proponent" of the property owners' rights as the property owners themselves. *Pennsylvania Psychiatric Soc'y*, 280 F.3d at 289. That test is met here. Association's objectives include furthering the interests of home ownership, safeguarding the interests of brokers and home owners, and protecting the rights guaranteed to property owners by the United States Constitution. Association Members enter into "exclusive right to sell" agreements with owners, must be licensed by the State to sell the property of another, 225 Ill. Comp. Stat. 454/5-15 (2008), and are statutorily required to follow City's Ordinance, 225 Ill. Comp. Stat. 454/15-15(a)(5) (2008) (licensed brokers

26

are bound to follow all statutes and regulations governing the sale of real property). Their interests are thus identical by agreement and by statute. As concerns the sale of homes, Association Members' and property owners' interests are identical – both want to sell the property as promptly as possible, for the highest price, without unconstitutional obstruction by City of the right to transfer the property. The Ordinance adversely affects the brokers and their clients in exactly the same way because it prevents the sale of private property which, of course, is the sole purpose of the relationship between the broker and home owner. Accordingly, Association is "uniquely qualified" to protect property owners' rights. *Singleton*, 428 U.S. at 117. Contrary to the Seventh Circuit's erroneous decision, the interests of Association Members are in no way "remote" from the interests of home sellers. Indeed, pursuant to the exclusive right to sell agreements, brokers – unlike the termite inspectors and title insurance companies cited by the Seventh Circuit as having similarly "remote" interests in the sale of a house – become the home owner's proxy and the *exclusive* means to sell property – again, by agreement and by statute.

Next, there will be either no or "little loss in terms of effective advocacy" from permitting Association to pursue its claim against City rather than individual property owners. *Singleton*, 428 U.S. at 118. In fact, as explained above, contrary to the Seventh Circuit's contention (which was not based upon any evidence contained in the record before the

27

Seventh Circuit), Association Members have knowledge superior to property owners, especially with respect to how the Ordinance works to prevent sales. With such superior knowledge, there will be no loss in terms of effective advocacy by allowing Association to litigate these issues.

Moreover, the Association's "institutional" interest in advancing property rights – and the thousands of transactions its Members process in City annually – will motivate it to vigorously pursue the constitutional claims. A property owner, who may sell only once in City, certainly benefits from the institutional advocacy of his broker's trade association.

The close relationship between property sellers and their real estate brokers is akin to the relationships between doctors and patients (*Singleton*), lawyer and client (*Caplin & Drysdale v. United States*, 491 U.S. 617 (1989)), and beer vendor and consumer (*Craig v. Boren*, 429 U.S. 190, 192-94 (1976)) which this Court has previously held satisfy the *Singleton* test. In those situations, as is the case here, the third-party hires and relies on the litigant to perform a specific task for which the litigant is specifically trained and licensed in compliance with the law (*i.e.*, perform abortions, provide legal counsel, sell beer or sell real estate). Here, the owner wants to sell his property and, by written contract, Association's Member has the *exclusive right* to sell it. Accordingly, "the enjoyment of the right [of the property owner] is inextricably bound up with the activity the litigant wishes to pursue." *Singleton*, 428 U.S. at 114.

28

Under these cases, then, the Court should hold that the "close relationship" prong of *Singleton* is satisfied.

## B. Existence of Obstacles.

Under *Singleton*, "some genuine obstacle" to a third-party asserting his rights must exist. 428 U.S. at 115-16. Such obstacles need not be "insurmountable." *Id.* at 117. There must only be some hindrance to the third party's ability to protect his or her own interests. *Powers v. Ohio*, 499 U.S. 400, 411 (1991). Examples include the prohibitive cost of pursuing litigation (*Council of Ins. Agents & Brokers v. Juarbe-Jimenez*, 363 F. Supp. 2d 47, 53 (D.P.R. 2005), *aff'd*, 443 F.3d 103 (1st Cir. 2006) (holding that an association had standing to represent third-party rights when the third-parties' "inability to finance the litigation" prevented the third-parties from asserting their claim)), and the "imminent mootness" of a third-party's rights (*Singleton*, 428 U.S. at 117).

Here, individual sellers do not have the financial means or incentive to sue City. Generally, City property owners are not affluent and do not have the financial resources, or may not perceive there is a sufficient financial incentive, to mount a constitutional challenge in the federal court system. Also, a seller's claim could become moot when the sale closed. Sellers' primary goals are to sell their property promptly (in many cases because their purchase of a new home cannot close until the sale of their current home is completed) and for the highest price. Given

29

the fluid (and currently depressed) real estate mar-
ket, delaying the sale to mount a constitutional
challenge is not an effective or affordable option. The
delay of litigation alone could also cause the loss of a
particular buyer, who was likely selected based upon
individual financial qualifications. Further, the cost
of complying with City's repair order or paying a
disputed water bill is less than the cost of preparing
and filing a complaint or a single day of trial. Given
these obstacles, the assertion of rights by the individ-
ual sellers would be, in practical terms, near impossi-
ble.

