IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HUSSEIN H. MANN and DEBRA HOUSTON-MANN,<br><br>   *Plaintiffs,*<br><br>v.<br><br>CALUMET CITY, ILLINOIS,<br><br>   *Defendant.* | Case No. 08-cv-00555<br><br>Judge David H. Coar |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR TEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION**

Philip C. Stahl
Patrick T. Nash
Donald P. Bunnin
Mark A. Semisch
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, Illinois 60606
(312) 704-7700

151453v1

# INTRODUCTION

Plaintiffs (the "Manns") move the Court for entry of a TRO and/or preliminary injunction enjoining enforcement of Calumet City's ("City") Point of Sale Inspection Ordinance ("Ordinance") (Ex. A). The Manns' motion is directed at Counts I and II of their Amended Verified Complaint. This memorandum sets forth (I) a brief fact statement, including (A) Judge Shadur's entry of two preliminary injunctions against earlier iterations of the Ordinance, (B) City's violation of Judge Shadur's injunction that caused considerable harm to the Manns, and a detailed explanation of (C) the Ordinance and (D) other ordinances at City's disposal to address health and safety issues, and (II) why the Manns are entitled to immediate injunctive relief.

## I.    STATEMENT OF FACTS

### A.    Judge Shadur's Injunctions

In *Realtor Association of West/South Suburban Chicagoland v. Calumet City*, No. 06-cv-02271 (N.D. Ill.), Mainstreet Organization of Realtors® ("Association") challenged the constitutionality of City's then-enacted Point of Sale Inspection Ordinance. On August 8, 2006, Judge Shadur entered a preliminary injunction against enforcement of that ordinance (the "August 8 Injunction") (Ex. B). Thereafter, City amended its ordinance and moved to dissolve the August 8 Injunction. Judge Shadur granted the motion to dissolve and, after briefing, on December 8, 2006, enjoined the new ordinance (the "December 8 Injunction") (Ex. C). The Seventh Circuit vacated the December 8 Injunction on the ground that Association lacked prudential standing to challenge the ordinance. *Mainstreet Org. of Realtors v. Calumet City*, 505 F.3d 742 (7th Cir. 2007). The Manns' suit is one of several actions that have been filed by City homeowners seeking to have the injunctive relief entered by Judge Shadur reinstated. Another of those actions, *Walker v. Calumet City*, No. 07 C 6148, was recently dismissed as moot after

City represented that it would not enforce the Ordinance against the plaintiff because her property had recently passed an annual rental dwelling inspection.

Since the Seventh Circuit vacated the December 8 Injunction on standing grounds, City has amended its Ordinance yet again. Importantly, however, the ordinance enjoined by Judge Shadur is, in all material respects, the same as the Ordinance the Manns seek to now enjoin. For example, both ordinances provide that a homeowner cannot sell property unless the property "passes" an inspection. Moreover, neither version of the ordinance contains limitations on the scope of searches or the types of repairs City can order as a precondition of the right to sell property. Thus, both versions of the ordinance allow City to stop sales for purely cosmetic and trivial reasons, such as having a loose soap dish. The reasoning that led Judge Shadur to issue two injunctions applies with equal force in the instant action.

**B.      Impact of the Ordinance on the Manns (And Other Homeowners)**

      **1.      City's Violation of Judge Shadur's Injunction As Respects the Manns**

In the fall of 2006, the Manns listed their property for sale and entered into a contract for the sale of the property. *See* Houston Declaration (Ex. D) at ¶ 3. The Manns scheduled the closing of the sale for October 30, 2006. *Id.* Prior to the closing, Ms. Houston-Mann and the buyer went to City's Department of Inspectional Services to purchase the necessary transfer stamps. *Id.* at ¶ 4. In violation of the August 8 Injunction, City told the Manns and the buyer that, even though City's file indicated that the property was "legal nonconforming," City would not issue a certificate of occupancy unless the property was deconverted. *Id.* at ¶ 5.

