# Exhibit I

## ARTICLE IX. CODE ENFORCEMENT*

**\*Cross references:** Fire code prevention, § 30-161 et seq.

**State law references:** Administrative adjudication of ordinances, 65 ILCS 5/1-2.1-1 et seq.

### Sec. 2-941. Purpose.

The stated purpose of this article is to provide for the fair and efficient enforcement of the Municipal Code of Calumet City, Illinois, other than those ordinances pertaining to vehicular standing, parking or vehicle compliance regulation (hereafter the "City Code"), as may be allowed by law and directed by ordinance, through an administrative adjudication of violations; and, establishing a schedule of fines and penalties, and authority and procedures for collection of unpaid fines and penalties.

(Code 1980, § 2-501; Ord. No. 99-63, § VI, 11-10-1999)

### Sec. 2-942. Creation.

There is hereby established a department of the city government to be known as the ordinance enforcement department and to have the power to enforce any municipal ordinance as from time to time authorized by the city council, except for (i) any offense enforced pursuant to Article VII.5 of Chapter 17 of this Code; (ii) any offense under the Illinois Vehicle Code (625 ILCS 5/1-100 et seq.); or a similar offense that is a traffic regulation governing the movement of vehicles; and, (iii) except for any reportable offense under 625 ILCS 5/6-204. The establishment of the ordinance enforcement department does not preclude the mayor and city council from using any other method or court with jurisdiction to enforce ordinances of the city.

(Code 1980, § 2-503; Ord. No. 99-63, 11-10-1999)

### Sec. 2-943. Administrative composition.

(a) The ordinance enforcement department shall be composed of a hearing officer, an ordinance enforcement administrator, system coordinator/computer operator and hearing room security personnel, with the power and authority as hereinafter set forth.

(1) The hearing officer is authorized and directed to:

a. The hearing officer, prior to appointment, must be an attorney licensed to practice law for at least three (3) years in the State of Illinois. The hearing officer shall preside over all adjudicatory hearings and shall have the following powers and duties:

1. To administer oaths;

2. To hear testimony and accept evidence that is relevant to the existence of the City Code violation;

3. To issue subpoenas directing witnesses to appear and give relevant testimony at the hearing, upon the request of the parties or their representatives;

4. To preserve and authenticate the record of the hearing and all exhibits and evidence introduced at the hearing;

5. To issue and sign a written finding, decision and order stating whether a City Code violation exists;

6. To impose penalties, sanctions or such other relief consistent with applicable City Code provisions and assessing costs upon finding a party liable for the charged violation, except however, that in no event shall the hearing officer have authority to impose a penalty of incarceration; and,

7. To review final determination of liability for an ordinance violation in accordance with the administrative review procedures hereinafter set forth.

b. Prior to conducting administrative adjudication proceedings under this article, the hearing officer shall have successfully completed a formal training program which includes the following:

1. Instruction on the rules of procedure of the administrative hearings over which the hearing officer shall preside;

2. Orientation to each subject area of the code violations that he/she will adjudicate;

3. Observation of administrative hearings; and

4. Participation in hypothetical cases, including ruling on evidence and issuing final orders.

(2) The ordinance enforcement administrator is authorized and directed to:

a. Operate and manage the ordinance enforcement department.

b. Adopt, distribute and process all notices as may be required under this article or as may be reasonably required to carry out the purpose of this article.

c. Collect moneys paid as fines and/or penalties assessed after a final determination of liability.

d. Certify copies of final determinations of an ordinance violation adjudicated pursuant to this article, and any factual reports verifying the final determination of any violation liability which was issued in accordance with this article.

e. Promulgate rules and regulations reasonably required to operate and maintain the administrative adjudication system hereby created.

f. Collect unpaid fines and penalties through private collection agencies and direct the pursuit of all post-judgment remedies available by law.

(3) The system coordinator/computer operator is hereby authorized and directed to operate and maintain the computer programs for the administrative adjudication system of the ordinance enforcement department hereby created, on a day-to-day basis, including but not limited to:

a. Input of violation notice information.

b. Establishing hearing dates and notice dates.

c. Record fine and penalty assessment and payments.

d. Issue payment receipts.

e. Issue succeeding notice of hearing dates and/or final determination of liability.

f. Keep accurate records of appearances and nonappearances at administrative hearings, pleas entered, judgments entered, sanctions imposed, if any, fines and penalties assessed and paid.

(4) All hearing room security personnel shall be qualified off-duty, full-time, part-time or auxiliary police officers who are hereby authorized and directed to:

a. Maintain hearing room decorum.

b. Have and execute authority as is granted to courtroom deputies of the circuit court.

c. Perform such other duties or acts as may reasonably be required and as directed by the hearing officer or ordinance enforcement administrator.

(b) The mayor is hereby authorized to appoint persons to hold the positions above set forth. Other than the hearing officer, one person may hold and fulfill the requirements of one (1) or more of the above stated

positions and compensation for each of the above stated positions shall be as approved by the city council.

(Code 1980, § 2-504; Ord. No. 99-63, 11-10-1999; Ord. No. 01-56, 11-19-2001)

### Sec. 2-944. Procedures.

The system of administrative adjudication of any ordinance violation authorized to be adjudicated hereunder, shall afford a party due process of law and the hearings shall be conducted in accordance with the following procedures:

(1) Violation notices of any City Code shall be issued by the persons authorized under this Code and shall contain information and shall be certified and constitute *prima facie* evidence of the violation cited as hereinafter set forth.

(2) All full-time, part-time and auxiliary police officers as well as other specifically authorized individuals of any department of the city shall have the authority to issue violation notices.

(3) Any individual authorized hereby to issue violation notices and who detects any ordinance violation authorized to be adjudicated under this article, is authorized to issue notice of violation thereof and shall make service thereof as is hereinafter set forth.

(4) The violation notice of the City Code shall contain, but shall not be limited to, the following information:

a.  The name of the party violating the ordinance, if known.

b.  The date, time and place of the violation (date of issuance).

c.  The particular ordinance violated.

d.  The fine and any penalty which may be assessed for the ordinance violation.

e.  The signature and identification number of the person issuing the notice.

f.  The date and location of the adjudicating hearing of ordinance violations, and the penalties for failure to appear at the hearing.

g.  That payment of the indicated fine and any late payment shall operate as a final disposition of the violation.

(Code 1980, § 2-505; Ord. No. 99-63, 11-10-1999; Ord. No. 01-56, 11-19-2001)

### Sec. 2-945. Service.

(a)  Service of any violation notice shall be made by the person issuing such notice by:

(1) Handing the notice to the person responsible for the ordinance violation;

(2) Handing the notice to the responsible person or leaving the notice with any person twelve (12) years of age or older at the residence of the responsible person;

(3) Mailing the notice by first class mail, postage prepaid, to the person responsible for the ordinance violation; or,

(4) Posting the notice upon the property where the violation is found when the person is the owner or manager of the property.

(b)  The correctness of facts contained in any violation notice shall be verified by the person issuing said notice by:

(1) Signing his name to the notice at the time of issuance; or

(2) In the case of a notice produced by a computer device, by signing a single certificate, to be kept by the ordinance enforcement administrator, attesting to the correctness of all notices produced by the device while under his control.

(c)  The original or a facsimile of the violation notice shall be retained by the ordinance enforcement administrator and kept as a record in the ordinary course of business.

(d)  Any violation notice issued, signed and served in accordance herewith, or a copy of the notice, shall be*prima facie* correct and shall be  *prima facie*  evidence of the correctness of the facts shown on the notice.

(Code 1980, § 2-506; Ord. No. 99-63, 11-10-1999)

### Sec. 2-946. Administrative hearings.

An administrative hearing to adjudicate any alleged City Code ordinance violation on its merits shall be granted to the person named in the ordinance violation notice. All administrative hearings shall be recorded and shall culminate in a determination of liability or nonliability, made by the hearing officer, who shall consider facts and/or testimony without the application of the formal or technical rules of evidence. Evidence, including hearsay, may be admitted only if it is of a type commonly relied upon by reasonable prudent persons in the conduct of their affairs. The hearing officer shall, upon a determination of liability, assess fines, penalties and costs in accordance with section 2-952 hereof. Persons appearing to contest the alleged violation on its merits may be represented by counsel at their own expense. The burden of proof shall be on the alleged offender to refute the*prima facie*  case set forth in the verified notice of violation.

(Code 1980, § 2-507; Ord. No. 99-63, 11-10-1999)

### Sec. 2-947. Notices.

(a)  Upon failure of the person receiving a notice of a violation of the City Code to appear at the time and date designated for a hearing, the ordinance enforcement administrator shall send, or cause to be sent, notices as provided in subsection (b) of this section, by first class mail, postage prepaid, to the person who received the notice of an ordinance violation. Service of notices sent in accordance herewith shall be complete as of the date of deposit in the United States mail.

(b)  The notices sent pursuant to subsection (a) of this section shall be in the following sequence and contain, but not be limited to, the following information:

(1)  Date and location of violation cited in the violation notice.

(2)  Particular ordinance violated.

(3)  Fine and any penalty that may be assessed for late payment.

(4)  A section titled "Notice of Hearing" which shall clearly set forth that the person receiving a notice of the City Code ordinance violation may appear at an administrative hearing to contest the validity of the violation notice on the date and at the time and place as specified in the notice of hearing.

