IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HUSSEIN H. MANN and DEBRA HOUSTON-MANN, <br><br> *Plaintiffs,* <br><br> v. <br><br> CALUMET CITY, ILLINOIS, <br><br> *Defendant.* | ) <br> ) <br> ) Case No. 08-cv-00555 <br> ) <br> ) Judge David H. Coar <br> ) Magistrate Judge Morton Denlow <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**PLAINTIFFS' REPLY MEMORANDUM OF LAW SUPPORTING THEIR MOTION
FOR PRELIMINARY INJUNCTION**

**INTRODUCTION**

In its Memorandum of Law in Opposition to Motion for Preliminary Injunction ("Opp."), Defendant Calumet City, Illinois ("City") either concedes key points or fails to address them. Additionally, City misrepresents facts and misinterprets applicable law. City also did not submit any evidence (*e.g.*, affidavits) to refute the allegations of Plaintiffs Hussein Mann and Debra Houston-Mann's ("Manns") First Amended Verified Complaint ("Amended Complaint" or "Am. Compl."). In sum, City failed to demonstrate that the Manns are not entitled to injunctive relief.

Below, in Section I, the Manns correctly identify the property interest at stake (*i.e.*, the right to freely alienate property). In Section II, the Manns show they are entitled to injunctive relief because (A) the Manns are likely to succeed on the merits, (B) City's denial of the Manns' constitutional right to alienate their property is, as a matter of law, an irreparable harm for which there is no adequate remedy, (C) the deprivation of the Manns' constitutional

496900.1

rights outweighs any alleged harm to City, and (D) the public interests are best served by granting injunctive relief.

I. **CITY MISREPRESENTS THE PROPERTY INTEREST AT STAKE; THE PROPERTY INTEREST AT STAKE IS THE ALIENABILITY OF PROPERTY.**

In an effort to mislead the Court and minimize the harm being caused to the Manns, City erroneously claims that the property interest at stake in Counts I and II of the Amended Complaint is "money – the cost of repairs," nothing more than a $500 tax imposed on the sale of property. Opp. at 10-11. City is wrong. The property issue at stake is the Manns' constitutional right to freely sell their property without undue interference by the government. Am. Compl. at ¶ 2 ("Plaintiffs seek a declaration that [the Ordinance] is unconstitutional because it [] unreasonably and unconstitutionally restrains property owners' right to sell their property without due process of law); *see also* Opening Memorandum ("Mem.") at pp. 7-9. This suit is not about the costs of the repairs required by City's Ordinance, but the unconstitutional restraints the Ordinance imposes on the alienability of property without due process.

II. **THE MANNS ARE ENTITLED TO INJUNCTIVE RELIEF.**

Injunctive relief is warranted because the Manns have satisfied each of the following elements: (1) some likelihood of success on the merits; (2) irreparable harm if the preliminary injunction is denied for which there is no adequate remedy at law; (3) the irreparable harm to the Manns if preliminary injunctive relief is denied outweighs the harm to City if such preliminary relief is granted; and (4) the public interest will be served if injunctive relief is granted. *See e.g. Jak Prod., Inc. v. Wiza*, 986 F.2d 1080, 1084 (7th Cir. 1993). Each element is discussed below.

A. **Likelihood of Success on the Merits.**

1. **City Has Failed To Demonstrate That The Ordinance Is Not An Unreasonable Restraint On The Right To Sell Property.**

As detailed in their Opening Memorandum, the Ordinance unreasonably and unconstitutionally restrains the alienability of the Manns' property in several ways. Mem. at 7-9. Specifically, (1) the Ordinance provides that property cannot be sold unless City says it can be sold by deciding that the property has "passed" a point of sale inspection by completing all required repairs; (2) the Ordinance contains no limitations on the type of repairs City can order as a precondition of the right to sell property; and (3) the Ordinance contains unreasonably long deadlines that result in unreasonably lengthy delays causing the loss of sales and/or a decrease in property value. Mem. at 8.