Despite the foregoing, the Seventh Circuit con-
cluded that it "need not worry" about any such obsta-
cles because "all the home owners in Calumet City
can be joined in a class action." (App. at 8) However,
the same could have been said of the patients in
*Singleton*, the clients in *Caplin & Drysdale*, and the
beer drinkers in *Craig*. Moreover, the Court has
recognized the advantages of an association bringing
suit instead of a class action:

> While a class action creates an ad hoc union
> of injured plaintiffs who may be linked only
> by their common claims, an association suing
> to vindicate the interests of its members can
> draw upon a pre-existing reservoir of exper-
> tise and capital. "Besides financial resources,
> organizations often have specialized exper-
> tise and research resources relating to the
> subject matter of the lawsuit that individual
> plaintiffs lack." . . . "[The] interest and exper-
> tise of this plaintiff, when exerted on behalf

of its directly affected members, assure 'that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions.'"

*International Union, United Auto., Aerospace and Agr. Implement Workers of America v. Brock*, 477 U.S. 274, 289 (1986).[2]

The Court's rationale is on point here. Association has superior knowledge, financial and research resources, and expertise. Individual home owners, on the other hand, cannot or do not want to be constitutional heroes challenging City's Ordinance.

The Seventh Circuit's decision represents a dangerous and unwarranted restriction on associational and prudential standing doctrines the Court has followed for more than 30 years. Its effect will be less advocacy of constitutionally-protected property rights and more infringement of those rights. The Court should grant this petition and reverse the Seventh Circuit's decision.

———————◆———————

---

[2] Neither City nor Association suggested to the Seventh Circuit that a class action was a proper way to proceed. The Seventh Circuit raised this idea on its own, without input from the parties. Again, if given the opportunity to brief the issue, Association would have cited *Brock* and explained what the Court recognized there – namely that associational litigation is often preferred to class action litigation.

31

## CONCLUSION

Association respectfully urges this Court to grant this petition for writ of certiorari to the United States Court of Appeals for the Seventh Circuit to address whether (1) a court of appeals is permitted to consider prudential standing *sua sponte* if an appellant does not raise the issue on appeal, (2) if it is, whether it must provide the appellee an opportunity to brief the issue (including whether the case should be remanded to the district court for development of a more complete record and fact-finding) before it decides it, and/or (3) whether the Seventh Circuit's opinion is an improper abandonment of the Court's associational and prudential standing precedent.

Dated:   February 11, 2008     Respectfully submitted,

PHILIP C. STAHL, ESQ.
*Counsel of Record*
PATRICK T. NASH, ESQ.
DONALD P. BUNNIN, ESQ.
MAGGIE M. HANEL, ESQ.
GRIPPO & ELDEN LLC

*Attorneys for Petitioner*
*MAINSTREET*
*ORGANIZATION*
*OF REALTORS®*

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AYANNA WALKER, for herself and all others similarly situated, | ) ) ) | |
| | ) | Case No. 07 C 6148 |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | Judge Milton J. Shadur |
| | ) ) | |
| CALUMET CITY, ILLINOIS, | ) ) | |
| | ) ) | |
| *Defendant.* | ) | |

SECOND AMENDED VERIFIED CLASS ACTION COMPLAINT FOR TEMPORARY
RESTRAINING ORDER, PRELIMINARY INJUNCTION,
PERMANENT INJUNCTION, DECLARATORY AND OTHER RELIEF

Plaintiff Ayanna Walker ("Walker"), on behalf of herself and all others similarly situated

(collectively, "Plaintiffs"), by her attorneys, Grippo & Elden LLC, for her complaint against

defendant, Calumet City, Illinois ("City") states as follows:

NATURE OF THE ACTION

1.      Plaintiffs bring this action for injunctive, declaratory and other relief, pursuant to

42 U.S.C. § 1983, and 28 U.S.C. §§2201 and 2202 to redress the deprivation, under color of law,

of rights guaranteed to Plaintiffs, by the United States Constitution and under Illinois law.

Plaintiffs seek declarations that certain provisions of Chapter 14 of the Municipal Code of

Calumet City, Illinois, (the "Code"), codified through Ordinance No. 08-06, enacted January 31,

2008, and are facially unconstitutional.  In addition, Plaintiffs seek a declaration that, as applied,

certain provisions of City's Zoning Code are unconstitutional because they, along with City's

conduct, effectively prevent the sale of legal nonconforming property.

2.      More particularly, Plaintiffs seek a declaration that Section 14-1 of Article I of

Chapter 14 of the Code (the "Point of Sale Inspection Ordinance," attached as Ex. A), is

144427v3

unconstitutional because it (a) unreasonably and unconstitutionally restrains property owners'
right to sell their property without due process of law, and (b) fails to provide procedural due
process. In addition, Plaintiffs seek a declaration that, as applied by the City, certain provisions
of the Zoning Ordinance are unconstitutional because they effectively force owners of legal
nonconforming property to conform their property to the current zoning classification if they
want to sell it.

3.      Plaintiffs request immediate declaratory and injunctive relief by which the Court,
among other things, would preliminarily and permanently enjoin enforcement of the Point of
Sale Inspection Ordinance and declare the Point of Sale Inspection Ordinance unconstitutional.