As a result of City's statements, the buyer decided to not purchase the property and the Manns lost the sale and suffered considerable damage. *Id.* at ¶¶ 6, 8, 10. Judge Shadur held City in contempt for interfering with the Manns' sale and ordered City to compensate the

Manns for their losses. Ex. N. City has refused to compensate the Manns and even denied the existence of Judge Shadur's order. Ex. O. Not only did the Manns suffer monetary loss as a result of City's conduct, they also suffered irreparable harm including the violation of their Constitutional right to freely sell their property, the loss of a sale in an extremely poor housing market, and emotional distress. The Manns have struggled to hold onto their property and potentially face foreclosure in the near future. *Id.* at ¶ 10.

### 2. The Manns' (And Others') Desire To Sell Their Property

The Manns are again attempting to sell their property. *Id* at ¶ 9. Unless enjoined, City can use the Ordinance – as it did in October 2006 – to unconstitutionally interfere with the Manns' efforts to sell their property. The Ordinance, of course, affects all property owners in City, not just the Manns. As of April 28, 2008, there were 35 real estate listings in City with contracts pending. Joseph Declaration (Ex. E) at ¶ 3. There are 456 active listings of property in City as of the same date. *Id.* Each such property is subject to the Ordinance if not enjoined.

## C. Key Aspects of the Ordinance

### 1. Transfer Stamps and Point of Sale Inspection Requirement

The Ordinance provides that property can only be sold if City issues transfer stamps. Calumet City Municipal Code ("Code") §§ 82-325, 82-328 (Ex. F). In all but one instance,[1] the only way for sellers to obtain transfer stamps is to first obtain a final or conditional "Certificate of Compliance" from City and to pay any outstanding water bill (even if disputed). Ex. A at §§ 14-1(h); 14-1(i), Ex. F at § 82-327(b). City will issue a Certificate of Compliance only if it decides the property "passed" a point of sale inspection. To "pass" an inspection and

---

[1] The only situation in which a Certificate Of Compliance is not required to obtain transfer stamps is when an owner refuses his consent to an inspection and City fails to obtain a warrant to conduct the search. Ex. A at §14-1(f).

obtain a Certificate of Compliance, a property owner must make all repairs (either by himself or using a licensed contractor) ordered by City after the inspection. *Id.*; *see also* Ex. A at § 14-1(k).

### 2. No Pre-Deprivation Due Process

The Ordinance immediately deprives a homeowner of her right to sell her property until City decides to permit it. Upon issuance of an inspector's repair order, the homeowner is prohibited from selling his property until repairs are made. The Ordinance provides the homeowner no due process *prior to* this deprivation.

In addition, the Ordinance requires citizens to pay the water bill before City will issue transfer stamps. Ex. A at § 14-1(i). Although the Ordinance states that an owner can dispute the water bill in a "predeprivation hearing," the Ordinance does not explain the due process protections, if any, of such a hearing and still requires the owner to pay the bill "under protest" while she challenges it. Thus, if a property owner wants to sell her property, she must pay what City claims it is owed. *Id.* Otherwise, she cannot obtain a transfer stamp. *Id.*

### 3. Lack Of Restriction On The Scope Of Inspections

The Ordinance does not restrict, in any way, the scope of searches or limit searches to health or safety issues. Ex. A. Moreover, the Ordinance does not contain any limitations on the duration or location of inspections (*e.g.*, there is no limitation on inspectors searching bedrooms, closets, desks or other areas where private or personal property may be stored). Rather than placing limitations on the scope of searches (*e.g.*, limiting searches to matters that concern health and safety), the Ordinance states that "[a]ll structures shall be in compliance with Article X, Sections 14-691 and 14-692 of this Chapter 14, 'Property Maintenance Code.'" *Id.* at §14-1(c)(1). Sections 14-691 and 14-692 adopt the "2006 International Property Maintenance Code" (the "International Code") with minor modifications. Ex. G. The International Code is not limited to issues that affect health and safety. Nor does the

International Code restrict the type of things City can order to be "repaired" before it will issue transfer stamps. Rather, the International Code states that property must be in "good repair." *See id.* at §§ 304, 305. Under the International Code, City inspectors have unfettered discretion to search for as long as, and for whatever, and wherever they want.