(5)  Date, time and place of the administrative hearing at which the alleged violation may be contested on its merits.

(6)  Statement that failure to either pay fine and any applicable penalty or failure to appear at the hearing on its merits on the date and at the time and place specified will result in a final determination of liability for the "cited" violation in the amount of the fine and penalty indicated.

(7)  Statement that upon the occurrence of a final determination of liability for the failure, and the exhaustion of, or the failure to exhaust, available administrative or judicial procedures for review, any unpaid fine or penalty will constitute a debt due and owing the city.

(c)  A notice of final determination of liability shall be sent following the conclusion of administrative hearing, as is hereinafter set forth, and shall contain, but not be limited to, the following information and warnings:

(1)  A statement that the unpaid fine and any penalty assessed is a debt due and owing the city;

(2)  A statement of any sanction ordered or costs imposed which costs are debts due and owing the city; and

(3)  A warning that failure to pay the fine and any penalty due and owing the city within the time

specified may result in proceeding with collection procedures in the same manner as a judgment entered by any court of competent jurisdiction.

(Code 1980, § 2-508; Ord. No. 99-63, 11-10-1999)

### Sec. 2-948. Final determination of liability.

A final determination of liability shall occur following the failure to pay the fine or penalty after the hearing officer's determination of liability and the exhaustion of, or the failure to exhaust, any administrative review procedures hereinafter set forth. Where a person fails to appear at the administrative hearing to contest the alleged violation on the date and at the time and place specified in a prior served or mailed notice pursuant to section 2-947(b) hereof, the hearing officer's determination of liability shall become final either upon a denial of a timely petition to set aside that determination or upon the expiration of the period for filing a petition without a filing having been made.

(Code 1980, § 2-509; Ord. No. 99-63, 11-10-1999)

### Sec. 2-949. Petition to set aside determination.

A petition to set aside a final determination of liability may be filed with the ordinance enforcement administrator within twenty-one (21) days of the date of the final determination of liability and payment of twenty-five dollars ($25.00).

(Code 1980, § 2-510; Ord. No. 99-63, 11-10-1999)

### Sec. 2-950. Judicial review.

Any final decision by a hearing officer that a City Code violation does or does not exist shall constitute a final determination for purposes of judicial review under the Illinois Administrative Review Law (735 ILCS 5/3-101 et seq.).

(Code 1980, § 2-511; Ord. No. 99-63, 11-10-1999)

### Sec. 2-951. Enforcement of judgment.

(a)  Any fine, other sanction, or costs imposed, or part of any fine, other sanction, or costs imposed, remaining unpaid after the exhaustion of or the failure to exhaust judicial review procedures under the Illinois Administrative Review Law (735 ILCS 5/3-101 et seq.) are a debt due and owing the municipality and may be collected in accordance with applicable law.

(b)  After expiration of the period in which judicial review under the Illinois Administrative Review Law (735 ILCS 5/3-101 et seq.) may be sought for a final determination of a code violation, unless stayed by a court of competent jurisdiction, the findings, decision, and order of the hearing officer may be enforced in the same manner as a judgment entered by a court of competent jurisdiction.

(c)  In any case in which a hearing officer finds that a defendant has failed to comply with a judgment ordering a defendant to correct a code violation or imposing any fine or other sanction as a result of a code violation, any expenses incurred by the city to enforce the judgment including, but not limited to, attorney's fees, court costs, and costs related to property demolition or foreclosure after they are fixed by the hearing officer, shall be a debt due and owing the municipality and may be collected in accordance with applicable law.

(d)  A lien shall be imposed on the real estate or personal estate, or both, of the defendant in the amount of any debt due and owing the city under this section. The lien may be recorded and enforced in the same manner as a judgment lien pursuant to a judgment of a court of competent jurisdiction. No lien may be enforced under this section until it has been recorded in the manner provided by Article XII of the Code of Civil Procedure (735 ILCS 5/1-101 et seq.) or by the Uniform Commercial Code (810 ILCS 5/1-101et seq.).

(e)  A hearing officer may set aside any judgment entered by default and set a new hearing date upon a petition filed within twenty-one (21) days after the issuance of the order of default if the hearing officer determines that the petitioner's failure to appear at the hearing was for good cause or at any time if the

ARTICLE IX. CODE ENFORCEMENT*                                                      Page 6 of 6

petitioner establishes that the municipality did not provide proper service of process.

(Code 1980, § 2-512; Ord. No. 99-63, 11-10-1999)


**Sec. 2-952. Schedule of fines/penalties.**

For an ordinance violation of the City Code, fines and penalties shall be as established from time to time by the mayor and city council.

(Code 1980, § 2-513; Ord. No. 99-63, 11-10-1999)

**//Calumet City, Illinois/MUNICIPAL CODE CALUMET CITY, ILLINOIS Codified through Ord. No. 07-72, enacted June 14, 2007. (Supplement No. 7)/Chapter 2 ADMINISTRATION*/ARTICLE IX. CODE ENFORCEMENT***

Exhibit J

## DIVISION 2. RENTAL DWELLING INSPECTIONS*

---

*Editor's note: Ord. No. 06-49, adopted June 22, 2006, amended division 2 in its entirety to read as herein set out. Former division 2, which consisted of §§ 14-711—14-718, pertained to similar subject matter and derived from the 1980 Code; Ord. No. 87-5, adopted Mar. 26, 1987; Ord. No. 87-16, adopted July 23, 1987; Ord. No. 88-2, adopted Feb. 25, 1988; Ord. No. 89-8, adopted Feb. 9, 1989; Ord. No. 89-40, adopted Nov. 9, 1989; Ord. No. 90-1, adopted Jan. 11, 1990; Ord. No. 94-16, adopted May 12, 1994; and Ord. No. 04-42,adopted June 29, 2004.

---

### Sec. 14-711. Certificate of occupancy requirement.

(a)  No owner, agent or person (hereinafter referred to as "responsible party") in charge of a one-family, two-family or multiple-family dwelling (hereinafter referred to as "rental dwelling", as those terms are defined in the property maintenance code, shall allow any person to occupy the same as a tenant or lessee or for valuable consideration unless said dwelling or structure shall have been inspected and determined to be in compliance with all of the provisions of the property maintenance code as well as all health and building ordinances as evidenced by a certificate of occupancy issued by the department of inspectional services ("department"). Thereafter, all rental properties shall be inspected annually and an updated certificate of occupancy issued.

(b)  No certificate of occupancy shall be issued unless the applicant[,] owner or operator agrees in his application to an inspection pursuant to this section. Notwithstanding any other provisions of this Code, when the city conducts inspections of a tenant's rental dwelling, the city must obtain the consent of such tenant to conduct the inspection. If a tenant refuses consent, the city may attempt to obtain a warrant pursuant to subsection (d) below.

(c)  Prior to the time that the department is scheduled to conduct the inspection, the department shall deliver to the owner and occupants of the structure written notice that includes the following:

(1)  Date and time of the inspection;

(2)  A statement that the owner or tenant has the right to withhold his consent to the inspection and require the city to attempt to obtain a warrant to conduct the inspection;

(d)  If the owner or occupant does not consent to the attempted inspection, the director of inspectional services ("director") or his designee shall seek in the circuit court of Cook County a warrant in accordance with the appropriate laws of the State of Illinois to allow an inspection. The application for the warrant shall specify the basis upon which the warrant is being sought and shall include a statement that the inspection will be limited to a determination whether there are violations of the city building and zoning ordinances or any applicable housing, fire or property maintenance codes or regulations. The court may consider any of the following factors along with such other matters as it deems pertinent in its decision as to whether a warrant shall issue:

(1)  Eyewitness account of violation;

(2)  Citizen complaints;

(3)  Tenant complaints;

(4)  Plain view violations;

(5)  Violations apparent from city records;

(6)  Property deterioration;

(7)  Age of property;

(8)  Nature of alleged violation;

(9)  Similar properties in the area;

(10) Documented violations on similar properties in the area;

(11) Passage of time since last inspection;

(12) Previous violations on the property.

(e)  If the annual inspection establishes that the rental dwelling complies with all the provisions of the property maintenance code as well as all other health, zoning, and building ordinances of the city, then the department of inspectional services shall issue a certificate of occupancy for said dwelling or structure. The certificate shall indicate the date of the inspection; that such dwelling or structure complies with the requirements of the property maintenance code as well as other health and building ordinances that apply to the dwelling. One (1) copy of the certificate shall be delivered to or mailed to the owner of the dwelling unit. A record of all certificates shall be kept on file by the department, and copies shall be furnished upon request to any person having a proprietary interest or tenancy interest in the dwelling affected. The director shall submit once a month to the mayor and the city council a list of addresses of those dwellings which have been inspected the previous month with an indication whether or not said dwellings have been issued certificate of occupancy permits. Every certificate of occupancy shall be issued for a period of one (1) year after its date of issuance, unless sooner revoked.

(f)  Inspection fee schedule.

(1)  Fifty dollars ($50.00) yearly.

(2)  Ten dollars ($10.00) per additional unit.

(3)  All inspection fees as herein provided shall be paid prior to the issuance of a certificate of occupancy.

(4)  Each fee set for the above covers the cost of one (1) follow-up inspection to verify compliance. In the event that additional inspections are required because full compliance did not exist at the time of the reinspection, then an additional reinspection fee of fifty dollars ($50.00) plus ten dollars ($10.00) per unit shall be assessed.