City does not dispute the Manns' argument (1), above. Therefore, for the reasons set forth in the Manns' Opening Memorandum, the Manns have shown some likelihood of success on their claim that the Ordinance unreasonably and unconstitutionally interferes with the right to freely transfer property.

In response to the Manns' argument (2), above, City contends that the "scope of search and types of repair the City may require are specific and limited," citing Ordinance §§ (c)(1) and (e). Opp. at p. 7. City's position is without merit.

Section (c)(1), Compliance with Property Maintenance Code, generically provides that "all structures shall be in compliance with Article X, Sections 14-691 and 14-692 of this Chapter 14, 'Property Maintenance Code.'" (*See* Ex. A to Opening Memorandum). Section 14-691 is a wholesale adoption of the 2006 International Property Maintenance Code and Section 14-692 simply amends certain sections of the 2006 International Property Maintenance Code. Neither section specifies or limits the scope of City's searches or the repairs it may order.

3

Section (e), Refusal to Consent, Warrant Procedures, relates to what must be contained in an application for a warrant. City misrepresents to the Court that Section (e) limits inspections "to a determination whether there are violations of the code provisions identified." In fact, Section (e) simply states that the application for an administrative search warrant shall include the aforementioned statement. Thus, City has failed to rebut the Manns' argument that there are no limitations on the scope of searches conducted pursuant to the Ordinance nor the nature of repairs that City can request as a precondition of the request to sell property.[1]

In response to the Manns' argument (3), above, City offers its Johnson hypothetical, concluding that "the notice, inspection and reinspection process will be completed within 45 days at the outside." Opp. at pp. 1-3, 8. The Johnson hypothetical is irrelevant. The issue is not how the Ordinance *might* work, but what it actually says. Moreover, the Johnson hypothetical is a best-case scenario based upon numerous assumptions and disregarding many of the realities of the real estate market. The assumptions include at least the following: (i) Mr. Johnson can locate a contractor who can complete all repairs within 14 days or Mr. Johnson has the skills, materials and time to complete all the repairs himself within 14 days; (ii) Mr. Johnson has the financial resources to make the repairs; (iii) no reinspections are required; (iv) City does not order any additional repairs after reinspection (the Ordinance does not prevent City from ordering new and additional repairs not identified in the original inspection); and (v) City immediately issues a Certificate of Compliance after reinspection (the Ordinance imposes no time limit on when City must issue a Certificate of Compliance after reinspection (Ex. A to Opening Memorandum at § 14-1(h))).

---

[1] Moreover, the only purported limitation in the Ordinance -- that property is inspected to make sure it is in "good repair" -- is no limitation at all. This issue is discussed in more detail in Section II.A.2.c. below.

4

In any event, whether or not a property owner is fortunate enough to experience the best-case delay of 45 days, City admits that the Ordinance restrains the free alienability of property for well over a month in the best of circumstances. In today's tumultuous real estate market, City's restraint of a property owner's ability to sell for over a month could be the difference between closing a sale and foreclosure. Indeed, that is exactly the predicament the Manns are now in.

Interestingly, City concedes that ordering repairs through the Ordinance is unnecessary. According to City, even if repairs are not required by the Ordinance, they will still be required "because the typical form real estate contract grants the buyer pre-closing inspection rights" and "the parties may be negotiating these repairs themselves." Opp. at pp. 1-2, 7. The fact that an inspection pursuant to the Ordinance is unnecessary supports injunctive relief. Indeed, the crux of the Manns' position is that the buyer and seller ought to be able to conclude their transaction (*e.g.*, by adjusting the purchase price to take into account needed repairs after the inspection by the buyer) without the government telling them what they need to do and otherwise interfering with a private transaction. The market and private negotiations should control, not the whim of a City inspector.

City's remaining cursory arguments are unpersuasive and easily dismissed.

- City notes that other municipalities have adopted point of sale inspection ordinances. Opp. at 6. City has not submitted copies of those other, unrelated ordinances and does not claim that all point of sale inspection ordinances are identical or provide the same procedural safeguards and protections. The fact that Paterson, New Jersey, Detroit, Michigan, and Vincennes, Indiana adopted point of sale inspection ordinances does not mean that City's

Ordinance does not unreasonably and unconstitutionally restrain the Manns' right to alienate their property or lack procedural due process.