4.      Plaintiffs challenge the constitutionality of the Point of Sale Inspection Ordinance
on its face because it takes City owners' property rights, without due process. Plaintiffs have
standing to bring this suit as property owners in City. A judgment from this Court will redress
the harm being suffered and directly advance and protect the interests of Plaintiffs.

JURISDICTION AND VENUE

5.      Plaintiffs' claims arise under the United States Constitution. This Court has
original jurisdiction pursuant to 28 U.S.C. § 1331.

6.      City is subject to personal jurisdiction in this district and venue is proper under 28
U.S.C. § 1391(b) because the events giving rise to the claims occurred in this district.

PARTIES

7.      Walker owns property in City located at 521-23 Greenbay Avenue. Walker's
property contains four dwelling units. Each unit has passed City's annual inspections. The
property is listed for sale and subject to the Point of Sale Inspection Ordinance. By virtue of its
Point of Sale Ordinance, City has taken and interfered and continues to take and interfere with
Walker's right to alienate her property, without due process of law.

2

144427v3

8.      Defendant Calumet City, Illinois is a unit of local government incorporated under the laws of Illinois.  City is located in Cook County, Illinois.

<u>FACTUAL BACKGROUND AND GENERAL ALLEGATIONS</u>

I.      <u>Summary Of Point Of Sale Inspection Ordinance.</u>

9.      The Point of Sale Inspection Ordinance (Ex. A) and other provisions of the Code provide that property can only be sold if City issues transfer stamps.  Code §§ 82-325, 82-328. In all but one instance,[1] the only way for sellers to obtain transfer stamps is to first obtain a final or conditional "Certificate of Compliance" from City and to pay any outstanding water bill (even if disputed).  Code §§ 14-1(h); 14-1(i); § 82-327(b).  City will issue a Certificate of Compliance only if it decides that property "passed" a point of sale inspection.  To "pass" an inspection and obtain a Certificate of Compliance, a property owner must make all repairs (using a licensed contractor) ordered by City after the inspection.  *Id.*; *see also id.* at § 14-1(k).

10.     The Point of Sale Inspection Ordinance results in the immediate deprivation of a home owner's right to sell her property until City decides to permit it.  Upon issuance of an inspector's repair order, the home owner is prohibited from selling her property until repairs are made.  The Point of Sale Inspection Ordinance provides the home owner no due process prior to this deprivation of her right to sell her property.

11.     In addition, the Point of Sale Inspection Ordinance requires citizens to pay the water bill before City will issue transfer stamps.  *Id.* at § 14-1(i).  Although the Point of Sale Inspection Ordinance states that an owner can dispute the water bill in a "predeprivation hearing," the ordinance does not explain the due process protections, if any, of such hearing and requires the owner to pay the bill "under protest" while he challenges it.  Thus, if a property

---

[1]      The only situation in which a Certificate of Compliance is not required to obtain transfer stamps is when an owner refuses his consent to an inspection and City fails to obtain a warrant to conduct the search.  Code §14-1(f).

3

owner wants to sell his property, he must capitulate and pay (albeit "under protest") what City claims it is owed. *Id.* Otherwise, he will be unable to obtain the necessary transfer stamp. *Id.*

12.    The Point of Sale Inspection Ordinance does not restrict, in any way, the scope of searches. Rather, City inspectors are permitted to search for *any* violation of City's "Property Maintenance Code" (regardless of whether the violation relates to health or safety issues). Moreover, the Point of Sale Inspection Ordinance does not contain any limitations on the duration or location of inspections (*e.g.*, there is no limitation on inspectors searching bedrooms, closets, desks or other areas where private or personal property may be stored). Rather than placing limitations on the scope of searches (*e.g.*, limiting searches to matters that concern health and safety), the Point of Sale Inspection Ordinance states that "[a]ll structures shall be incompliance with Article X, Sections 14-691 and 14-692 of this Chapter 14, 'Property Maintenance Code.'" Ex. A at §14-1(c)(1).  Sections 14-691 and 14-692, in turn, expressly adopt the "2006 International Property Maintenance Code" (the "International Code") with minor modifications. Ex. B.  The International Code is not limited to conditions that affect health and safety. Ex. B.  Nor does the International Code restrict the type of things City can order to be "repaired" before it will issue transfer stamps.  Rather, the International Code contains provisions requiring maintaining property in "good repair."  See Ex. B, at §§ 304, 305. Under the International Code, City inspectors have unfettered discretion to search for as long as, and for whatever, and wherever they want.  Property owners have no notice of the conditions that fail to constitute "good repair" before a search.  City inspectors have unfettered discretion to order "repairs" that must then be made by a licensed contractor.

13.    Under a similar prior ordinance (which was amended during the pendancy of related litigation filed by the Realtor® Association of West/South Suburban Chicagoland) City

4

144427v3

repeatedly stopped sales of property (by refusing to issue Certificates of Compliance) until
property owners made "cosmetic repairs" unrelated to health, safety, and public welfare such as:

    a.    Painting windows, tightening a loose soap dish, replacing a "decorative cover" on
        a vanity;

    b.    Replacing floor tiles, tightening a loose soap dish, painting a bedroom wall,
        putting a "globe" on a light, painting a bathroom ceiling;

    c.    Repairing closet doors, painting door trims, repairing kitchen cabinets; and

    d.    "Patch – Paint – Clean – Decorate."