Under prior versions of the Ordinance (which Judge Shadur twice enjoined) City repeatedly stopped sales of property (by refusing to issue Certificates of Compliance) until property owners made "cosmetic repairs" unrelated to health, safety, and public welfare such as:

    a.    Painting windows, tightening a loose soap dish, replacing a "decorative cover" on a vanity;

    b.    Replacing floor tiles, tightening a loose soap dish, painting a bedroom wall, putting a "globe" on a light, painting a bathroom ceiling;

    c.    Repairing closet doors, painting door trims, repairing kitchen cabinets; and

    d.    "Patch – Paint – Clean – Decorate." *See* Ex. H.

City's incorporation of the International Code into the Ordinance will not curb City's past abuses because City can improperly rely on the "good repair" provisions of the International Code to improperly order cosmetic repairs as a condition to the right to sell the property. A homeowner, of course, cannot stop an overly intrusive search or refuse to make cosmetic repairs. Homeowners must capitulate to an inspector's demands, even if the repair work is unnecessary from a public health or safety standpoint, if they want to sell their property.

    4.    **Deconversion Provisions and Lack of Pre-Deprivation Due Process**

The Ordinance permits City to order the "deconversion" of "illegally converted" property. Ex. A at §§ 14-1(c)(2), 14-1(g). The Ordinance contains no due process protection against City improperly ordering the deconversion of legal nonconforming property as a precondition of the right to sell the property. *Id.* There is no pre-deprivation hearing at which property owners are permitted to be represented by counsel and to submit evidence that the

5

property is legal. *Id.* Thus, City may prevent the sales of legal nonconforming property simply by declaring it illegal. *Id.* Indeed, City did just that in connection with the Manns' attempt to sell their property in October 2006.

     **5.    Unreasonable Delays**

The Ordinance also unreasonably restrains the free alienability of property by allowing City unreasonably long time periods to conduct its searches, order repairs, and make re-inspections. *See* Ex. A at § 14-1(d) (allowing City 28 days to conduct inspection after receipt of notice of transfer), § 14-1(g)(1) (granting City three additional days after inspection to issue inspection report), § 14-1(h) (granting City three additional days to complete re-inspections after repairs are made). The Ordinance imposes no limit on the number of reinspections City may require because "new repairs" may be ordered during reinspection. The Ordinance also imposes no time limit on when City must issue a Certificate of Compliance after reinspection. *Id.* at § 14-1(h). Thus, City can, at a minimum, prevent sales of private property for at least fifty days (assuming conservatively, that (i) it takes ten days for a homeowner to find a licensed contractor who can make all repairs, and for such contractor to make repairs, and (ii) City issues a Certificate of Compliance within ten days after reinspection). During such time, sales can and will be lost. Delays are considerably longer if a homeowner appeals City's decision to not issue a Certificate of Occupancy to the Circuit Court.

   **D.    City's Other Ordinances**

City has two other ordinances that allow inspections to address health and safety issues. First, City enacted Code, Article IX, §§ 2-941 *et seq.* ("Code Enforcement Ordinance"), which allows City to enforce building codes and to prevent violations that create legitimate public health and safety problems (including illegal conversions). Ex. I. Second, City enacted Code, Article X, Division 2, § 14-711 *et seq.* ("Rental Dwelling Inspection Ordinance") which

6

151453v1

allows City to annually inspect multi-family dwellings, such as the Manns' property, to ensure compliance with building and maintenance codes. Ex. J. Neither of these ordinances can be used to prevent the sale of property. Rather, they can be used to address legitimate safety issues by, among other things, issuing fines if safety issues are not addressed. Ex. I at § 2-952. Under the Code Enforcement Ordinance, before City can issue a fine, property owners are afforded due process. Such pre-deprivation due process is lacking in the Ordinance.