(5)  If an owner, agent or tenant has failed to appear for two previously scheduled inspections, an additional inspection fee of fifty dollars ($50.00) plus ten dollars ($10.00) per unit shall be assessed.

(Ord. No. 06-49, § 1, 6-22-2006)

## Sec. 14-712. Notice of violation.

(a)  Whenever the building official determines that any rental dwelling or the premises surrounding fails to meet the requirements set forth in this chapter or in applicable rules and regulations issued pursuant thereto, the building official in accordance with the property maintenance code and the other city health, and building codes shall issue a notice setting forth the alleged failures and advising the responsible party that such failures must be corrected. This notice shall:

(1)  Be in writing.

(2)  Set forth the alleged violations of this chapter or of applicable rules and regulations issued pursuant thereto.

(3)  Describe the rental dwelling where the violations are alleged to exist or to have been committed. Such written notice shall specify an appropriate or acceptable method of correction.

(4)  Specify a specific date for the correction of any violation alleged.

(5)  Be served upon the responsible party of the rental dwelling by the building official, or mailed to the responsible party. If one (1) or more persons to whom such notice is addressed cannot be found after diligent effort to do so, service may be made upon such persons by posting the notice in or about the rental dwelling described in the notice.

(b)  At the end of the period of time allowed for the correction of any violation alleged, which was stated in the inspection notice, the building official shall reinspect the rental property described in the notice.

(c)  If, upon reinspection, the violations are determined by the building official not to have been corrected, the

DIVISION 2. RENTAL DWELLING INSPECTIONS*                                    Page 3 of 3

building official, in turn, shall issue an O.V. (ordinance violation) ticket to initiate legal proceedings to be handled in Calumet City's housing court for the immediate correction of the alleged violations or shall order the rental property vacated within thirty (30) days, or both.

(Ord. No. 06-49, § 1, 6-22-2006)

### Sec. 14-713. Responsibility of tenants.

No tenant shall damage or cause to be damaged any unit or building leased nor shall any damage be caused to the general premises of any building used by the tenants. Each tenant and the families of each tenant shall maintain his rental unit free of any litter, and tenants shall not litter any of the premises or the buildings provided for use by the tenants. The tenants must maintain their responsibilities as outlined in the property maintenance code, subject to O.V. citations.

(Ord. No. 06-49, § 1, 6-22-2006)

### Sec. 14-714. Penalties.

Any responsible party of a rental dwelling who has received an order or notice of an alleged violation of this article shall be subject to a penalty of not less than one hundred dollars ($100.00) nor more than one thousand dollars ($1,000.00) for each day the alleged violation continues after expiration of the specified reasonable consideration period; provided that no such penalty shall be applicable while reconsideration, hearing or appeal to a court of competent jurisdiction is pending in the matter.

(Ord. No. 06-49, § 1, 6-22-2006)

### Sec. 14-715. Validity and severability.

If any section, subsection, paragraph, sentence, clause, or phrase of this Code shall be declared invalid for any reason whatsoever, this decision shall not affect the remaining portions of this Code, which shall continue in full force and effect, and to this end, the provisions of this Code are hereby declared to be severable.

(Ord. No. 06-49, § 1, 6-22-2006)

### Sec. 14-716. Savings clause.

This Code shall not affect violations of any other ordinance, code or regulation of the jurisdiction existing prior to the effective date hereof, and any such violation shall be governed and shall continue to be punishable to the full extent of the law under the provisions of those ordinances, codes or regulations in effect at the time the violation was committed.

(Ord. No. 06-49, § 1, 6-22-2006)

Secs. 14-717—14-750. Reserved.

# Exhibit K

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

AYANNA WALKER, for herself and all others ) 
similarly situated, )
                                          )
                    Plaintiffs,           )
                                          )
v.                                        )     Case No. 07 C 6148
                                          )
CALUMET CITY, ILLINOIS,                   )     Judge Milton Shadur
                                          )     Magistrate Judge Valdez
                    Defendant.            )

## AFFIDAVIT OF VAL WILLIAMS

Val Williams being duly sworn and under oath deposes and states as follows:

1.  I am Director of the Department of Inspectional Services ("Department") of the City of Calumet City.

2.  The functions of the Department include:

    a.  determining whether buildings are a legal conforming use; and

    b.  determining whether buildings sufficiently comply with the applicable City building and property maintenance ordinances to warrant the issuance of transfer stamps.

3.  I have reviewed the file maintained by the Department for the property commonly known as 521-523 GreenBay ("Property") and have determined:

    a.  that the Property is a legally non-conforming use in accordance with the applicable ordinances of the City; and

    b.  that the Property is sufficiently in compliance with the applicable building and property maintenance ordinances so that the City will issue transfer stamps in connection with conveyance of the Property upon application and payment of the applicable tax.

AFFIANT SAYETH FURTHER NOT.

_Val Williams_
Val Williams

Subscribed and Sworn to before
me this 8ᵗʰ day of April, 2008.

_____
Notary Public
MARK H. STERK
Notary Public - State of Illinois
My Commission Expires May 01, 2012

# Exhibit L

Westlaw.

1994 WL 601863 (Ill.A.G.)                                                                 Page 1


1994 WL 601863 (Ill.A.G.)

                        Office of the Attorney General
                              State of Illinois

                            File No. 94-024

                            October 25, 1994

MUNICIPALITIES:

Requirement that Title Insurance Reports Reflect Payment of Document Inspection Fee

Mr. Frank C. Casillas
Director

Dear Mr. Casillas:

I have your letter wherein you inquire regarding the validity of ordinances adop-
ted by non-home-rule municipalities which require the inspection of documents and
the payment of fees prior to the transfer of real property lying within the muni-
cipality. Of particular concern to the Department, which regulates title insurance
companies (215 ILCS 155/1 et seq. (West 1992)), is a provision in the ordinances
which mandates that the requirement of inspection and payment of fees be reflected
in title insurance reports. For the reasons hereinafter stated, it is my opinion
that the ordinances in question are not valid.

In February, 1994, the village of Westchester adopted ordinance no. 94-1387, which
purports to require that any document evidencing the transfer of ownership of real
estate located in the village must be submitted to the village for inspection and
review. Upon payment of a fee of $25, the village will affix a stamp to the docu-
ment if the subject property is found to be in compliance with all village codes
in force at the time the document is submitted. The ordinance further provides
that the requirement be reflected on all real estate title insurance reports con-
ducted precedent to the transfer of ownership, to give public notice of the man-
datory inspection. In April, 1994, the village of River Grove adopted a similar
ordinance. Both Westchester and River Grove are non-home-rule municipalities.

Non-home-rule municipalities have only those powers which are expressly granted by
statute and the constitution, those powers which are incident to those which have
been expressly granted and those powers which are indispensable to the accomplish-
ment of the declared objects and purposes of the municipal corporation. (Pesticide
Pub. Pol. v. Village of Wauconda (1987), 117 Ill.2d 107, 111-112.) Consequently,


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

as a threshold issue, it must be determined whether Westchester and River Grove
have the power to adopt the ordinances in question. Only if this question is
answered affirmatively will it be necessary to consider whether the villages'
power is preempted by State law relating to title insurers.

Neither village has cited any authority for the adoption of these ordinances. The
only purpose suggested within the body of each ordinance, apart from the collec-
tion of a $25 fee, is to determine whether the property is in compliance with vil-
lage codes (Village of Westchester Ordinance No. 94-1387, adopted February 8,
1994, at p. 1) or to determine whether any "outstanding obligation is due to the
[v]illage with respect to the property" (Village of River Grove Ordinance No.
1994-05, adopted April 21, 1994, at p. 1). Municipalities are authorized, under
Article 11 of the Municipal Code (65 ILCS 5/11-1-1 et seq. (West 1992)), to adopt
a number of ordinances and codes designed to protect public health and safety, and
are authorized to enforce such codes by requiring permits, fees, and fines. (E.g.,
65 ILCS 5/11-31.1-1 et seq.; 5/11-37-1 et seq.; 5/11-38-4 (West 1992).) Further,
municipalities may impose various fees for other services relating to real prop-
erty. In no instance, however, are municipalities authorized to limit the alienab-
ility of property in order to enforce such codes.

Although these ordinances do not expressly so state, I assume that the villages
will refuse to affix the "document review" stamp to any deed for property which is
not in compliance with the village codes (the village of Westchester) or concern-
ing which unpaid obligations may be deemed to be due (the village of River Grove).
Thus, even if the deeds are returned to the persons submitting them, if they pro-
ceed with the transactions they will violate the application ordinance and be sub-
jected to its penalties. This attempt to make alienability subject to municipal
regulation clearly exceeds the villages' powers.

Further, non-home-rule municipalities have no authority to impose a tax on the
transfer of real property. The authority to impose such a tax is expressly re-
served to home rule municipalities (65 ILCS 5/8-11-6a (West 1992)). While the fee
imposed by the River Grove and Westchester ordinances is denominated a document
inspection fee, rather than a transfer tax, there can be little doubt that it op-
erates as the letter. As previously discussed, the villages' authority to enforce
their health and safety codes is entirely unrelated to the transfer of property.
Moreover, a document inspection would provide no basis upon which to determine
whether the property was in compliance with codes, and the ordinances do not even
suggest that the affixing of the required stamp will depend upon an inspection of
the property itself. In my opinion, the inspection fee is, in both operation and
effect, a prohibited transfer tax.