- According to City, because it is permitted to tax the sale of property and enforce building codes, "it is rationale to use one regulatory mechanism to facilitate compliance with other regulations." Opp. at p. 7. City's theory is flawed. Although municipalities are permitted to impose certain taxes in certain circumstances and authorized to enact codes to protect the health and safety of residents, they are not authorized to use such taxes and codes to limit the alienability of property. Op. Ill. Atty' Gen. No. 94-024 (Oct. 25, 1994), 1994 WL 601863 (West 1992); *Petropoulos v. Chicago*, 5 Ill. 2d 270, 274-75, 125 N.E.2d 522, 525 (Ill. 1955)(legal restrictions rendering property unsaleable "would be an utter violation of a man's right to alienate property"). (*See* Ex. L to Opening Memorandum).

- City describes the allegation that the Ordinance requires the use of a "licensed contractor" as "empty-headed" because the Ordinance does not prevent do-it-yourself repairs by property owners. The problem is the Manns have not made any such allegation.[2] However, the Amended Complaint does allege, and City does not dispute, that a property owner is prohibited from having repairs done by a family member or unlicensed person (Am. Compl. at ¶ 16), a common practice today.

- City claims that the allegation that even if a property is in compliance, the City may nevertheless ignore the Ordinance and refuse to issue a Certificate of Compliance, is speculation. Opp. at p. 8. The Manns, unfortunately, are not speculating. As detailed at page 2 in their Opening Memorandum, in October 2006, City informed the Manns and a prospective

---

[2] The Manns note that City's citations to paragraphs in the Amended Complaint on pages 7 and 8 of its Opposition Brief are erroneous. For example, Paragraph 33 of the Amended Complaint makes no mention of licensed contractors, but rather details the immediate and irreparable harm suffered by the Manns as a result of the enforcement of the Ordinance. *See* Am. Compl. at ¶ 33.

buyer that, even though City's file indicated that the Manns' property was "legal nonconforming," City would not issue a certificate of occupancy unless the Manns' property was deconverted. Moreover, the Ordinance contains no safeguards against City refusing to issue a Certificate of Compliance for any reason whatsoever (*e.g.*, until the Manns repair their soap dishes).

- Without offering any support whatsoever, City professes: "Plaintiff's [] concerns, relating to no 'meaningful right to a hearing' are belied by the terms of the Ordinance." Opp. at 8. As detailed in Section II.A.2. below, the Ordinance, in fact, does not provide procedural due process as it fails to provide *pre-deprivation* due process. The Ordinance, by its terms, takes away the Manns' right to sell their property until City says they can sell it. No due process is provided prior to City's taking of the Manns' right to sell. The fact that the Manns can appeal a decision after the right to sell has been taken does not cure the constitutional problems with the Ordinance.

- In response to the Manns' allegation that the Ordinance does not provide any detail regarding the due process protection of a water bill hearing and requires the owner to pay the disputed bill "under protest" while challenging the bill (Am. Compl. ¶ 31), City cites *Memphis Light, Gas & Water v. Kraft*, 436 U.S. 1 (1978), averring that the lack of detail with respect to the water bill hearing "does not go to the facial validity of the Ordinance." Opp. at p. 8. *Memphis Light*, however, undermines City's position. *Memphis Light* held:

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. . . . The purpose of notice under the Due Process Clause is to apprise the affected individual of, and permit adequate preparation for, an impending 'hearing.' 436 U.S. at 13-14.

Again, the Ordinance does not provide any detail regarding the hearing and, more importantly, City makes no attempt whatsoever to argue that it does.