    14.    City can – as it has in the past -- rely on the "good repair" provisions of the
International Code to order any kind of cosmetic repair it wants as a condition to the right to sell
private property. A seller of property cannot stop an overly intrusive search or refuse to make
cosmetic repairs because the seller needs a "Certificate of Compliance" to obtain a "transfer
stamp" to transfer the property. The seller/owner is completely at the mercy of the inspector's
unfettered discretion in conducting the search and ordering repairs. Under the Point of Sale
Inspection Ordinance, property owners must capitulate to an inspector's demands, even if the
repair work is unnecessary from a public health or safety standpoint, if they want to sell their
property.

    15.    The Point of Sale Inspection Ordinance permits City to order the "deconversion"
of "illegally converted" property. Code §§ 14-1(c)(2), 14-1(g). The Point of Sale Inspection
Ordinance contains no due process protection against City improperly ordering the deconversion
of *legal nonconforming* property as a precondition of the right to sell the property. There is no
pre-deprivation hearing at which property owners are permitted to be represented by counsel and

144427v3

to submit evidence that the property is legal. *Id.* Thus, City may prevent the sales of *legal nonconforming* property simply by declaring it illegal. *Id.*

16.    The Point of Sale Inspection Ordinance also unreasonably restrains the free alienability of property by allowing City unreasonably long time periods for City to conduct its searches, order repairs, and make re-inspections. *See* Ex. A at § 14-1(d) (allowing City 28 days to conduct inspection after receipt of notice of transfer), § 14-1(g)(1) (granting City three additional days after inspection to issue inspection report), § 14-1(h) (granting City three additional days to complete re-inspections after repairs are made). The Ordinance imposes *no* limit on the number of reinspections City may require because "new repairs" may be ordered during reinspection, and *no* time limit on when City must issue a Certificate of Compliance after reinspection. Ex. A at § 14-1(h) (no limitation on when City must issue Certificate of Compliance after all repairs are made). Any owner is prohibited from repairing his own property or having repairs done by a family member or unlicensed person. Thus, where repairs are ordered under the Point of Sale Inspection Ordinance, City can, at a minimum, prevent sales of private property for at least fifty days (assuming conservatively, that (i) it takes ten days for a home owner to find a licensed contractor who can make all repairs, and for such contractor to make repairs, and (ii) City issues a Certificate of Compliance within ten days after reinspection). During such time, sales can and will be lost.

## II.    Zoning Code.

17.    The Zoning Code provides that legal nonconforming property cannot be rebuilt as-such if it is damaged by more than 50%. Ex. C, Zoning Code at §5.5. City relies on this provision of the Zoning Code to effectively force legal nonconforming property to comply with current zoning classifications or City's order to deconvert.

144427v3

18.    When an owner of legal nonconforming property finds a buyer for his property, the buyer's lender almost uniformly asks City to issue a letter that states that, if the legal nonconforming property is damaged, it can be re-built as legal nonconforming property consistent with the Zoning Code. City uniformly refuses to issue such "re-build" letters. Indeed, City uses a pre-printed form as part of its procedures that explicitly states that City will not issue re-build letters, despite the Zoning Code's provisions permitting rebuilding of legal nonconforming property.

19.    As a result of City's conduct, notwithstanding that the Point of Sale Inspection Ordinance states that only "illegally" converted property must be deconverted, City in reality, forever prohibits the sale of legal nonconforming property because lenders will not loan money to buyers in the absence of a re-build letter. This means that, if an owner of legal nonconforming property wants to sell his property, he is forced to modify or deconvert it, without due process or compensation by City.

III.    **Other Relevant Codes.**

20.    City has also enacted a Code Enforcement Ordinance (Ex. D), to prosecute property owners who fail to maintain their property in compliance with City's building and maintenance codes. *Id.* City can also remedy health and safety related code violations through its Rental Dwelling Inspection Ordinance, which permits City to annually inspect multi-unit dwellings. (Ex. E) Unlike the Point of Sale Inspection Ordinance, neither the Code Enforcement Ordinance nor the Rental Dwelling Inspection Ordinance is tied to the transfer of property. Rather, City may invoke the provisions (including as respects illegal conversions) whenever it believes that there is a code violation that poses a risk to public health and safety.

21.    Unlike the Point of Sale Inspection Ordinance, the Code Enforcement Ordinance contains *pre-deprivation* due process protections. For example, under the Code Enforcement

7

144427v3

Ordinance, before a property owner can be fined, a property owner is entitled to an administrative hearing where he is permitted to be represented by counsel, to present testimony and other evidence to challenge City's complaint, and to subpoena and cross-examine City officials regarding the alleged code violation.  Ex. D at §§ 2-943, 2-946.  Further, a property owner may petition for rehearing of an adverse decision before the enforcement administrator, *Id.* at § 2-949, and appeal any final decision to a Cook County Court.  *Id.* at § 2-950.  Finally, if a property owner is found guilty of a code violation, he is fined, *id.* at § 2-952, not deprived of his Constitutional right to sell and transfer his property.  None of these pre-deprivation due process protections are present in the Point of Sale Inspection Ordinance.