Recently, in an effort to moot the *Walker* litigation, City conceded that compliance with the Ordinance is unnecessary and redundant if a property owner passes an inspection pursuant to the Rental Dwelling Inspection Ordinance. Ex. K.

II. **THE MANNS ARE ENTITLED TO INJUNCTIVE RELIEF**

To obtain a preliminary injunction, the Manns must demonstrate: (A) some likelihood of success on the merits; (B) without injunctive relief, they will suffer irreparable harm for which there is no adequate remedy at law; (C) the irreparable harm the Manns will suffer absent the requested relief will outweigh the irreparable harm City will suffer if the relief is granted (measured over the length of time that the relief will be in force), and (D) the public interest will be served if injunctive relief is granted (in terms of the consequences to non-parties). Before Judge Shadur and the Seventh Circuit, City has never contested issues B-D. *Jak Prod., Inc. v. Wiza*, 986 F.2d 1080, 1084 (7th Cir. 1993). The more likely it is that the Manns will succeed on the merits, the less the balance of irreparable harms need weigh toward its side. *Abbott Lab. v. Mead Johnson & Co.*, 971 F.2d 6, 11-12 (7th Cir. 1992).

A. **Likelihood of Success on the Merits**

1. **Unreasonable Restraint on Manns' Right to Sell Their Property**

The Ordinance unreasonably and unconstitutionally restrains the alienability of the Manns' property in several ways.

7

First, the Ordinance provides that property cannot be sold unless City issues a transfer stamp. Ex. A at § 14-1(h); Ex. F at §§ 82-325, 82-327(b), 82-328. With one limited exception (*see* n.1, above), the only way for property owners to obtain a transfer stamp is to first obtain a "Certificate of Compliance" which, in turn, can only be obtained if an inspector decides his property "passed" a point of sale inspection. Ex. A. A property owner can "pass" a point of sale inspection only if it completes all repairs required by the inspector -- even if those repairs are cosmetic in nature. *Id.* Thus, even if property complies with all City codes, a property owner may not sell his property if City refuses to issue a "Certificate of Compliance."

Second, the Ordinance contains no limitations on the type of repair City can order as a precondition of the right to sell property. *Black v. Village of Park Forest,* 20 F. Supp. 2d 1218, 1228-30 (N.D. Ill. 1998) (inspection ordinance held unconstitutional because it did not contain limitations regarding scope of permissible searches). City has historically stopped sales of property until homeowners make cosmetic repairs such as replacing soap dishes and painting. Nothing in the Ordinance restrains City's powers in any way.

Third, the Ordinance contains unreasonably long deadlines which, even if everything works perfectly, allow City to delay or prevent sales for more than 50 days. During such delay, sales will be lost and property values diminished.

These aspects of the Ordinance, collectively and individually, show that the Manns have some likelihood of success on their claim that the Ordinance unreasonably and unconstitutionally interferes with the right to freely transfer property. In vacating the December 8 Injunction on standing grounds, the Seventh Circuit correctly noted:

> The challenged ordinance is quite likely to delay the sale of homes in the area serviced by the real estate brokers whose association has brought this suit, to reduce sales prices, and thus to reduce the brokers' commissions . . .

> The initial victims of an ordinance impeding the sale of homes are homeowners who would like to sell – or perhaps all homeowners subject to the ordinance; for as we said, any impairment of the salability ('alienability' in an older legal vocabulary) is one of the rights that, along with such other rights as the right to the exclusive enjoyment of the property, make a fee-simple interest more valuable than other interest in property, such as that of a licensee.

*Mainstreet Org. of Realtors v. Calumet City*, 505 F.3d 742, 745 (7th Cir. 2007).