Because the non-home-rule villages in question have no authority to enact or en-
force ordinances restricting the transfer of real property or to impose a fee or
tax thereon, it is my opinion that the ordinances are void and unenforceable. Be-
cause of this conclusion, it is not necessary to determine whether such ordin-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 601863 (Ill.A.G.)                                                                    Page 3


ances, with respect to their effect on title insurers, are preempted or superseded
by State laws requiring the licensure of title insurers.

Respectfully yours,
Roland W. Burris
Attorney General

1994 WL 601863 (Ill.A.G.)
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit M

**LexisNexis®** *Total Research System*

Switch Client ⋮ Preferences ⋮ Sign Off ⋮ ? Help

Search ⎸ Research Tasks ⎸ Get a Document ⎸ *Shepard's®* ⎸ Alerts ⎸ Total Litigator ⎸ Transactional Advisor ⎸ Cour

Service: Get by LEXSEE®
Citation: **1998 us dist lexis 7287**

*1998 U.S. Dist. LEXIS 7287, \**

LIONEL BORDELON, Plaintiff, v. CHICAGO SCHOOL REFORM BOARD OF TRUSTEES, successor to the Board of Education of the City of Chicago, Defendant.

Case No. 98 C 1932

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

1998 U.S. Dist. LEXIS 7287

May 8, 1998, Decided

**DISPOSITION:** **[\*1]** *Recommended that Plaintiff's motion for preliminary injunction treated as motion for permanent injunctive relief and that motion granted.*

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff school principal brought an action alleging breach of contract against defendant board of trustees (trustees), alleging that the trustees deprived him of his Fourteenth Amendment procedural due process rights in violation of 42 U.S.C.S. § 1983 when it reassigned him without a hearing or notice of misconduct charges against him.

**OVERVIEW:** The principal was reassigned from his position despite that an investigation demonstrated that the charges were insufficient to satisfy the legal standard required by Ill. Code § 34-85 and the Chief Executive Officer of the Board of Education declined to approve the charges against him. In his action, the principal sought reinstatement and an injunction preventing the trustees from reassigning him from his position without due process of law. The court granted the principal's motion for injunctive relief and treated the motion for a preliminary injunction as one for permanent injunctive relief. The court recommended that he be reinstated to his position. The principal established that he had already succeeded on the merits by demonstrating that the trustees failed to provide him with the constitutionally required notice and opportunity to be heard. The reassignment deprived the principal of the position to which he had a contractual right and in which he maintained a protected property interest. The principal's contract provided that he could be removed for cause, but no cause existed. Thus, the trustees' action was nothing more than an attempt to evade the contract terms.

**OUTCOME:** In the principal's action for breach of contract and constitutional violations, the court recommended that the principal's motion for a preliminary injunction be treated as motion for permanent injunctive relief and that the motion granted. The court also recommended the principal's reinstatement to his former position.

**CORE TERMS:** reassignment, injunctive relief, deprivation, injunction, notice, recommendation, reassigned, Board Rule, irreparable harm, adequate remedy,

constitutional violation, removal, preliminary injunction, property interest, monetary damages, terminated, deprived, temporary, employment contract, process rights, irreparable injury, liberty interest, likelihood of success, post-termination, recommend, issuance, educational, removing, state law, process violation

## LEXISNEXIS® HEADNOTES                                             ⊟ **Hide**

Civil Procedure > Judgments > Relief From Judgment > General Overview 📑
Civil Procedure > Remedies > Injunctions > Elements > General Overview 📑
Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions 📑

*HN1* ⚓ In order to qualify for a preliminary injunction, a plaintiff must show that: (1) there is a reasonable likelihood of success on the merits; (2) he will suffer irreparable harm without the issuance of a preliminary injunction; (3) no adequate remedy exists at law; (4) the harm he will suffer is greater than any harm defendant will suffer if injunctive relief is granted; and (5) the injunction will not harm the public interest. More Like This Headnote

Civil Rights Law > Section 1983 Actions > Elements > Color of State Law > General Overview 📑
Constitutional Law > Privileges & Immunities 📑
Constitutional Law > Qualifications for Federal Office 📑

*HN2* ⚓ To succeed in 42 U.S.C.S. § 1983 action, plaintiff must establish that the conduct complained of was carried out under color of state law and that this conduct deprived him of rights, privileges or immunities guaranteed by the Constitution or laws of the United States. More Like This Headnote

Constitutional Law > Substantive Due Process > Scope of Protection 📑

*HN3* ⚓ In order to assert a substantive due process violation, plaintiff must plead and prove that he had a constitutionally protected property or liberty interest, that the decision to deprive him of that interest was arbitrary or irrational, and that he either suffered a separate constitutional violation or that the state law remedies are inadequate. More Like This Headnote

Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection 📑

*HN4* ⚓ Procedural due process claims encompass a two step analysis. First, the court must ascertain whether the plaintiff has been deprived of a protected property or liberty interest, and if so, the court must then determine what process is constitutionally due. More Like This Headnote

Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection 📑
Labor & Employment Law > Employment Relationships > Employment Contracts > Conditions & Terms > General Overview 📑
Public Contracts Law > Contract Interpretation > General Overview 📑

*HN5* ⚓ A term of employment set by contract gives rise to a property interest, which the state cannot extinguish without conforming to the dictates of procedural due process. In ascertaining the nature and boundaries of the property interest protected, the court must look to the instrument, which creates the interest asserted. More Like This Headnote

Civil Procedure > Equity > Adequate Remedy at Law 📑
Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions 📑

*HN6* ⚓ To justify the entry of a preliminary injunction, plaintiff must first prove that he has no adequate remedy at law. More Like This Headnote

Get a Document - by Citation - 1998 U.S. Dist. LEXIS 7287    Page 21 of 43

Case 1:08-cv-00559    Document 40-15    Filed 05/21/2008    Page 3 of 11

Civil Procedure > Remedies > Injunctions > Elements > General Overview 🔍
Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions 🔍

*HN7* ⭐ There is no adequate remedy at law if the plaintiff will suffer irreparable harm in the interim that is, harm that cannot be prevented or fully rectified by final judgment after trial. Although sometimes treated as conceptually distinct elements, the no adequate remedy at law element and irreparable harm element are really part of the same analysis. Thus, a conclusion that the injury is irreparable in turn establishes that there is no adequate remedy at law.  More Like This Headnote

Civil Procedure > Remedies > Damages > Monetary Damages 🔍
Civil Procedure > Remedies > Injunctions > Elements > General Overview 🔍

*HN8* ⭐ Irreparable harm is presumed to flow from a constitutional violation that is not fully compensable by monetary damages.  More Like This Headnote

Civil Procedure > Remedies > Injunctions > Elements > General Overview 🔍
Civil Procedure > Remedies > Injunctions > Permanent Injunctions 🔍
Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions 🔍

*HN9* ⭐ In order to obtain permanent injunctive relief, plaintiff must establish that he has in fact succeeded on the merits rather than merely establishing the likelihood of success on the merits, as would be required on a motion for preliminary injunctive relief.  More Like This Headnote

**COUNSEL:** For Plaintiff: EDWARD J. COPELAND, Esq., MICHAEL F. BRAUN, Esq., Schuyler, Roche & Zwirner, P.C., Chicago, IL.

For Defendant: MARILYN F. JOHNSON, Esq., JAMES J. SEABERRY, JR., Esq., Board of Education of the City of Chicago, Chicago, IL.

**JUDGES:** MARTIN C. ASHMAN, United States Magistrate Judge. Judge Robert W. Gettleman.

**OPINION BY:** MARTIN C. ASHMAN

 **OPINION**

**REPORT AND RECOMMENDATION**

**I. Background**

On March 30, 1998, Plaintiff, Lionel Bordelon (hereinafter "Bordelon"), filed a two-count complaint alleging the deprivation of his civil rights and the breach of his employment contract with the Defendant, Chicago School Reform Board Trustees of (hereinafter "the Trustees"). Plaintiff seeks, *inter alia*, his reinstatement as the Principal of Kozminski Community Academy and an injunction preventing the Board from reassigning Plaintiff from his position as Principal without due process of law.

The facts relevant to this motion are not in dispute. On or about April 12, 1995, Plaintiff entered into a Uniform Principal Performance Contract **[*2]** with the Kozminski Local School Council wherein Plaintiff contracted to serve as the Principal of the Kozminski Community Academy located at 936 East 54th Street in Chicago. Pursuant to the contract, Plaintiff was to be employed as the Principal of the Kozminski Community Academy commencing July 1, 1995

Get a Document - by Citation - 1898 U.S. Dist. LEXIS 7287

Case 1:08-cv-00538 Document 40-8 Filed 05/21/2008 Page 22 of 43 Page 4 of 11

and ending June 30, 1999. Additionally, the contract provides that it constitutes the entire agreement of the parties and that no additions, deletions, or modifications may be made thereto.