- City also argues that this Court should not consider Count I because the Manns "allege no independent constitutional violation and the process is replete with state remedies." Opp. at p. 9 (citing *Gen. Auto*, 526 F.3d at 991). However, plaintiffs need establish "either an independent constitutional violation or the inadequacy of state remedies" only as a prerequisite to as-applied challenges, not facial challenges. *E.g.*, *Gen. Auto*, 526 F.3d at 991; *accord Smithfield Concerned Citizens for Fair Zoning v. Town of Smithfield*, 907 F.2d 239, 242–43 (1st Cir. 1990) (citing cases) ("The district court erred in ruling that a facial substantive due process challenge to a zoning ordinance . . . is not ripe for adjudication until [plaintiff exhausts state remedies]."); *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 386 (1926); *County Concrete Corp. v. Town of Roxbury*, 442 F.3d 159, 166 (3d Cir. 2006). Even were an independent constitutional violation required in this case (which it is not), the Manns allege that the Ordinance violates the Fourth Amendment and also that the Ordinance fails to provide procedural due process.

- Strangely, City argues that the Supreme Court has never "constitutionalized" the Manns' "'restraint on alienation' theory," yet admits that the Supreme Court has acknowledged the "ancient doctrine disfavoring restraints and [sic] alienation of property." Opp. at 9 (citing *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 188 n.3 (1995)). Indeed, it is the Supreme Court's "time-honored practice of viewing restraints on alienation of property with disfavor." *Asgrow Seed*, 513 U.S. at 194 (citing *Sexton v. Wheaton*, 21 U.S. 229 (1823)). Moreover, as explained in the Manns' response to City's Motion to Dismiss, the due

process clause plainly provides that the government may not deprive a person of his right to alienate his property without due process. *See* Opposition to Motion to Dismiss at pp. 3-4.

- City takes issue with the Illinois Attorney General opinion letter which unequivocally states that municipalities are not permitted to interfere with the right to freely sell property. Ignoring the propositions for which it was cited, City argues that the opinion letter is irrelevant by manufacturing distinctions between itself (home rule) and the villages discussed in the letter (non-home rule). Opp. at 10. While the Manns do not dispute that home rule and non-home rule municipalities have different powers, the Illinois Attorney General made no distinction between the two with respect to the holdings important to this dispute. Indeed, the opinion letter unequivocally states "*In no instance*, however, are municipalities authorized to limit the alienability of property in order to enforce [] codes." Mem. at p. 9. Moreover, City ignores the other controlling authorities cited for the proposition that the due process clause provides that the government may not deprive a person of his right to sell property without due process.

2. **The Ordinance Lacks Procedural Due Process.**

   (a) **The *Post-Deprivation* Review Procedures Outlined By City Are Insufficient As Due Process Requires *Pre-Deprivation* Review.**

On pages 10 through 13 of their Opening Memorandum, the Manns (1) explain that procedural due process requires a *pre-deprivation* hearing, and (2) detail how the Ordinance fails to comply with this requirement because it provides no hearing or review *prior to* the deprivation of the right to sell property. City's brief does not dispute that procedural due process requires a *pre-deprivation* hearing or that Ordinance fails to provide any such *pre-deprivation* hearing. As such, the Manns have shown some likelihood of success on their claim that the Ordinance lacks procedural due process.

Rather than address the Manns' arguments and authorities, City simply outlines the *post-deprivation* "layers of review" for decisions under the Ordinance after the City has deprived property owners of the right to sell their property. Opp. at pp. 3-4, 12-13. Of course, *post-deprivation* review is insufficient under the procedural due process standards set forth by the Supreme Court. Mem. at 10-13; *see also Memphis Light*, 436 U.S. at 16 (quoting *Wolff v. McDonnell*, 418 U.S. 539, 557-558 (1974)(the Supreme Court "consistently has held that 'some kind of hearing is required at some time *before* a person is finally deprived of his property interests.'")(emphasis added)).