IV.    **Impact Of The Point Of Sale Inspection Ordinance On City Property Owners.**

22.    As of February 20, 2008, according to the multiple listing service, there were 26 residential real estate listings in City with contracts pending.  There are 430 active listings of property in City.

23.    Each of the 26 properties under contract is subject to an unconstitutional taking of the right to transfer prior to closing if City is permitted to enforce the Point of Sale Inspection Ordinance.  Similarly, the 430 properties currently listed for sale are at risk of unconstitutional taking of the right to transfer by City pursuant to the Point of Sale Inspection Ordinance.  The unconstitutional taking of the right to alienate property depresses the value of all residential property in City.

CLASS ACTION ALLEGATIONS

24.    Walker brings this action as a class action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure on behalf of a class consisting of all owners of residential property in City.

8

144427v3

25.   The class is sufficiently numerous to make bringing all parties before the court impractical.

26.   There are questions of law and fact common to the class that predominate over any questions affecting only individual class members, including, but not limited to:

        a.   Whether the Point of Sale Inspection Ordinance is unconstitutional because it unreasonably and unconstitutionally restrains property owners' right to sell their property without due process of law;

        b.   Whether the Point of Sale Inspection Ordinance is unconstitutional because it fails to provide procedural due process; and

        c.   Whether City applies provisions of the Zoning Code unconstitutionally to effectively prohibit owners of legal non-conforming property from selling such property.

27.   Walker is a member of the class, her claims are typical of the claims of the class members, and she will fairly and adequately protect the interests of the class. Walker is a typical residential property owner in City and her interests are coincident with and not antagonistic to those of the other members of the class. Walker has retained counsel able and experienced in class action litigation and other litigation advancing constitutional rights related to the ownership and sale of real property.

28.   City has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or declaratory relief with respect to the class as a whole.

29.   A class action is superior to other methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated

144427v3

persons to adjudicate their common claims in a single forum simultaneously, efficiently, and

without the duplication of effort and expense that numerous individual actions would engender.

Class treatment will also permit the adjudication of claims by many class members who could

not afford individually to litigate constitutional claims such as those asserted herein. This class

action likely presents no difficulties in management that would preclude maintenance as a class

action. The class is readily ascertainable.

### CAUSES OF ACTION

**COUNT I: THE POINT OF SALE INSPECTION ORDINANCE
UNREASONABLY RESTRAINS THE RIGHT OF PROPERTY
OWNERS TO TRANSFER THEIR PROPERTY**

30.    Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1-29, as

though fully set forth herein.

31.    Title 42, Section 1983 of the United States Constitution provides as follows:

> Every person who, under the color of an statute, ordinance, regulation,
> custom, or usage of any State or Territory, or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress.

32.    City, as a municipal corporation under the laws of Illinois, is a "person" that is

subject to suit under 42 U.S.C. § 1983.

33.    The Point of Sale Inspection Ordinance unreasonably and unconstitutionally

restrains the alienability of property. The Point of Sale Inspection Ordinance provides that

property cannot be sold unless City issues a transfer stamp. Code § 14-1(h) and § 82-327(b);

Code §§ 82-325, 82-328. With one limited exception (*see* n. 1), the only way to obtain a transfer

stamp is to first obtain a "Certificate of Compliance" which, in turn, can only be obtained if an

inspector decides that property "passed" a point of sale inspection. *Id.* There are no limitations

10

on the scope of searches required by the Point of Sale Inspection Ordinance or the type of repair City can require as a condition of the right to sell property. A property owner can "pass" a point of sale inspection only if it completes all repairs required by the inspector -- even if those repairs are cosmetic in nature -- by using a licensed contractor. *Id.* at § 14-1(k). Thus, even if property complies with all City codes, a property owner may not transfer his property if City refuses to issue a "Certificate of Compliance." When City fails or refuses to issue a "Certificate of Compliance" a property owner has no meaningful right to a hearing to contest the inspector's decision. *Id.* Even where City eventually issues a Certificate of Compliance, it prohibits sales of property for an unreasonably long period of time while inspections, repairs and re-inspections take place.

34.     In addition, the Point of Sale Inspection Ordinance requires a seller to pay the water bill before City will issue transfer stamps. *Id.* at § 14-1(i). Although an owner can dispute the water bill in a "predeprivation hearing," the ordinance does not provide any detail regarding the due process protection of such hearing and requires the owner to pay the disputed bill "under protest" while he challenges the bill if he wants to obtain a transfer stamp. *Id.*

35.     Although cities are permitted to adopt ordinances to protect public health and safety, they may not use such ordinances to restrict the free transfer of property. *See* Op. Ill. Att'y Gen. No. 94-024 (Oct. 25, 1994), 1994 WL 601863 ("Municipalities are authorized, under Article 11 of the Municipal Code (65 ILCS 5/11-1-1 *et seq.*) (West 1992)) to adopt a number of ordinances and codes designed to protect public health and safety, and are authorized to enforce such codes by requiring permits, fees, and fines ... Further, municipalities may impose various fees for other services relating to real property. *In no instance, however, are municipalities authorized to limit the alienability of property in order to enforce such code.*") (emphasis added).