In addition to the Seventh Circuit's statements that the Ordinance impairs sales, the Illinois Attorney General has ruled that, although cities are permitted to adopt ordinances to protect public health and safety, they may not use such ordinances to restrict the free transfer of property. Op. Ill. Att'y Gen. No. 94-024 (Oct. 25, 1994), 1994 WL 601863 ("Municipalities are authorized, under Article 11 of the Municipal Code (65 ILCS 5/11-1-1 et seq.) (West 1992) to adopt a number of ordinances and codes designed to protect public health and safety, and are authorized to enforce such codes by requiring permits, fees, and fines ... Further, municipalities may impose various fees for other services relating to real property. *In no instance, however, are municipalities authorized to limit the alienability of property in order to enforce such code.*") (emphasis added) (Ex. L). But the Ordinance does exactly what the Illinois Attorney General has said municipalities may not do. *Huggins v. Isenbarger*, 798 F.2d 203, 208-10 (7th Cir. 1986) ("a federal court is not authorized on that account to give the Attorney General's views lesser weight than they would receive if they appeared in a bound volume of legal opinions").

The Illinois Supreme Court has also made clear that municipalities may not use ordinances to interfere with the free alienability of property. *Petropoulos v. Chicago*, 5 Ill. 2d 270, 274-75, 125 N.E.2d 522, 525 (Ill. 1955) ("To place a legal restriction on the use of such property to the extent the same is rendered practically unsaleable would be an utter violation of a man's right to alienate property"). The Court should follow this authority and find that the Ordinance unconstitutionally interferes with the free alienability of property.

9

151453v1

### 2. Lack of Procedural Due Process

The right to sell property is, by itself, a property right protected by the Constitution. *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 142 (1978); *United States v. James Good Real Prop.*, 510 U.S. 43, 53-54 (1993) ("right of sale" is one of many protected property rights associated with the ownership of real property). Basic due process jurisprudence dictates that, *before* a property right – such as the right to sell property – can be taken, the State must provide due process, including the right to be heard. *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 11 (1978) ("[S]ome kind of hearing is required at some time *before* a person is finally deprived of his property rights") (internal cite omitted) (emphasis added); *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ("Due process requires 'the opportunity to be heard at a meaningful time and in a meaningful manner'").

The Supreme Court has repeatedly applied this fundamental due process rule – that a hearing is required *before* a property right can be taken away – when the "taking" adversely affects the fundamental right to freely sell residential property. For example, *Connecticut v. Doehr*, 501 U.S. 1 (1991) held unconstitutional a statute that permitted prejudgment attachment of real estate without a hearing. The Supreme Court emphasized the significance of an owner's right to freely sell his home without governmental interference:

> [T]he property interests that attachment affects are significant. For a property owner . . . attachment ordinarily clouds title; impairs the ability to sell or otherwise alienate the property . . . . *Id.* at 11.

The Supreme Court also held that the taking of the right to sell property – even if only temporary – requires pre-deprivation due process protection:

> But the Court has never held that only such extreme deprivations trigger due process concern. To the contrary, our cases show that even the temporary or partial impairment to property rights that attachments, liens, and similar encumbrances entail are sufficient to merit due process protection. *Id.* at 12 (citation omitted).

10

151453v1

Similarly, the Court stated:

> The Fourteenth Amendment draws no bright lines around three-day, 10-day, or 50-day deprivations of property. Any significant taking of property by the State is within the purview of the Due Process Clause. *Id.* at 15, *quoting Fuentes v. Shevin*, 407 U.S. 67, 86 (1972).

The Supreme Court held that a *post-deprivation* hearing is not sufficient to comply with due process because a post-deprivation hearing "would not cure the temporary deprivation that an earlier hearing might have prevented." *Id.* at 15.