Plaintiff was employed without incident as the Principal of the Kozminski Community Academy for approximately one and a half years. However, by letter dated December 12, 1996, the Kozminski Local School Council recommended that the Board of Education revoke Plaintiff's contract. This recommendation was predicated on several alleged violations of state and federal law, in addition to allegations of other misconduct and wrongdoing. After conducting a "lengthy investigation" wherein "each and every assertion brought forth by [the Local School Council] was examined in detail," Paul Vallas, Chief Executive Officer of the Board of Education, concluded that the charges were insufficient to satisfy the **[*3]** legal standard required by Section 34-85 of the Illinois Code which governs the removal of a principal. Vallas consequently declined to approve the charges pending against Plaintiff, and by letter dated February 24, 1997, so informed Josephine Hampton, the Chairperson of the Kozminski Local School Council.

While Vallas' findings would appear to have resolved the conflict surrounding Plaintiff's employment, such was not the case. On March 11, 1997, Plaintiff received a letter from Dr. Blondean Y. Davis, Deputy Chief Education Officer of the Board of Education, informing him that, effective March 12, 1997, he was to be "temporarily reassigned" to the Office of Schools and Regions of the Board of Education (hereinafter "the Central Office"). Defendant made this decision allegedly under the authority of Board Rule 4-52. Board Rule 4-52 grants the General Superintendent of Schools authority to assign a principal to a temporary assignment when the Superintendent believes the reassignment to be in the best interests of the Chicago Public Schools and the reassignment does not unreasonably compromise the educational program at the principal's school.

On October 28, 1997, Plaintiff wrote a **[*4]** letter to Marilyn Johnson, General Counsel of the Board of Education, requesting information as to whether he was the subject of an investigation and if so, requesting a copy of the charges against him. Plaintiff received no response to the letter. To date, Plaintiff has been working in the Central Office for over a year, during which time he has continued to receive the salary and benefits provided under his contract.

As Defendant has given no indication that the temporary reassignment will end prior to the expiration of Plaintiff's employment contract, Plaintiff has filed the instant motion for a temporary restraining order and preliminary injunction, asking that he be reinstated to his former position as Principal of the Kozminski Community Academy and further asking that the Defendant be enjoined from taking any action against the Plaintiff which would prevent him from being employed in this position. Plaintiff alleges that, without such injunctive relief, he will suffer irreparable harm as a result of the Defendant's actions, including the deprivation of his property and liberty rights under the Fourteenth Amendment, and the loss of his good name, reputation and honor. Plaintiff **[*5]** concludes that, while the issuance of an injunction will prevent his irreparable injury, such relief will not cause any loss or injury to the Defendant.

## II. Analysis

We begin by noting that, during oral argument, the parties waived their right to present evidence and agreed to stand on the facts as set out in their papers. In light of the absence of any factual disputes, the Court has made its ruling based strictly on the parties' written submissions.

Turning to the merits of the instant motion, the Defendant argues that Plaintiff's motion for an injunction [1] should be denied because Plaintiff has failed to establish the prerequisites to

injunctive relief. _HN1_ In order to qualify for a preliminary injunction, Plaintiff must show that: (1) there is a reasonable likelihood of success on the merits; (2) he will suffer irreparable harm without the issuance of a preliminary injunction; (3) no adequate remedy exists at law; (4) the harm he will suffer is greater than any harm the Defendant will suffer if injunctive relief is granted; and (5) the injunction will not harm the public interest. _Brunswick Corp. v. Jones_, 784 F.2d 271 (7th Cir. 1986); _Roland Machinery Co. v. Dresser_ **[*6]** _Industries_, 749 F.2d 380 (7th Cir. 1984). Defendant contends that Plaintiff is unable to establish any of above factors and is therefore not entitled to injunctive relief. The Court reviews the five factors below.

**FOOTNOTES**

1 Defendant first advances arguments directed at defeating the Temporary Restraining Order portion of Plaintiff's motion. However, as this case has advanced beyond the TRO stage, we do not address the parties' arguments which relate to the Plaintiff's request for such relief.

## A. Likelihood of Success on the Merits

In addressing the first factor, Defendant contends that the Plaintiff has misconstrued the action that the Board of Education (hereinafter "the Board") has taken. Defendant contends that, contrary to Plaintiff's assertions, he has not been removed or terminated and that, as a result, Plaintiff's reliance on the discharge procedures set forth in 105 ILCS 5/34-85 is misplaced. Defendant argues that, because Bordelon has not been terminated, he has not suffered any cognizable constitutional **[*7]** deprivation and is therefore not entitled to notice and a pre- or post-termination hearing. Additionally, Defendant argues that even if Plaintiff's reassignment did constitute a deprivation of a protected property right, the delay in providing a hearing does not implicate the due process clause. We disagree.

Plaintiff alleges that the Defendant deprived him of his Fourteenth Amendment procedural [2] due process rights in violation of 42 U.S.C. § 1983 when it reassigned him to his current position at the Central Office without a hearing or notice of the charges against him. _HN2_ To succeed in a Section 1983 action, Plaintiff must establish that the conduct complained of was carried out under color of state law and that this conduct deprived him of rights, privileges or immunities guaranteed by the Constitution or laws of the United States. _Larsen v. City of Beloit_, 130 F.3d 1278, 1282 (7th Cir. 1997). In this case, Defendant apparently concedes that it was acting under color of state law when it reassigned the Plaintiff. [3] Thus, the only remaining issue is whether the Defendant deprived Bordelon of his procedural due process rights.

**FOOTNOTES**

2 The Court notes that, while the deprivation of a constitutionally protected property interest such as the one suffered by Plaintiff may be sufficient on its own to support a substantive due process claim, Plaintiff does not appear to have asserted such a claim in his complaint or briefs. _HN3_ In order to assert a substantive due process violation, the Plaintiff must plead and prove that he had a constitutionally protected property or liberty interest, that the decision to deprive him of that interest was arbitrary or irrational, and that he either suffered a separate constitutional violation or that the state law remedies are inadequate. _New Burnham Prairie Homes, Inc. v. Village of Burnham_, 910 F.2d 1474, 1481 (7th Cir. 1990). Plaintiff has neither alleged nor argued any of the above. **[*8]**

3 We base this conclusion on the absence of any argument to the contrary in Defendant's

response brief.

HN4 Procedural due process claims encompass a two step analysis. *See Doherty v. City of Chicago, 75 F.3d 318, 322 (7th Cir. 1996)*. First, the court must ascertain whether the plaintiff has been deprived of a protected property or liberty interest, and if so, the court must then determine what process is constitutionally due. *See id.*

Turning to the first factor, it is well established that HN5 "a term of employment set by contract [gives rise to] a property interest which the state cannot extinguish without conforming to the dictates of procedural due process." *Vail v. Board of Education of Paris Union School District No. 95, 706 F.2d 1435, 1437 (7th Cir. 1983)*, *aff'd, 466 U.S. 377, 104 S. Ct. 2144, 80 L. Ed. 2d 377 (1984)* (citing *Hostrop v. Board of Junior College District No. 515, 471 F.2d 488, 494 (7th Cir. 1972)*, *cert. denied, 411 U.S. 967, 93 S. Ct. 2150, 36 L. Ed. 2d 688 (1973)*). In ascertaining the nature and boundaries of the property interest protected, the Court **[*9]** must look to the instrument which creates the interest asserted -- here, Bordelon's employment contract. *See Vail, 706 F.2d at 1437.*

Plaintiff's employment contract clearly created a contractual right of employment for the term of the contract. We reach this conclusion on the basis of the contract terms themselves which provide that the contract may not be terminated except by (1) written agreement of the parties; (2) discharge of the principal for cause; (3) closure of the school; (4) the death, resignation or retirement of the principal; or (5) misrepresentation regarding the principal's certification.

The rights created by the contract included the Plaintiff's right to perform the duties and responsibilities incident to the position of Principal of the Kozminski Community Academy, in exchange for which, the Plaintiff was to receive the specified compensation and benefits. The rights encompassed by the contract therefore include not only the relevant compensation, but also the intangible, non-economic benefits that flowed from Plaintiff's duties and responsibilities as Principal. By removing Plaintiff from his position as Principal and assigning him to a job in the Central **[*10]** Office with responsibilities which are not commensurate with those performed by Plaintiff in his capacity as Principal, 4 Defendant has, in effect, terminated Plaintiff's employment as Principal, and while Defendant's decision to continue to provide Plaintiff with his salary and benefits may impact the determination of damages, it does not alter the fact that Plaintiff is *no longer performing the job for which he contracted.* Thus, the reassignment deprived Plaintiff of the position to which he has a contractual right and in which he consequently maintains a protected property interest.

### FOOTNOTES

4 Indeed, when the Court suggested at oral argument that the Plaintiff had been assigned to a "paper shuffler" position in the Central Office, Defendant's attorney did not deny this characterization.

The Defendant's argument that Plaintiff was reassigned, pursuant to the authority of Board Rule 4-52, rather than terminated is unconvincing. The contract, as it relates to the Plaintiff's responsibilities, mentions the Kozminski **[*11]** Community Academy in at least six paragraphs. Specifically, the contract provides, *inter alia*, that Plaintiff is to supervise the educational operation of the Kozminski Community Academy; assume administrative responsibility and instructional leadership for the planning, operation and evaluation of the educational program of the Kozminski Community Academy; assume primary responsibility for the improvement of the instruction at the Kozminski Community Academy; develop a three-

Get a Document - by Citation - 1998 U.S. Dist. LEXIS 7287

Case 1:08-cv-00558  Document 40-5  Filed 05/21/2008  Page 25 of 43  Page 7 of 11

year Local School Improvement Plan for the Kozminski Community Academy; and develop an expenditure plan for the Kozminski Community Academy. Thus, Plaintiff's reassignment to the Central Office constitutes a deprivation of all of the rights and responsibilities provided to him as Principal of the Kozminski Community Academy in that it not only prevents Plaintiff from performing the responsibilities attendant to his position as Principal but also prevents him from serving the Kozminski Community Academy in any capacity.