      **(b)**     **Deconversion Provisions And Lack Of Pre-Deprivation Due Process.**

The deconversion provisions of the Ordinance permit City to order the "deconversion" of "illegally converted" property, without any due process protection. Mem. at p. 5. City's apparent defense – albeit unclear – is that Section (c)(2) of the Ordinance "operates against only illegal conversions." Opp. at 13. City's "defense" totally misses the mark. The Manns' constitutional challenge is that the Ordinance contains no procedural due process protection against City improperly ordering the deconversion of legal nonconforming property as a precondition of the right to sell. Am. Compl. at ¶ 38; Mem. at p. 5. And while City is correct in that the Manns do not contend that their property has been illegally converted to multi-family (because it has not), the Manns do contend that they directly suffered from the lack of due process protection in the Ordinance when City prevented the sale of their property in October 2006 simply by declaring it "illegal" even though City's own documents showed that the property was legal nonconforming. Mem. at p. 6.

      **(c)**     **The Ordinance Is Unconstitutionally Vague.**

The Ordinance is void for vagueness because it mandates that property be in "good repair" without explaining what constitutes "good repair." Mem. at 13. City's responses are without merit.

City's initial response – although far from clear – is that it is the legislature's duty to determine what building code provisions are reasonable and further public health, safety, and welfare. Opp. at 11. This "argument" does not respond to the Manns' claim that the Ordinance is unconstitutionally vague. And while it is conceivable that "little" repairs have a positive impact (Opp. at 11), City again misses the point, which is that the Ordinance does not identify which "little" repairs constitute "good repair" and, therefore, the Ordinance is unconstitutionally vague. Historically, City has relied on the "good repair" provisions of the Ordinance to require cosmetic repairs such as repairing a soap dish before permitting the sale of property.

City's next response is that its inspectors do not have unfettered discretion because the Ordinance incorporates the International Property Maintenance Code. Specifically, City cites International Property Maintenance Code Sections 304.1 ("The exterior of a structure shall be maintained in good repair, structurally sound and sanitary so as not to pose a threat to the public health, safety or welfare") and 305.1 ("The interior of a structure and equipment therein shall be maintained in good repair, structurally sound and in a sanitary condition"). Opp. at 11. City then sums up its response with only the conclusory statement that "[p]eople with common intelligence can understand what it means to keep a house in good repair." Opp. at 12. City offers nothing in support of its conclusion, and does not even attempt to explain how "people with common intelligence" could understand these or other sections of the International Property Maintenance Code to mean that (apparently) you must have working soap dishes for

11

496900.1

property to be in "good repair." City's failures are not surprising, as they simply underline the fact that the Ordinance is unconstitutionally vague.

City's reliance upon foreign authorities, several of which are criminal matters, to argue that "in good repair" is not unconstitutionally vague, is misplaced. City first cites a Court of Appeals case from the District of Columbia Circuit that interpreted a specific section of the Mine Act. *Freeman United Coal Mining Co. v. Federal Mine Safety & Health Review Commission*, 108 F.3d 358 (D.C. Cir. 1997). There, the court determined that the term "maintained" was not unconstitutionally vague within the Mine Act and ruled that "any reasonable prudent person would recognize that allowing steel beams supporting a walkway to corrode and deteriorate to the point of collapse constitutes a failure to maintain a facility in good repair." 108 F.3d at 362 (emphasis added). City's reliance on *City of Cleveland Heights v. G.&C. Properties*, 1974 WL 184833 (Oh. App. 1974), is likewise misplaced as the Ohio Court of Appeals narrowly ruled that the meaning of "good repair" was understandable "with respect to screens on windows." *Id.* at *1. The 47-year old California criminal case, *People v. Balmer*, 17 Cal. Rptr. 612 (1961), is also unpersuasive as it is an appeal of a conviction for violating California's Administrative Code governing nursing and convalescent homes. Finally, City offers an unpublished New Jersey case which found that some of the provisions of the BOCA National Property Maintenance Code of 1993 were not unconstitutionally vague. *Reedy v. Borough of Collingswoods*, 2005 WL 1490478 (D.N.J. 2005). City misrepresents to the Court that 1993 BOCA National Property Maintenance Code is the same model code provisions adopted by City (City incorporated the 2006 International Property Maintenance Code). More importantly, the codes at issue in *Reedy* did not deprive a property owner of his right to sell if code violations were found, but rather, a citation was issued requiring violators to appear at a

496900.1

municipal court proceeding where they could face fines and imprisonment if the necessary repairs were not made. *Id.* at *1.