11

36.    Plaintiffs have suffered and will continue to suffer immediate and irreparable harm from enforcement of the Point of Sale Inspection Ordinance. The Point of Sale Inspection Ordinance is unconstitutional because it violates the protections in the U.S. Constitution against unreasonable governmental restriction on the right to sell private property. This irreparable harm to Plaintiffs will substantially outweigh any harm to City if immediate relief is granted. Even if the Point of Sale Inspection Ordinance is enjoined, City can protect public health and safety with the Code Enforcement Ordinance and Rental Dwelling Inspection Ordinance.

37.    There is no adequate remedy at law. Money damages are not adequate to remedy the immediate loss of the Constitutional right to alienate property.

**WHEREFORE**, Plaintiffs pray for the following relief:

a.    That this action be certified and proceed as a class action and that Walker be certified as the representative of the class and that her counsel be appointed class counsel;

b.    A declaration that the Point of Sale Inspection Ordinance is unconstitutional;

c.    A temporary restraining order, preliminary and permanent injunction prohibiting City from enforcing the Point of Sale Inspection Ordinance and enjoining City from prohibiting the sale of property or refusing to issue transfer stamps in the absence of a point of sale inspection and/or issuance of a "Certificate of Compliance;"

d.    An award of reasonable attorneys fees and expenses as part of the costs of this action, pursuant to 42 U.S.C. § 1988; and

e.    Such other relief as the Court deems just and proper.

144427v3

### COUNT II:  LACK OF PROCEDURAL DUE PROCESS

38.    Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1-29, as though fully set forth herein.

39.    The Point of Sale Inspection Ordinance fails to provide procedural due process. Among other things, the due process clause requires that, at a minimum, a hearing must be provided *before* a property right -- here, the right to transfer property -- can be taken.  The Point of Sale Inspection Ordinance immediately deprives a property owner of her right to sell her property without first providing due process.  The Ordinance fails to notify a property owner of what conditions fail to constitute "good repair."  An inspector has unfettered discretion to order repairs unrelated to conditions that affect health or safety or the public good.  An owner must comply with any repair order before he can obtain the transfer stamp necessary to close the sale of the property.

40.    Property owners must capitulate to City's inspectors' demands, even if the repair order is mistaken, unnecessary from a public health or safety standpoint or otherwise improper, if they want to sell their property.  Owners are not permitted to make their own repairs; they must use a licensed contractor and endure unnecessary cost and delay.  The Point of Sale Inspection Ordinance prohibits the transfer of every residential property unless City consents, but no due process protection attaches.  In effect, City has enjoined the transfer of residential property -- without a complaint, evidence, a hearing or any procedural or substantive rules -- until it decides to consent.  The home seller has no protection if an inspector conditions City's consent on "repairs" that have no relationship to health or safety.  Such a scheme does not comport with due process.

41.    As respects deconversions, the Point of Sale Inspection Ordinance does not provide *any* procedural due process protection to ensure that City does not wrongfully deprive

13

property owners of the "valuable property right" to sell and transfer legal nonconforming property. The ordinance does not provide any notice of how City will determine whether property is "legal" or "illegal." Further, property owners are not granted a meaningful hearing before an independent tribunal, where they can be represented by counsel, rebut City's positions or submit evidence to show that the property is not an illegal conversion.

42.    Plaintiffs have suffered and will continue to suffer immediate and irreparable harm from enforcement of the Point of Sale Inspection Ordinance, including its deconversion provisions, because the Point of Sale Inspection Ordinance fails to provide procedural due process guaranteed by the U.S. Constitution. This irreparable harm to Plaintiffs will substantially outweigh any harm to City if immediate relief is granted. Even if the Point of Sale Inspection Ordinance is enjoined, City can protect public health and safety with the Code Enforcement Ordinance and Rental Dwelling Inspection Ordinance.

43.    There is no adequate remedy at law. Money damages are not adequate to remedy the immediate loss of Constitutional rights.

WHEREFORE, Plaintiffs pray for the following relief:

a.    That this action be certified and proceed as a class action and that Walker be certified as the representative of the class and that her counsel be appointed class counsel;

b.    A declaration that the Point of Sale Inspection Ordinance is unconstitutional under the United States Constitution;

c.    A temporary restraining order, preliminary and permanent injunction prohibiting City from enforcing the Point of Sale Inspection Ordinance and enjoining City from prohibiting the sale of property or refusing to issue transfer stamps in the

144427v3

absence of a point of sale inspection and/or issuance of a "Certificate of

Compliance;"

d.     An award of reasonable attorneys fees and expenses as part of the costs of this

action, pursuant to 42 U.S.C. § 1988; and

e.     Such other relief as the Court deems just and proper.