Similarly, in *Daniel Good*, the Supreme Court held that, as respects the deprivation of real property such as a home, the requirement for a predeprivation hearing is critically important because, without a hearing, property owners are deprived of "valuable rights of ownership, including the right of sale." 510 U.S. at 53-54. In *Daniel Good*, the Court held that a hearing was required before a home could be seized pursuant to 21 U.S.C. §881(a)(7) on the ground that the home was used to facilitate a federal drug offense. Relevant to our case, the Supreme Court observed at pp. 53-54:

> [A property owner's] right to maintain control over his home, and to be free from governmental interference, is a private interest of historic and continuing importance. ... The seizure deprived [the property owner] of valuable rights of ownership, including the right of sale ... All that the seizure left him was the right to bring a claim for the return of title at some unscheduled future hearing. ... The seizure of a home produces a far greater deprivation than the loss of furniture, or even attachment. It gives the Government not only the right to prohibit sale, but also the right to ... modify the property, to condition occupancy ... and to supersede the owner in all rights pertaining to the use, possession, and enjoyment of the property.

*See also Linmark Associates, Inc. v. Township of Willingboro*, 431 U.S. 85, 96 (1977) (emphasizing the value of the right to sell real property when the Court prohibited a township from banning "for sale" signs, based, in part, on the effect of the ban on "one of the most important decisions [residents] have a right to make: where to live and raise their families").

The Ordinance fails to comply with the Supreme Court's edict that, at a minimum, a hearing must be provided *before* a property right can be taken. As respects point of sale inspections, the Ordinance results in the immediate deprivation of a homeowner's right to sell her property until City decides to permit it. Upon issuance of an inspector's repair order, the homeowner is prohibited from selling his property until repairs are made. The Ordinance provides the homeowner no due process *prior to* this deprivation of the right to sell his property. In effect, City has enjoined the transfer of residential property -- without a complaint, evidence, a hearing or any procedural or substantive rules -- until it decides to consent.

Ironically, City provides a "predeprivation hearing" when an owner disputes the amount owed on a water bill (probably less than $100), but provides no such hearing when City orders the deconversion of, or refuses to issue a Certificate of Compliance to allow the sale of, property worth hundreds of thousands of dollars. Ex. A at §14-1-(i) ("predeprivation hearing" consistent with *Memphis Light, Gas & Water* is required regarding any dispute over water bill). Even as respects the water bill, however, the Ordinance fails. Although an owner can dispute the water bill in a "pre-deprivation hearing," the Ordinance does not provide any detail regarding the due process protections of such hearing and requires the owner to pay the disputed bill "under protest" while she challenges the bill if she wants to obtain a transfer stamp. *Id.*

As respects deconversions, the Ordinance does not provide pre-deprivation due process protection to ensure that City does not wrongfully deprive property owners of the "valuable property right" to sell legal nonconforming property. *Village of Oak Park v. Gordon*, 32 Ill. 2d 295, 298, 205 N.E.2d 464, 466 (Ill. 1965). For example, the Ordinance does not explain how City will determine whether property is "illegal." Ex. A. Further, property owners are not granted a pre-deprivation hearing where they can be represented by counsel, rebut City's

positions or submit evidence to show that the property is not an illegal conversion. Once City declares property to be illegally converted, it cannot be sold without deconversion. Of course, this aspect of the Ordinance has already cost the Manns the opportunity to sell their property.

As the Supreme Court has held, it does not matter that the Ordinance provides some *post-deprivation* due process, such as the right to appeal a repair order, because the Constitution requires *pre-deprivation* due process. *Connecticut v. Doehr*, 501 U.S. at 15.

Because the Ordinance fails to provide pre-deprivation due process, the Manns have at least some chance of success on the merits of their claim of unconstitutionality.

### 3. Void for Vagueness

An ordinance is unconstitutional if its prohibitions are not clearly defined. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). An ordinance lacking defined standards violates the due process clause. *Brockert v. Skornicka*, 711 F.2d 1376, 1381-82 (7th Cir. 1983). To survive a due process challenge, an ordinance must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and contain "explicit standards" that preclude "arbitrary and discriminatory enforcement." *Grayned*, 408 U.S. at 108-9.