In light of the fact that Plaintiff's reassignment effectively operates as a termination of the Plaintiff's employment as Principal of the Kozminski School, we conclude that the Board acted **[*12]** outside its authority in reassigning Plaintiff pursuant to Board Rule 4-52. We reach this conclusion on two bases. First, we note that the contract does not incorporate this Rule 5 and therefore does not provide the Board with resort to the Rule as a means of removing Plaintiff from his position. The contract specifically provides the mechanisms for such a removal -- namely, that Plaintiff may be removed for cause. However, Vallas concluded after conducting his investigation that no such cause existed in this case. Thus, we view the Board's actions pursuant to Board Rule 4-52 as nothing more than an attempt to evade the terms of the Plaintiff's contract.

### FOOTNOTES

5 The failure to incorporate Board Rule 4-52 into the contractual terms is especially noteworthy in light of the fact that the contract did incorporate the Board Rules governing compensation, Plaintiff's professional growth through his attendance at professional meetings and his pursuit of additional education, and Plaintiff's other obligations under the contract.

**[*13]** Second, we note that even if Board Rule 4-52 was incorporated into the terms of the contract, the rule only granted the Superintendent authority to **temporarily** reassign Plaintiff. In the instant case, Plaintiff was reassigned approximately half way through his contract term. Plaintiff has remained in that reassignment for over 13 months and the Board has given no indication that Plaintiff's reassignment will conclude prior to the end of his contract term which expires on June 30, 1999. 6 Thus, Plaintiff has, for all intent and purposes, been **permanently** reassigned to the Central Office and the Defendant has consequently acted outside of the scope of the Rule itself in carrying out the instant reassignment.

### FOOTNOTES

6 Of the 34 months served under his contract to date, Plaintiff has spent approximately 38% of this time reassigned to the Central Office.

The bottom line of the above conclusions is that Defendant cannot be allowed to make an end run around the terms of the contract and the Illinois statute **[*14]** governing the removal of principals by calling the removal of a principal a "temporary reassignment."

Based on the foregoing, we conclude that Plaintiff has demonstrated a reasonable likelihood of success on the merits with respect to his ability to establish the deprivation of a constitutionally cognizable property right. 7 This conclusion, however, does not end our inquiry into Plaintiff's due process claim, for it is not the deprivation of Plaintiff's property interest which triggers a procedural due process violation, but rather, it is the Defendant's failure to provide the constitutionally required notice and opportunity to be heard.

### FOOTNOTES

**7** Although it is unclear from Plaintiff's complaint and briefs, it appears that Plaintiff also attempts to assert the loss of a liberty interest based on damage to his reputation and integrity. We, however, find no competent evidence that the Board or any of its agents publicly revealed any of the charges made against Plaintiff. Plaintiff bases his claim, in large part, on statements made by Josephine Hampton. However, the comments attributable to Josephine Hampton were made in her individual capacity during her campaign for reelection to the local school council and cannot therefore be attributed to the Board. We consequently note that the relief granted by this Court is in no way predicated on a finding that the School Board's actions violated Plaintiff's liberty interest.

[*15]  Defendant contends that, even if Plaintiff has a protected property interest, the delay in providing him with a hearing does not implicate the due process clause. In support of this assertion, Defendant cites _DeVito v. Chicago Park District, 972 F.2d 851 (7th Cir. 1992)_, for the proposition that a one-year delay in the administration of a post-deprivation hearing does not violate the due process clause. Defendant, however, misreads _DeVito_.

In _DeVito_, the plaintiff was formally discharged after he received notice of the charges against him and a pre-suspension hearing. _972 F.2d at 851_. Plaintiff appealed the discharge and requested a post-termination hearing. _Id._ Approximately one year after this request, the Park District finally scheduled a post-termination hearing. _Id._ In ruling that the one-year delay in providing a post-termination hearing did not violate plaintiff's due process rights, the court examined three factors: (1) the importance of the private interests and the harm to the interests occasioned by the delay in providing the hearing; (2) the justification offered by the government for the delay and its relation to the underlying governmental interest;  [*16]  and (3) the likelihood that the interim decision may have been erroneous. _Id. at 855_. Analyzing these factors, the Seventh Circuit noted that the Park District's administrative backlog provided a legitimate reason for the delay and that the risk of the interim decision being erroneous was minimized by the fact that the plaintiff was given a pre-termination hearing. _Id. at 856-57_. The court consequently concluded that the delay in the administration of the plaintiff's post-discharge hearing did not give rise to a constitutional violation. _Id. at 851_.

Contrary to Defendant's assertions, _DeVito_, therefore, does not stand for the proposition that the Defendant may delay the Plaintiff's hearing for over a year without implicating the due process clause. Indeed, applying _DeVito_ to the facts of the instant case yields the opposite conclusion, for in the instant case, the Plaintiff has not been given notice of the charges against him, nor a hearing of any sort. Additionally, the Defendant has offered no explanation whatsoever for the lengthy delay in providing the Plaintiff with notice or a hearing. Indeed, rather than offering an explanation for the delay, Defendant has [*17]  steadfastly maintained that Plaintiff is not entitled to a hearing now or at any time in the future and, in fact, the real reason no notice or hearing has been provided is that, according to Vallas on behalf of Defendant, insufficient grounds exist for a removal and thus, a hearing would be superfluous. On these facts, we easily conclude that the Plaintiff has established a deprivation of his procedural due process rights and has consequently successfully established the elements of his Section 1983 claim. **8**

### FOOTNOTES

**8** In ruling on the instant motion, we do not address the Plaintiff's breach of contract count as that count does not seek injunctive relief but rather seeks monetary damages.

### B. The Adequacy of the Remedy At Law and Plaintiff's Irreparable Harm

Defendant contends that Plaintiff will not suffer irreparable harm in the absence of injunctive relief because he has and will continue to draw his full salary and benefits during the term of his reassignment. Thus, Defendant concludes that the reassignment **[*18]** has absolutely no economic impact on the Plaintiff and therefore does not necessitate the issuance of an injunction. Additionally, Defendant argues that the Plaintiff's breach of contract and constitutional claims are both compensable by monetary damages, should Plaintiff prevail on the merits. Defendant therefore concludes that Plaintiff has adequate legal remedies. Defendant's conclusions, however, are without merit.

_HN6_ To justify the entry of a preliminary injunction, the Plaintiff must first prove that he has no adequate remedy at law. This requirement is a vestige from the time when there were separate tribunals for legal and equitable relief and equity courts were only empowered to provide relief when no legal remedies were available or when those that were available were ineffective. 11 WRIGHT AND MILLER, INJUNCTIONS § 2944, pp. 392-94 (1973). The Seventh Circuit has stated _HN7_ that there is no adequate remedy at law if the plaintiff "will suffer irreparable harm in the interim -- that is, harm that cannot be prevented or fully rectified by final judgment after trial. . . ." _Roland Machinery, 749 F.2d at 386_. Although sometimes treated as conceptually distinct elements, the no **[*19]** adequate remedy at law element and irreparable harm element are really part of the same analysis. _See Abbott Laboratories v. Mead Johnson & Co., 971 F.2d 6, 11 (7th Cir. 1992)_. Thus, "a conclusion that the injury is irreparable in turn establishes that there is no adequate remedy at law." _Tanford v. Brand, 883 F. Supp. 1231, 1237 (S.D. Ind. 1995)_ (citing _Fleet Wholesale Supply v. Remington Arms Co., 846 F.2d 1095, 1098 (7th Cir. 1988)_). With these principles in mind, we turn to the facts of the case now before us.

Interestingly, Defendant first argues that there is an adequate remedy at law because the Plaintiff can collect monetary damages if he prevails at trial, but then argues that the Plaintiff has suffered no irreparable injury because his reassignment has had no economic impact. We disagree.

Plaintiff's reassignment has and will continue, if left unabated, to result in an irreparable injury for which no adequate remedy at law exists. We begin by noting that _HN8_ irreparable harm is presumed to flow from a constitutional violation which is not fully compensable by monetary damages. _Hamlyn v. Rock Island County Metropolitan Mass Transit District, 960 F. Supp. 160,_ **[*20]** _162 (C.D. Ill. 1997)_; _Tanford, 883 F. Supp. at 1237_; 11 WRIGHT AND MILLER, INJUNCTIONS § 2944, p. 94 (1973). We have already concluded that the Plaintiff has likely established a constitutional violation arising from the deprivation of the non-economic benefits associated with his position as Principal and we now conclude that this violation is not fully compensable through the award of monetary damages.