### B. The Denial Of The Manns' Constitutional Right Is An Irreparable Harm For Which There Is No Adequate Remedy.

City does not dispute that, as a matter of law, the deprivation of a constitutional right is an "irreparable injury" for which there is no adequate remedy at law. Opp. at 14. Accordingly, this factor weighs in favor of granting the Manns' request for injunctive relief.

### C. The Deprivation Of The Manns' Constitutional Right Outweighs Any Alleged Harm To City.

According to City, injunctive relief will prevent City from maintaining the quality of its housing stock and that such harm outweighs any harm suffered by the Manns. Opp. at pp. 14-15. City's argument is wholly without merit.

City does not (because it cannot) deny that it may maintain the quality of its housing stock through enforcement of its Code Enforcement Ordinance and Rental Dwelling Inspection Ordinance, both of which eliminate code violations related to health and safety (and do so without infringing on property owners' right to freely alienate their property). Indeed, City conceded as much in the *Walker* litigation which was before Judge Shadur. *See* Mem. at p. 7, Ex. K. Moreover, City acknowledges that, to the extent its housing stock is maintained through repairs ordered under the Ordinance, the housing stock will likewise be maintained without enforcing the Ordinance "because the typical form real estate contract grants the buyer pre-closing inspection rights" and "the parties may be negotiating these repairs themselves." Opp. at pp. 1-2, 7.

As importantly, City ignores the fact that beginning upon the entry of the August 8 Injunction and lasting until the recent dismissal of the *Walker* litigation, City has not enforced the Ordinance (either because it was enjoined from doing so or agreed not to). Since August 8,

2006, there have been over 611 sales of property that have closed in City. (Ex. A, Joseph Declaration at ¶ 3). City has presented no evidence showing that these 600-plus closings have harmed City, adversely affected the health or safety of City citizens and properties, or prevented City from maintaining the quality of City's housing stock.

        **D.**    **The Public Interest Is Best Served By Enjoining Enforcement Of The Ordinance.**

City argues that the public is best served by permitting enforcement of the Ordinance. Opp. at p. 15. Rather than identifying any specific public interests that enforcement of the Ordinance would advance, City asserts an injunction should be denied because the Ordinance was "adopted and amended through the democratic process" and *City's* defense of the Ordinance "demonstrates the commitment of the *community* to the importance of enforcing the Ordinance." Opp. at 15.

City's first argument is nonsensical. City fails to explain how the fact that the Ordinance was "adopted and amended through the democratic process" has anything to do with promoting the public interest or whether the Ordinance is constitutional. The real issue is whether the public interest would be best served by an injunction. The answer is plainly yes because protecting the constitutional rights of City's property owners, which an injunction will do, is plainly in the best interests of the public.

## CONCLUSION

For the reasons set for above and in the Manns' Opening Memorandum, the Court should grant the Manns' immediate injunctive relief.

496900.1

August 7, 2008

Philip C. Stahl
Patrick T. Nash
Donald P. Bunnin
Mark A. Semisch
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, Illinois 60606
(312) 704-7700

Respectfully submitted,

**HUSSEIN MANN AND DEBRA HOUSTON-MANN**

By: _____/s/ Patrick T. Nash_____
      One of their Attorneys

496900.1

## CERTIFICATE OF SERVICE

I, Patrick T. Nash, certify that on this 7th day of August, 2008, I electronically filed **PLAINTIFFS' REPLY MEMORANDUM OF LAW SUPPORTING THEIR MOTION FOR PRELIMINARY INJUNCTION** with the Clerk of the Court using the CM/ECF system which will send notification of said filing to:

> Mark H. Sterk
> Odelson & Sterk, Ltd.
> 3318 West 95th Street
> Evergreen Park, Illinois  60805
>
> John B. Murphey
> Rosenthal, Murphey & Coblentz
> 30 North LaSalle Street
> Suite 1624
> Chicago, IL  60602

/s/  Patrick T. Nash

496900.1