**COUNT III: CITY UNCONSTITUTIONALLY APPLIES THE ZONING CODE TO FORCE THE DECONVERSION OR MODIFICATION OF LEGAL NONCONFORMING PROPERTY AS A CONDITION OF THE RIGHT TO SELL SUCH PROPERTY**

44.     Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1-29, as though fully set forth herein.

45.     The right to continued use of, and the right to sell, legal nonconforming property are constitutionally protected property rights.  Under Illinois law, the right to continue a legal nonconforming use can only be taken away gradually and only if necessary for health and safety reasons.  65 ILCS 5/11-13-1.

46.     The Point of Sale Inspection Ordinance, the Zoning Ordinance and City's conduct in enforcing them effectively prohibits owners of legal nonconforming property from selling it unless they immediately deconvert it or conform it to the current zoning classification.  The Zoning Ordinance states that legal nonconforming property cannot be rebuilt as such if it is damaged by more than 50%.  Ex. C.  In addition, the Point of Sale Inspection Ordinance does not require City to issue re-build letters (that state legal nonconforming property can be built as such if damaged) that buyers' lenders uniformly require.  Moreover, City arbitrarily refuses to issue re-build letters.  Buyers' lenders will not loan buyers money in the absence of a re-build letter.  Thus, under the current scheme, owners of legal conforming property are forever barred from selling their legal nonconforming property.

15

144427v3

47.    City applies the Zoning Code and refuses to issue re-build letters in such a way that unreasonably restrains the rights of owners of legal nonconforming property from selling their property as legal nonconforming.  As applied, the Zoning Code also violates 65 ILCS 5/11-13-1.

48.    Plaintiffs have suffered and will continue to suffer immediate and irreparable harm from how City applies the Zoning Code, including its refusal to issue rebuild letters because City's conduct effectively prohibits owners of legal nonconforming property from selling such property as legal nonconforming.  Thus, as applied, the Zoning Code and City's conduct in refusing to issue rebuild letters violate the protections in the U.S. Constitution against unreasonable governmental restriction on the right to sell private property.  This irreparable harm to Plaintiffs will substantially outweigh any harm to City if immediate relief is granted.  City can protect public health and safety with the Code Enforcement Ordinance and Rental Dwelling Inspection Ordinance.

49.    There is no adequate remedy at law.  Money damages are not adequate to remedy the immediate loss of Constitutional rights.

WHEREFORE, Plaintiffs pray for the following relief:

a.    That this action be certified and proceed as a class action and that Walker be certified as the representative of the class and that her counsel be appointed class counsel;

b.    A declaration that, as applied by City, the Zoning Code, including City's refusal to issue rebuild letters, is unconstitutional under the United States Constitution and violates 65 ILCS 5/11-13-1;

16

c.    A temporary restraining order, preliminary and permanent injunction prohibiting City from refusing to issue rebuild letters;

d.    An award of reasonable attorneys fees and expenses as part of the costs of this action, pursuant to 42 U.S.C. § 1988; and

50.    Such other relief as the Court deems just and proper.

DATED:  March 4, 2008                    Respectfully submitted,

**AYANNA WALKER AND ALL OTHERS SIMILARLY SITUATED,**

Philip C. Stahl
Patrick T. Nash
Maggie M. Hanel                    By:/s/ Patrick T. Nash_____
GRIPPO & ELDEN LLC                        One of Their Attorneys
111 South Wacker Drive
Chicago, IL 60606
Phone: (312) 704-7700
Fax: (312) 558-1195

17

144427v3

## CERTIFICATE OF SERVICE

I, Patrick T. Nash, certify that on this 4th day of March, 2008, I served the

foregoing **SECOND AMENDED VERIFIED CLASS ACTION COMPLAINT FOR**

**TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION,**

**PERMANENT INJUNCTION, DECLARATORY AND OTHER RELIEF** to the following

by Electronic Mail Transmission via the ECF System upon:

> Mark H. Sterk
> ODELSON & STERK, LTD.
> 3318 West 95th Street
> Evergreen Park, IL  60805

> John B. Murphey
> ROSENTHAL, MURPHEY & COBLENTZ
> 30 North LaSalle Street
> Suite 1624
> Chicago, IL  60602

> /s/ Patrick T. Nash
> Patrick T. Nash

144427v3

## VERIFICATION

I, Ayanna Walker, verify under penalty of perjury that the foregoing statements set forth in the Second Amended Verified Class Action Complaint For Temporary Restraining Order, Preliminary Injunction, Permanent Injunction, Declaratory and Other Relief are true and correct.