The Ordinance fails this test because it requires that property be in "good repair" but fails to explain what conditions fail to constitute "good repair." Pursuant to the Ordinance, an inspector has unfettered discretion to order repairs unrelated to health or safety issues because the Ordinance contains no standards to prevent arbitrary enforcement. City has historically relied on the "good repair" provisions to require property owners to make minor, cosmetic repairs (such as repairing soap dishes) before allowing property to be sold. Because the Ordinance lacks restrictions and definitions, it is unconstitutionally vague. *See Penny Saver Publications, Inc. v. Village of Hazel Crest*, 905 F.2d 150 (7th Cir. 1990) (finding ordinance impermissibly vague based on failure to clearly define regulated conduct).

13

B.  **Without Injunctive Relief, the Manns Will Be Denied Their Constitutional Rights -- An Irreparable Harm for Which There is No Adequate Remedy**

As a matter of law, the deprivation of a constitutional right is an "irreparable injury" for which there is no adequate remedy at law. *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976); *Bordelon v. Chicago Sch. Reform Bd. of Tr.*, No. 98 C 1932, 1998 U.S. Dist. LEXIS 7287 at *19 (May 8, 1998) ("irreparable harm is presumed to flow from a constitutional violation which is not fully compensable by monetary damages") (Ex. M).

C.  **The Irreparable Harm That Will Be Suffered Absent the Requested Relief Outweighs the Irreparable Harm that City May Suffer if Relief is Granted**

The wrongful denial of an injunction will result in irreparable harm: the deprivation of the Manns' Constitutional right to freely sell their property without unreasonable restraint by City without due process. In contrast, City will not be harmed by the injunction. Even with an injunction, City may enforce its Code Enforcement Ordinance and the Rental Dwelling Inspection Ordinance. Those ordinances allow City to eliminate code violations, including those created by illegal conversions, that relate to public health and safety, without encroaching on the right to sell property. See Ex. I at § 2-952 (property owner fined for code violation, not deprived of his Constitutional right to sell his property). As City conceded in *Walker*, City does not need to enforce the Ordinance to address health and safety issues.

Beginning upon entry of the August 8 Injunction and lasting until the recent dismissal of the *Walker* litigation, City has not enforced the Ordinance (either because enforcement has been enjoined or by voluntary agreement). Since August 8, 2006, there have been at least 611 sales of property that have closed in City. Joseph Declaration (Ex. E) at ¶ 3. City has presented no evidence showing that lack of enforcement of the Ordinance has adversely affected the health, safety or welfare of City citizens and property owners since August 8, 2006.

### D. The Public Interest Will Be Served If The Injunction is Granted

The public interest is best served by protecting the Manns and other City citizens from City's constitutional violations. It is in the public interest not to allow City to interfere with the right to sell property unless owners comply with its demands, no matter how unreasonable, and without any due process protection. The public is better served by letting the market dictate how, what and when repairs should be made and by whom. Buyers and sellers should be free to negotiate such issues without City precluding sales unless its demands are met. As of April 28, there were 35 real estate listings in City with contracts pending and 456 active listings of property in City. Each owner of such property will have his or her Constitutional rights violated if the Ordinance is not enjoined. All owners of nonconforming property are at risk that City will declare their property illegal, without due process. Plainly, it is in the public interest to make sure citizens are afforded due process before their right to sell their property is taken.

Finally, the public would not be harmed because, even if the Ordinance is enjoined, as City conceded in *Walker*, City may use the Code Enforcement Ordinance and the Rental Dwelling Inspection Ordinance to address legitimate health and safety issues.

### CONCLUSION

The Court should enjoin City's enforcement of the Ordinance.

May 21, 2008

Philip C. Stahl
Patrick T. Nash
Donald P. Bunnin
Mark A. Semisch
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, Illinois 60606
(312) 704-7700

Respectfully submitted,

**HUSSEIN MANN AND DEBRA HOUSTON-MANN**

By: _____/s/ Patrick T. Nash_____
    One of their Attorneys

151453v1