We reach this conclusion based on the nature of the losses at issue here. The losses occasioned by the Defendant's constitutional violation are intangible and nebulous, for they are bound up with such benefits as job satisfaction, professional growth and development, service to the community and professional advancement. For every day that Plaintiff remains assigned to his administrative position, Plaintiff is denied the opportunity to perform his chosen profession. Plaintiff has dedicated significant time and energy to serving the community in his capacity as Principal. Therefore, Plaintiff suffers when he is unable to perform in that capacity. _See Banks v. Chicago Public Schools, 1996 U.S. Dist. LEXIS 5163, 1996 WL 197545_ at *4 (N.D. Ill. 1996). In addition to suffering these losses, Plaintiff will **[*21]** also be harmed in that, if the reassignment goes unremedied, Plaintiff's resume will necessarily contain a reference to his removal from the position of Principal of Kozminski and will indicate that his current position is that of an administrator in the Central Office. Money will not adequately compensate Plaintiff for these losses and we thus conclude that Plaintiff has suffered an irreparable injury for which no adequate legal remedy exists.

## C. Harm To the Defendants and the Public Interest

With respect to the third and fourth factors, the Defendant contends that the harm to the students, teachers and staff of the Kozminski School that would accrue if the Court grants the Plaintiff's motion for an injunction militates against such an order. Defendant contends that the Plaintiff is unable to provide the appropriate educational environment and the improvements students need to learn and that the Plaintiff's purported interests must therefore give way to the interests of the student and teachers.

Defendant offers no evidentiary support for its position that the reinstatement of Plaintiff would harm the students or staff of the Kozminski School. The only arguable support offered **[*22]** by Defendant is the School Report issued by the Office of Accountability which was rendered pursuant to observations conducted by that office shortly after Plaintiff was reassigned. This evidence, however, does not support Defendant's argument because it was conducted after Plaintiff left his position and more importantly, because it does not specifically attribute the problems discussed in the report to the Plaintiff. Indeed, the evidence provided by Defendant is to the contrary. After conducting a thorough investigation, Vallas concluded that most of the charges levied against Plaintiff were without foundation or substantial justification and that there was no basis for the initiation of dismissal proceedings. 9 Additionally, Plaintiff provided a long list of programs and activities which he initiated while serving as Principal of the Kozminski School which facts Defendant has not refuted. Finally, there is no evidence that the Kozminski School was ever placed on probation or remediation nor evidence that Plaintiff was ever disciplined or counseled for any alleged failure to adequately perform his job.

## FOOTNOTES

9 To the extent that there were legitimate problems uncovered by Vallas' investigation, Vallas himself concluded that the problems could be promptly addressed without resort to removing Plaintiff from his position.

**[*23]** Based on the above considerations, the Court finds that the harm to the Defendant which would result from the issuance of this injunction, if there is any harm at all, is greatly outweighed by the harm that will accrue to the Plaintiff if no such relief is granted.

## III. Conclusion and Recommendation

Prior to reaching its recommendation on the proper adjudication of the motion now before the Court, the Court first recommends the consolidation of the preliminary and permanent injunction stages of this motion pursuant to Federal Rule of Civil Procedure 65(a)(2). The Court bases this recommendation on its finding that there are no factual disputes and that the evidence considered at this stage would be duplicative of that which would be considered in deciding Plaintiff's prayer for permanent injunctive relief. Based on these findings, the Court believes it would be appropriate to treat the instant motion as one for permanent injunctive relief under Rule 65(a)(2).

Pursuant to this recommendation, the court notes that, *HN9* in order to obtain permanent injunctive relief, the Plaintiff must establish that he has in fact succeeded on the merits rather than merely establishing the **[*24]** likelihood of success on the merits, as would be required on a motion for preliminary injunctive relief. *Plummer v. American Institute of Certified Public Accountants*, 97 F.3d 220, 229 (7th Cir. 1996).

In the instant case, the Court believes that the Plaintiff has satisfied this heightened requirement. As no additional evidence on the issue of the alleged constitutional violation will

Get a Document - by Citation - 1998 U.S. Dist. LEXIS 7287    Page 29 of 43

Case 1:08-cv-00558    Document 46-8    Filed 05/21/2008    Page 11 of 11

be forthcoming, the Court finds that the reasoning applied in reaching the conclusion that the Plaintiff established a likelihood of success on the merits is equally applicable to a finding that the Plaintiff has in fact succeeded in establishing the required constitutional violation. The Court thus concludes that the Plaintiff has satisfied all of the factors required for either preliminary or permanent injunctive relief and the Court consequently recommends that the Plaintiff's motion for a preliminary injunction be treated as a motion for permanent injunctive relief and that the motion be granted.

Ordinarily, in granting a motion for injunctive relief based on a procedural due process violation, the Court would recommend that the Plaintiff be given notice of the charges against him and a hearing **[*25]** on those charges. However, as Vallas has already concluded that the charges against Plaintiff were insufficient to support his dismissal and therefore insufficient to warrant a hearing, the Court instead recommends that the Plaintiff be reinstated to his position as Principal of the Kozminski Community Academy and that the Defendant be enjoined from removing Plaintiff from that position without notice and an opportunity to be heard.

**Dated:** May 8, 1998.

**MARTIN C. ASHMAN**

United States Magistrate Judge

Written objections to any finding of fact, conclusion of law, or the recommendation for disposition of this matter must be filed with the Honorable Robert W. Gettleman within ten (10) days after service of this Report and Recommendation. *See* FED. R. C.V. P. 72(b). Failure to object will constitute a waiver of objections on appeal.

---

Service: **Get by LEXSEE®**
Citation: **1998 us dist lexis 7287**
View: Full
Date/Time: Tuesday, May 20, 2008 - 12:12 PM EDT

\* Signal Legend:
- Warning: Negative treatment is indicated
[Q] - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
✦ - Positive treatment is indicated
(A) - Citing Refs. With Analysis Available
(i) - Citation information available
\* Click on any *Shepard's* signal to *Shepardize*® that case.

---

 LexisNexis®    About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# Exhibit N

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

REALTOR® ASSOCIATION OF WEST/ )
SOUTH SUBURBAN )
CHICAGOLAND, )
               *Plaintiff,* )
          )
      v. )
CALUMET CITY, ILLINOIS, )
             *Defendant.* )
          )

Case No. 06 C 2271

Judge Milton I. Shadur

## ORDER DENYING MOTION FOR ORDER
## TO SHOW CAUSE AND GRANTING OTHER RELIEF

Plaintiff filed a Motion for Order to Show Cause Why Defendant Should not be

Held in Contempt for Violating the Court's Injunction. For the reasons stated at the

December 29, 2006, February 2, 2007 and March 2, 2007 hearings on the motion and based on

the written submissions of the parties, IT IS HEREBY ORDERED:

    1.    The owners of the property at 514 Forsythe in Calumet City, along with the

involved real estate brokers, are entitled to be compensated by Calumet City for the damages

they incurred or will incur in the future in connection with their failed closing of the sale and

transfer of the property on or about October 31, 2006.

    2.    The owners of the property at 514 Forsythe in Calumet City, along with the

involved real estate brokers, are entitled to be compensated by Calumet City for reasonable

attorneys' fees and related costs incurred in enforcing their rights under paragraph 1 of this

Order.

    3.    Persons who acquired property in Calumet City when the version of Calumet

City's ordinance attached hereto as Exhibit A (the "1996 Ordinance") was in force, are entitled

to sell or otherwise transfer their property pursuant to the terms of the 1996 Ordinance.

110975v3

4.    Calumet City shall distribute the Notice attached hereto as Exhibit B to all

personnel in its Housing Department and/or its Department of Inspectional Services.

5.    Except as set forth above, Plaintiff's Motion for Order to Show Cause Why

Defendant Should not be Held in Contempt for Violating the Court's Injunction is denied.

Dated:       March 14, 2007                    ENTERED:

                                               Judge Milton I. Shadur

2



A

1996
ORDINANCE

BUILDINGS, BUILDING REGULATIONS    § 6-308

### Sec. 6-308. Point of sale inspection requirement.

(a) A department of inspectional services is hereby created pursuant to this section. The department of inspectional services shall be headed by a director of inspectional services who shall be a member of the Calumet City Fire Department appointed by the chief of the department. All inspectional services concerning point-of-sale matters within the city, including building and housing, shall be under the jurisdiction of the fire department, department of inspectional services. The building commissioner/ deputy director of inspectional services and the housing director/ deputy director of inspectional services shall be responsible for reporting to the director of inspectional services relative to all matters relating to this section and the director of inspectional services shall have full authority to direct, train and provide appropriate personnel subject to city council approval as to expenditures and/or requirements as provided herein. For the purpose of this section, a point-of-sale inspection shall be required relative to any transfer of any interest in property, which is subject to this section, except as exempted herein.

(b) At the point of sale of any one-family, two-family, multiple-family dwelling unit or structure, or commercial/industrial structure within the city, the seller shall apply for a "certificate of compliance" to the department of inspectional services or to any department so designated by the department of inspectional services in order to comply with the following requirements:

(1) Electrical service: Single-family residence shall have a minimum of a one-hundred (100) amp service and multiple unit residences shall comply with the latest code.

(2) All structures shall be in a good state of repair as to general building maintenance, including, on-site sidewalks and accessory structures, including any legal nonconforming use structures, and in full compliance with Calumet City building and zoning ordinances, including any B.O.C.A. codes adopted by the city.