_Ayanna Walker_
Ayanna Walker

145030v1

# EXHIBIT E

1

1

2            IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
3                   EASTERN DIVISION

4
AYANNA WALKER,                    ) DOCKET NO. 07 C 6148
5                                 )
                    Plaintiff,)
6                                 )
     vs.                          )
7                                 )
CALUMET CITY, ILLINOIS            ) Chicago, Illinois
8                                 ) November 21, 2007
                    Defendant.) 9:00 o'clock a.m.
9

10

11

          TRANSCRIPT OF PROCEEDINGS BEFORE THE HONORABLE
12               MILTON I. SHADUR, Judge

13 APPEARANCES:

14 For the Plaintiff:
                    MR. PHILIP C. STAHL
15

16

17 For the Defendant:
                    MR. MARK H. STERK
18

19

20

21                   JESSE ANDREWS
          Official Court Reporter - U. S. District Court
22               219 S. Dearborn Street
                 Chicago, Illinois  60604
23                   (312) 435-6899

24          *     *     *     *     *     *

25

5

1  muster.  So I don't know how many times we can, you know --

2            THE COURT:  You know, but I took exception the last

3  time.  That is, I gave you not just a ruling, I gave you what

4  I thought were a lot of signals about how -- the way in

5  which -- it would be possible to obviate the problems, really

6  if not all, the bulk of any problems.  And it seems to me that

7  the sensible thing would be to focus on those rather than just

8  throwing up your hands and saying, "Well, we are never going

9  to get something pass the Court."

10           MR. STERK:  Well, Judge --

11           THE COURT:  I would hope that's not the message.

12           MR. STERK:  -- I am certainly not suggesting that to

13  the Court, and my comments shouldn't be taken that way,

14  because if that was my inclination I would have said that at

15  the last hearing, and I wouldn't have bothered to go back to

16  the City Council, because I had to reschedule another meeting

17  that I had for other clients to make -- you know, to make the

18  appearance to take this issue up with them.  So that certainly

19  is not the intention from my comments.

20           What the City Council has done is they have

21  voluntarily held the enforcement Of the current ordinance in

22  abeyance until this can be resolved, which you know they are

23  not obligated to do because they are not under any court order

24  at this time.

25

10

1  attorney-client constraints, I am not able to say --

2         THE COURT:   I am not asking about that --

3         MR. STERK:   -- everything that I said to them.

4         THE COURT:   Yes.

5         MR. STERK:   But I can say to you that what I did was

6  present to them were a whole variety of ways to resolve these

7  situations.   And what the City Council said to me was that

8  this process that's been going on for so long, and to ask us

9  in one hour to say this is what you need to do to fix it, it's

10 not said to me --

11        THE COURT:   That's the reason that's I started out

12 saying, "Can't you put in on the agenda at a time when they

13 don't feel, 'Oh, we only have an hour and the judge has been

14 unfair, he put us under the gun,'" whatever, whatever

15 whatever.   Because my sense is that everybody is going to be

16 better off -- everybody, plaintiff and the City -- if they can

17 address in a sensible way, a rational way, the things that I

18 have talked about.

19        And you know -- look.   If they are not going to do

20 it, then I guess I am going to have to ultimately decide the

21 question whether this current ordinance will pass muster

22 constitutionally or not.

23        MR. STERK:   And if I can continue, that is why the

24 City Council is not enforcing the ordinance right now, because

25 they want to be reasonable about -- you know about the whole

11

1 situation, while at the same time protecting what they think

2 is a vital City interest.  So we have not -- you know when the

3 Appellate Court decision didn't come - you know came down and

4 dismissed the original case, there was no rush to enforce the

5 ordinance, because we expected that this was going to happen

6 and we are trying to get this worked out.

7         THE COURT:  I am not going to fault you for that.

8 My question, I guess simplistic and what I asked a couple of

9 times, is can't this be put before them in a way and at a time

10 when they are able to reach a rational resolution and maybe

11 come up with a solution.

12         MR. STERK:  Yes it can, but it will require a

13 special meeting.  Because they cannot -- I can't ask them to

14 take something that's going to take hours and hours of

15 discussion and deliberation --

16         THE COURT:  I am not quarreling with that.

17         MR. STERK:  -- take up on the second and third

18 Thursday in the night when they have all worked all day and

19 come here and take care of the rest of the City's business.

20         THE COURT:  So what do you think in terms of time?

21         MR. STERK:  Well, you know I don't know, because now

22 I will have to go back and ask the Mayor and the Clerk, poll

23 the City Council, find out when they would be willing to have

24 a special meeting, when they are capable of convening a

25 special meeting to discuss that.  What I have said to the

12

1  Court now a couple of times already is that the City has

2  voluntarily stayed the enforcement of the  ordinance.

3          THE COURT:  Let me put it over to not long after the

4  first of the year, to give you a chance to talk with them and

5  find out -- see about setting up a schedule.  And in the

6  meantime -- now look.  If they are not enforcing it on a

7  voluntary basis, it doesn't seem to me that you can point to

8  irreparable harm on the part of the --

9          MR. STAHL:  Your Honor, I agree.  This is the first

10 we have heard --

11         THE COURT:  I know that.

12         MR. STAHL:  -- they are not enforcing.  That's good

13 news.

14         THE COURT:  Okay.

15         MR. STAHL:  That makes the motion for preliminary

16 injunction less urgent than it otherwise would be.

17         THE COURT:  Okay.  So let's put it over.  And if, as

18 I hope would not be the case, something erupts in the

19 meantime, you people can come in on a motion.

20         MR. STAHL:  Yes.

21         MR. STERK:  Right.  And if something interrupts in

22 the interim, and I am told it's not going to happen, they are

23 going to stand with the ordinance the way it is, then I will

24 come back and tell the Court.

25         THE COURT:  Sure.