(3) All units, whether single- and/or multiple-family units or commercial units, shall be in compliance with all current building codes, housing codes and fire code requirements and regulations, including, but not limited to, the installa-



§ 6-308                         CALUMET CITY CODE

tion and maintenance of smoke detectors. In the event a single-family dwelling has been converted to a multi-unit apartment (more than one (1)) without the benefit of permit or approval of the city and such conversion has taken place more than fifteen (15) years prior to the date of the first inspection of the subject property pursuant to this section, the inspector shall make note on any form provided by the department of inspectional services that the property is not in compliance with zoning requirements and may be subject to additional compliance requirements upon any subsequent sale. Commencing with the third transfer of the property after the date of this section, the transferor shall be required to be in full compliance with all Calumet City building and zoning ordinances, including any B.O.C.A. codes adopted by the city as provided herein. Further, in the event any single-family unit has been converted to multiple-family dwellings, regardless of the number of units within what was originally intended to be a single-family residence, the owner of such property shall immediately register the property with the housing director/ deputy director of inspectional services and shall henceforth comply with all inspectional requirements of the department of housing. This provision is specifically subject to all other provisions of this section heretofore and hereinafter delineated.

(4) After the initial inspection as provided herein, the director of inspectional services may require additional independent certification by a contractor who has registered with the department of inspectional services. Wherever possible, all contractors registered with the department of inspectional services shall be bonded and shall make available, upon request, copies of errors and omissions insurance policies which cover city inspections.

(5) In the event the inspection reveals any violation of any applicable provision of this section or any building and/or zoning or other code adopted by the city and, in lieu of immediate compliance by the seller, the buyer and the seller agree, and the buyer accepts, the responsibility to bring the structure into compliance with all applicable

BUILDINGS, BUILDING REGULATIONS          § 5-308

Code requirements within a period not to exceed one hundred twenty (120) working days after the closing of the transaction, and a conditional certificate of compliance shall be issued in order to allow the transaction (closing) to be completed. Said conditional certificate of compliance shall be issued by the department of inspectional services or the department's designees and said certificate shall terminate and be held for naught on the 121st day after closing and no extensions will be granted. A buyer who elects to accept the premises, subject to the inspection, with existing violations, and who agrees, in order to close the transaction, to be responsible as provided herein, shall execute a sworn affidavit satisfactory to the director of inspectional services, which will clearly indicate that the buyer is fully aware of the existing violations and any violations which may subsequently occur prior to the expiration of the conditional certificate and further agrees to accept the requirement and obligation to bring the structure into compliance within the one hundred twenty (120) working day requirement. Further, in the event the buyer fails to complete said obligation, the buyer hereby agrees to submit to the jurisdiction and venue of the *Circuit Court of Cook County* and to waive service of summons subject only to the notice requirement as required by law in order to enable the city to expeditiously obtain an order of compliance with this section.

(6) Any legal nonconforming use structure which has been vacant for a period of twelve (12) months shall not be re-established and shall be brought into conformity with appropriate zoning requirements and building codes pursuant to the latest then in force codes and zoning requirements. No exceptions will be permitted.

(7) Any approved structure (approved on the last inspection date) registered with the housing department at the point of sale which contains a nonconforming and unpermitted use shall be returned to the proper use suitable to the city zoning and building codes that relate to the condition approved at the time of registration with the department of housing.

§ 6-308                        CALUMET CITY CODE

(8) The director of inspectional services or his/her designee may, where appropriate, based upon the age of the structure, subject to inspection and based upon a recognition that the structure was in conformity with the existing Code requirements at the time of construction, waive compliance, in part or in its entirety as heretofore described, with the exception that life safety, fire and public safety code requirements and electrical service as required in paragraph (b)(1) of this section, shall not be waived and a certificate of compliance in all respects shall not issue unless the seller and/or buyer, as per paragraph (5) above, agree to comply with the requirements for upgrading relative to fire, public safety and health requirements pursuant to existing zoning and/or building code requirements at the time of the request for a point-of-sale inspection.

(9) Subject to paragraphs (3) and (8) of this section, it is intended that inspection requirements conform to all building code and zoning requirements of the city, including, but not limited to, Code requirements as provided in Section 6-308(b)(2).

(10) A certificate of compliance issued to the seller shall be valid for one hundred eighty (180) days from the date of issuance.

(c) Transfer stamps, as required by sections 26-70 et seq. of the Calumet City Municipal Code, shall not be issued by the clerk until a point-of-sale inspection has been completed and a "certificate of compliance," as well as the required paid water bill, has been issued to the seller by the director of inspectional services and appropriate personnel of the water department.

(d) In issuing a certificate of compliance, whether temporary or permanent, the city does not make any warranty, representation or statement nor does it intend to insure or guarantee to either buyer or seller of the property subject to the point-of-sale inspection or any of their designees, agents, representatives, heirs or assigns or any other interested party, including mortgage companies, insurance companies, banks or any other party which may have any interest relative to the property subject to the point-of-

BUILDINGS, BUILDING REGULATIONS          § 6-400

sale inspection, nor does the city affirm that there are no additional unnoted violations relative to any other provisions of any of the codified ordinances of the city, the B.O.C.A. Code or relevant statutes, ordinances, rules and regulations of the County of Cook, the State of Illinois or the United States of America.

(e) Inspection fee schedule.

(1)  The fee for a point-of-sale inspection shall be one hundred dollars ($100.00) for all residential and multifamily inspections for the initial inspection and one (1) follow-up inspection. Commercial and industrial building inspection fees shall be at the rate of ten cents ($0.10) per square foot, with the minimum fee being one hundred dollars ($100.00) and the maximum fee being seven hundred fifty dollars ($750.00). Additional required follow-up inspections shall be at the rate of fifty dollars ($50.00) each. The failure of an owner/seller or his/her designee to appear at the time of inspection shall result in a fifty dollar ($50.00) penalty.

(2)  In the event additional inspections are required as per subsection (b)(4) herein, the cost of said additional inspections shall be borne by the owner/seller.

(Ord. No. 96-28, § 1, 5-9-96)

Secs. 6-309—6-399.  Reserved.


ARTICLE IX. INTERNATIONAL MECHANICAL CODE

Sec. 6-400. International Mechanical Code—Adopted.

A certain document, one (1) copy of which is on file in the office of the City Clerk of the City of Calumet City, Cook County, Illinois, being marked and designated as "2000 International Mechanical Code" be and is hereby adopted by the City of Calumet City in the State of Illinois, for the regulation of the design, installation, maintenance, alteration and inspection of mechanical systems that are permanently installed and utilized to provide control of environmental conditions and related processes within buildings and also regulate those mechanical sys-

B

ROSENTHALMURPHYCOBLENT Fax:13125419191         Jan 15 2007 12:50pm P004/005

TO:        Calumet City Department of Inspectional Services

FROM:      Mark H. Sterk, City Attorney

DATE:      January 15, 2007

RE:        Administration of Real Estate Transfer Tax Ordinance

This memorandum will reiterate prior direction to the Department. Until further notice:

1.     No further point-of-sale inspections are to be made.

2.     The processing of transfer declaration applications should proceed without regard to the zoning status of any property. During the course of your processing of these applications, you should not comment on whether a property is conforming or nonconforming to the existing zoning classification. You should not require payment of any outstanding water bills prior to, or as a condition of, the issuance of the transfer stamps. You should not make any mention of "deconverting" multi-family dwellings. Simply continue to verify the transfer information as set forth on the modified attached "Information Sheet." Once the information is verified, the application should be sent to the City Clerk's office for the payment of the tax and the issuance of stamps.

3.     These procedures shall remain in effect until further notice.

ROSENTHALMURPHYCOBLENT Fax:13125419191    Jan 15 2007 12:50pm  P005/005

# Information sheet

## CITY OF CALUMET CITY
### DEPARTMENT OF INSPECTIONAL SERVICES
### 708-891-8120

Property Address _____

Current Owner Name: _____ Home Phone _____

Current Owner's Address: _____ Bus. Phone _____

If land trust, state beneficiaries with names and address on an attached sheet*

Property Index Number (P.I.N.) of all associated property: _____

Property Type: Residential____ Commercial____ Multifamily____ #of Units____

Listing Broker: _____ Company _____ Phone _____

Selling Broker: _____ Company _____ Phone _____

Prospective buyer (Include all buyers to prospective deed)* _____

Buyers Current Address: _____

Will the buyer occupy the property? YES____ NO____ Buyers Phone _____

Buyers Lending Institution _____ Phone _____

Date of Closing _____ Contract Price _____ Loan: FHA/HUD__ Conven.__ Cash__

Owner/Authorized Agent Signature _____ Date _____

# Exhibit O



3318 WEST 95TH STREET
EVERGREEN PARK, IL 60805
(708) 424-5678
FAX (708) 425-1898
www.odelsonsterk.com

*RECEIVED AUG 2 7 2007*

August 23, 2007

Ms. Marcia B. Gevers
Marcia B. Gevers & Associates
19710 Governors Highway, Suite 8
P.O. Box 146
Flossmoor, Illinois 60422

Re:   Realtor's Association of West/South Suburban Chicagoland v. Calumet City
       Case # 06 C 2271

Dear Ms. Gevers:

. This is response to your August 15, 2007 correspondence to John Murphy outlining your client's demands in connection with the property at 514 Forsythe in Calumet City.

I am ~~1113 North West Street~~ unaware of an order entered by Judge Shadur directing that your client's are entitled to any relief. Absent such an order we respectfully decline to respond to the demand. Please forward all future communications regarding this matter directly to me.

Very truly yours,

ODELSON & STERK, LTD.

Mark H. Sterk

MHS/sp

cc:    John B. Murphey