# EXHIBIT A

Westlaw.

1994 WL 601863 (Ill.A.G.)                                                          Page 1

1994 WL 601863 (Ill.A.G.)

Office of the Attorney General
State of Illinois

File No. 94-024

October 25, 1994

MUNICIPALITIES:

Requirement that Title Insurance Reports Reflect Payment of Document Inspection Fee

Mr. Frank C. Casillas
Director

Dear Mr. Casillas

I have your letter wherein you inquire regarding the validity of ordinances adop-
ted by non-home-rule municipalities which require the inspection of documents and
the payment of fees prior to the transfer of real property lying within the muni-
cipality. Of particular concern to the Department, which regulates title insurance
companies (215 ILCS 155/1 et seq. (West 1992)), is a provision in the ordinances
which mandates that the requirement of inspection and payment of fees be reflected
in title insurance reports. For the reasons hereinafter stated, it is my opinion
that the ordinances in question are not valid.

In February, 1994, the village of Westchester adopted ordinance no. 94-1387, which
purports to require that any document evidencing the transfer of ownership of real
estate located in the village must be submitted to the village for inspection and
review. Upon payment of a fee of $25, the village will affix a stamp to the docu-
ment if the subject property is found to be in compliance with all village codes
in force at the time the document is submitted. The ordinance further provides
that the requirement be reflected on all real estate title insurance reports con-
ducted precedent to the transfer of ownership, to give public notice of the man-
datory inspection. In April, 1994, the village of River Grove adopted a similar
ordinance. Both Westchester and River Grove are non-home-rule municipalities.

Non-home-rule municipalities have only those powers which are expressly granted by
statute and the constitution, those powers which are incident to those which have
been expressly granted and those powers which are indispensable to the accomplish-
ment of the declared objects and purposes of the municipal corporation. (Pesticide
Pub. Pol. v. Village of Wauconda (1987), 117 Ill.2d 107, 111-112.) Consequently,

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 601863 (Ill.A.G.)                                          Page 2

as a threshold issue, it must be determined whether Westchester and River Grove have the power to adopt the ordinances in question. Only if this question is answered affirmatively will it be necessary to consider whether the villages' power is preempted by State law relating to title insurers.

Neither village has cited any authority for the adoption of these ordinances. The only purpose suggested within the body of each ordinance, apart from the collection of a $25 fee, is to determine whether the property is in compliance with village codes (Village of Westchester Ordinance No. 94-1387, adopted February 8, 1994, at p. 1) or to determine whether any "outstanding obligation is due to the [v]illage with respect to the property" (Village of River Grove Ordinance No. 1994-05, adopted April 21, 1994, at p. 1). Municipalities are authorized, under Article 11 of the Municipal Code (65 ILCS 5/11-1-1 et seq. (West 1992)), to adopt a number of ordinances and codes designed to protect public health and safety, and are authorized to enforce such codes by requiring permits, fees, and fines. (E.g., 65 ILCS 5/11-31.1-1 et seq.; 5/11-37-1 et seq.; 5/11-38-4 (West 1992).) Further, municipalities may impose various fees for other services relating to real property. In no instance, however, are municipalities authorized to limit the alienability of property in order to enforce such codes.

Although these ordinances do not expressly so state, I assume that the villages will refuse to affix the "document review" stamp to any deed for property which is not in compliance with the village codes (the village of Westchester) or concerning which unpaid obligations may be deemed to be due (the village of River Grove). Thus, even if the deeds are returned to the persons submitting them, if they proceed with the transactions they will violate the application ordinance and be subjected to its penalties. This attempt to make alienability subject to municipal regulation clearly exceeds the villages' powers.

Further, non-home-rule municipalities have no authority to impose a tax on the transfer of real property. The authority to impose such a tax is expressly reserved to home rule municipalities (65 ILCS 5/8-11-6a (West 1992)). While the fee imposed by the River Grove and Westchester ordinances is denominated a document inspection fee, rather than a transfer tax, there can be little doubt that it operates as the letter. As previously discussed, the villages' authority to enforce their health and safety codes is entirely unrelated to the transfer of property. Moreover, a document inspection would provide no basis upon which to determine whether the property was in compliance with codes, and the ordinances do not even suggest that the affixing of the required stamp will depend upon an inspection of the property itself. In my opinion, the inspection fee is, in both operation and effect, a prohibited transfer tax.

Because the non-home-rule villages in question have no authority to enact or enforce ordinances restricting the transfer of real property or to impose a fee or tax thereon, it is my opinion that the ordinances are void and unenforceable. Because of this conclusion, it is not necessary to determine whether such ordin-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 601863 (Ill.A.G.)                                                    Page 3

ances, with respect to their effect on title insurers, are preempted or superseded
by State laws requiring the licensure of title insurers.

Respectfully yours,
Roland W. Burris
Attorney General

1994 WL 601863 (Ill.A.G.)
END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Realtor Association of West/South Suburban Chicagoland, | ) | No. 06 C 2271 |
| Plaintiff, | ) | |
| v. | ) | Judge Milton I. Shadur |
| Calumet City, Illinois | ) | Magistrate Judge Maria G. Valdez |
| Defendants. | ) | |

## RESPONSE OF CITY OF CALUMET CITY
## TO REALTORS' PETITION TO SHOW CAUSE

### I.    Overview

Since the 8-8-06 Preliminary Injunction, there have been over 950 transfers of real estate

in Calumet City which used to be subject to the P-O-S Ordinance inspections (Wojewoda

Declaration, ¶20).[1] The Realtors' Petition focuses on just two properties.[2] Only the owners of

the Forsythe property appear to have been involved in a potential real estate transaction since the

issuance of the Preliminary Injunction. As set forth below, the City has not been violating the

Injunction. There is no basis for this Court to issue a Rule to Show Cause. The Motion should be

denied.

### II.    514 Forsythe

**Exhibit 1** to this Response is a copy of the City Zoning Map. The area of 514 Forsythe

(the "Forsythe Property" or the "Forsythe House") is circled and is located in the far northeast

quadrant of the City. The Forsythe Property is in the R-1 Zoning District, which allows only

single-family use (¶4).

---

[1] Most of the our citations will come from the Rebecca Wojewoda Declaration. We will simply reference the paragraph number (¶_).

[2] Awkwardly, both properties have the same numerical address – 514 Forsythe and 514 Pulaski. This Response will identify these properties by street name rather than number.

The Forsythe House is over 90 years old (¶4). From the exterior, the Forsythe House appears to be a single-family home. There is a second floor apartment (¶5). This second floor apartment is accessed from the interior of the house. Prior to 1999, the Forsythe Property was owned by a family named Zimmerman (¶6).

### A.  The 1996 Ordinance And The "Three Transfer" Amortization Policy.

In 1996, the City amended its Zoning Ordinance to deal with the issue of multi-family buildings (that is, buildings having two units or more) located in the R-1 Single-Family Zoning District. A copy of the 1996 Ordinance is attached to this Response as **Exhibit 2.** The 1996 Ordinance was specifically applicable to properties such as the Forsythe Property. In particular, the Forsythe Property was in an R-1 Zoning District, but had more than one dwelling unit in it. The multi-family use was not authorized by the City by way of zoning amendment or variance, but has been in existence for more than 15 years.

Under the approach set forth in the 1996 Ordinance, whatever real estate value was added by the unpermitted or illegal additional dwelling units was to be amortized through what might be called a "Three Transfer Rule." A property could be sold two times from the effective date of the 1996 Ordinance while maintaining its unpermitted use. Upon the third transfer, the property had to come into conformance with all applicable zoning regulations, including deconversion to single-family use.

The Forsythe Property was sold by Zimmerman to Houston in 1999 (¶9). This was the first transfer of the Forsythe Property since the 1996 Ordinance and the Three Transfer Rule. Attached hereto as **Exhibit 3** is a copy of the 1999 inspection form (this is the same as the Realtors' Exhibit 6). There is a handwritten note on page 2 of the transfer form stating that this is

2

a "legal nonconforming use." This statement was accurate, but reflected nothing more than this was the first transfer of the Forsythe Property since the adoption of the 1996 Ordinance.

When viewed in context of the 1999 regulatory landscape, this was a perfectly accurate statement. The Realtors either were not aware of the 1996 Ordinance, or have misapprehended it for purposes of their Petition. The notation does not mean that the property was a "legal nonconforming use" in the sense which the Realtors are asserting; a legal nonconforming use is one which was legal at some point. See Zoning Ord. Sec. 5.1 (Ex. 11). The two-flat conversion of the Forsythe Property may have been tolerated and accepted by the City over the years, but it was never a permitted use under the R-1 Zoning Regulations. The inferences which the Realtors are asking this Court to draw are erroneous. They are not based on the facts in existence in 1999.

**B.    The 2004 Ordinance And The Rental Inspections.**

Section 6-308 was recodified and amended on 8-10-04 by Ordinance No. 04-50. This is the Ordinance which is the subject of the Preliminary Injunction. The "Three Transfer" provision from the 1999 Ordinance was eliminated.

The owners of the Forsythe Property were Debra Houston and Hussein Mann. In accordance with applicable provisions of the City Code, Houston and Mann periodically submitted the Forsythe Property to an annual Code Compliance Inspection For Rental Properties. Attached hereto as **Exhibit 4** is a copy of the August 2004 "Application for Code Compliance Inspection." **Exhibits 5** and **6** are copies of the Rental Inspection for early 2005 and one from late 2005. As set forth on the first page of both documents, the owners of the Forsythe Property were put on notice as to the terms of the 2004 Ordinance.

In January 2005, Houston and Mann were notified that they "may have to deconvert to single family prior to sale." Ex. 4, p. 1, bottom, * notation. Later that year, they were

3

specifically advised that they were going to have to "deconvert prior to sale." Ex. 4A, p. 1, bottom notation. Therefore, the record demonstrates that these owners knew, or should have known, that this property was going to have to be deconverted into a single-family unit at the time the property transferred.

Exhibit 7 is a copy of the Cook County Assessor's Office property photograph of the Forsythe Property. The City printed out and made notations to this form in July 2005.[3] Exhibit 7 shows that on July 19, 2005, the City's position was that this property would need to convert to single family at the time of sale ("Two Units Now-Must Deconvert to Single Family").

C.    Mann's July 2006 Request For Point Of Sale Inspection.

Exhibit 8 is a "Point of Sale Application For Occupancy Inspection" for the Forsythe Property. The application was made by Hussein Mann on July 7, 2006, a month before this Court's Injunction. The City conducted the Point of Sale Inspection on July 28, 2006, ten days before this Court's Injunction. Exhibit 9. Exhibit 9 shows that the City identified this property as being nonconforming because it was in an R-1 Zoning District and had multiple units. The notice also attached "Application for Remedy for Rezoning of Land."

D.    Analysis Of Houston Declaration.

The Houston Declaration contains a number of omissions and assertions which are not reflective of the public record as attached to this Response. In particular:

Declaration Paragraph 2.    Houston's statement that when she purchased the property she was "not informed that it was not legal nonconforming, or that it would have to be deconverted," may or may not be accurate. The fact is, the property did not have to be

---

[3] Typically when either an owner, broker and would be purchaser of a property makes inquiry regarding the zoning status and zoning limitations, the City will print out this material, furnish the original to the interested party, and keep a copy of the annotated print-out for the file (¶13).

4

deconverted in connection with her 1999 purchase. Until 2004, she could have sold the property in its nonconforming status, because that would have been the second such transfer.

**Declaration Paragraph 3**.   Houston's contention that prior to October 30, 2006, "Calumet City had confirmed that the property is legal nonconforming," is belied by the public record. Realtors' Exhibit 6 is a notation from the 1999 closing which we have discussed above. The City's Exhibits 5, 6 and 9 show that Houston and Hussein Mann (we are assuming for purposes of this Response that Hussein Mann is the husband of Debra Houston), were or should have been aware of the deconversion requirement subsequent to the 2004 Ordinance.

**Declaration Paragraphs 4-6**.      These paragraphs provide no information to this Court which would be indicative of contemptuous conduct on the part of the City. Paragraph 4 states only that "prior to the closing" the "buyer (unnamed) and I went to Calumet City" to purchase stamps. The Declaration does not indicate the date of this visit. To the extent the date was prior to August 8, 2006, any conversation is irrelevant because the Injunction was not in place. To the extent the asserted conversation took place after August 8, Houston's version is inconsistent with the practice of the City and the Declaration of Rebecca Wojewoda ("Wojewoda). In particular, the City does not issue "Certificates of Occupancy" in connection with the transfer of real estate (¶21A). Certificates of Occupancy are issued in connection with new construction (¶21A).

**Declaration Paragraph 7**.    Again, as set forth in the Wojewoda Declaration, the City does not issue "Certificates of Occupancy" in connection with transfers of real estate (¶21A).

**Declaration Paragraphs 8-9**.      Houston is obviously not competent to testify about the buyer's "concerns" or the buyer's financial condition. To the extent the buyer declined to complete the transaction because of concerns regarding the City's Point of Sale Inspection

5

Ordinance and deconversion requirements, those concerns do not bear on any claim of contemptuous conduct by the City. The possibility exists that the Ordinance will be upheld by the Seventh Circuit. The possibility exists that Calumet City will at some date have the ability to require the deconversion of multi-family units in single-family zoning districts. The possibility exists that this property was illegally converted. Those determinations are for a later day. But the concerns of the buyer about the future regulatory landscape (even if everything in the Houston Declaration is true) do not reflect that the City has violated this Court's Preliminary Injunction.

E.    **The Wojewoda Declaration**.

**Exhibit 13** to this Response is the Declaration of Rebecca Wojewoda. She is the City's Housing Administrator. We assume that this is the individual to whom Houston makes reference.

As set forth in Wojewoda's Declaration, the City is abiding by this Court's Order. City Staff has discontinued doing any Point of Sale Inspections. The City Staff has modified the Point of Sale Inspection Form in accordance with **Exhibit 10**. Now the City is only using the form as an information intake sheet. Ms. Wojewoda and Staff are not enforcing the current Ordinance.

The City is not conditioning the issuance of Transfer Stamps on the payment of water bills. The City is not threatening anybody with deconversion. Indeed, as set forth in paragraph 32 of Wojewoda's Declaration, the processing of a Real Estate Transfer Tax Payment takes less than an hour.

6

Wojewoda has no memory of any conversations in October 2006 with Houston or involving the Forsythe Property.[4] Wojewoda's Declaration demonstrates that it is inconsistent with the practices of Wojewoda personally and the Department generally.

The City's treatment of the Forsythe Property is not indicative of a failure to abide by this Court's August 8 Order. The property is not a legal nonconforming use as asserted by the Realtors. The City's recognition of the property in 1999 was based on the laws in effect at 1999. Both Houston and Mann were on notice in 2004 and 2005 that under the Ordinance as amended, the second unit would have to be deconverted. They took no action to obtain administrative relief to allow the second unit. The City denies that it engaged in any conduct with respect to this property from August 2006 to the present which indicates in any way a failure to abide by the Injunction.

**F.    The Sebok Declaration**.

The Sebok Declaration is simply wrong in certain respects. The City is not still using the same form. The document has been altered to conform to this Court's Order. **Exhibit 10.** The City is not informing owners "that the City may inspect the property based on the form and could demand repairs if the property is not in compliance." (¶25). Mr. Sebok offers no support for this conclusion and the Declaration of Wojewoda belies it.

Paragraph 5 of Sebok's Declaration has nothing to do with this Court's Order. As we understand Mr. Sebok's terminology, a "rebuild letter" is a letter stating that if a property is destroyed or damaged, the owner may "rebuild" the property to its original use. We presume that what Mr. Sebok is looking for are letters from the City saying that if a single-family home has

---

[4] This is certainly understandable in light of the activity in the Department.

7

additional apartment(s) and that structure is destroyed by fire, the owner will be able to rebuild the house with the extra apartments.

As a factual matter, the City does not issue rebuild letters (¶27). The City did not issue rebuild letters before this Court's Order and still does not issue rebuild letters. As a legal matter, the City's "failure" to issue rebuild letters is not a violation of the Injunction. Finally, even if we were to assume that (using the Forsythe Property as an example) a two or three unit conversion of a single family house were a legal nonconforming use, the City's Zoning Ordinance would specifically prohibit a "rebuild" of any additional apartments in the R-1 District. See City Zoning Ordinance Section 5.5 (**Exhibit 11**).

There is nothing in the Sebok Declaration which in is any way probative of a violation of the Preliminary Injunction.

### G.    514 Pulaski.

The Realtors' claims regarding 514 Pulaski (3-4) are not supported by any Declaration or other fact-based matter. As set forth in the Wojewoda Declaration, there is no way for the City to respond to these assertions because they are not based on anybody's firsthand knowledge. The narrative itself cannot furnish us any sort of basis for the consideration of a Rule to Show Cause.

### H.    Realtors' Misstatements In Their Motion.

We wish to call this Court's particular attention to the Realtors' misreading of the Houston Declaration. On pp. 2-3 of the Motion, the Realtors assert: "On October 30, however, the property owner and potential buyer attempted to purchase transfer stamps from the Calumet City [Department of] Inspectional Services. Ex. 5 at ¶4. The City conditioned the issuance of the transfer stamp on the payment of the outstanding water bill. Id. Moreover, the City told the buyer that it would not issue a certificate of occupancy until the property was deconverted. Id."

8

The assertion that Houston declared anything about anything happening on 10-30-06 is

not true.  Paragraph 4 of the Houston Declaration states:

> Prior to the closing, the buyer and I went to Calumet City Inspectional Services to
> purchase the necessary transfer stamp.  Rebecca an employee of Calumet City
> Inspectional Services required the payment of the final water bill before Calumet
> City would issue the transfer stamps.

Paragraph 5 then states in part:

> Rebecca explained that the buyer could not occupy the property until it was
> deconverted.

The Declaration does not say that Houston and the unnamed buyer went to Calumet City

on October 30, 2006.  What the Declaration says is that Houston "scheduled the closing of the

property on October 30, 2006."  There is nothing in this Declaration to indicate that the alleged

encounter with the City occurred on October 30, 2006.  However, that is exactly (at 2-3) what the

Realtors are representing to this Court in their Motion.  See Motion par. 4.

We assume inadvertently, but The Realtors' submission is attempting to convey the

misimpression that this claimed encounter took place on October 30, 2006.  The records of the

City indicate that any contact with the City took place prior to this Court's Injunction and at the

instance of Hussein Mann, not Ms. Houston.  We ask this Court to please disregard this aspect of

the Realtors' Motion.

## I.     Plat Of Survey.

The City respectfully submits that this Court's August 8th Order does not prohibit the City

from obtaining a copy of the property survey as a condition to issuance of the stamps.  The Order

enjoined the enforcement of Section 327(b) of Chapter 82, Article X of the City Code.  The

survey requirement is found in Section 327(c).  It is extremely difficult to understand how this

requirement can in any way be viewed as working a restraint on the alienability of property.

Every buy/sell transaction requires the furnishing of a survey. It is boilerplate in every single real estate contract and the Realtors know that. The Realtors have failed to provide this Court with a basis for determining (i) how requiring a survey constitutes a violation of the Injunction; and (ii) any anecdotal evidence as to how this requirement works any sort of a hardship on any buy/sell transaction.

### J.     **Civility And Cooperation**.

The Realtors have attached some emails to their Motion. These emails are indicative of the Realtors' approach to this litigation. On October 30, 2006, Attorney Maggie Hanel sent emails to the City attorneys. The email simply said that "we are investigating" whether the City violated the August 8 Order as to 514 Pulaski and 514 Forsythe. No details were provided. Rather than explaining the problem, or picking up the phone in order to discuss whether there might be some misunderstanding, the Realtors issued a 48-hour ultimatum ("Please send a copy of the file ... to us before 5:00 p.m. on Wednesday November 1.").

We respectfully suggest that the issuance of ultimatums while failing to either disclose the substance of concerns or making an effort to work through them is not the way to meaningfully address concerns regarding implementation of the Injunction. Real estate transfer in Calumet City is – unfortunately – a high volume business. Stray problems should be addressed collegially, rather than with a gun-to-the-head approach.

### III.     **This Motion Does Not Furnish The Basis For**
###          **This Court To Issue A Rule To Show Cause**

Magistrate Cole recently summarized the heavy burden imposed upon a party seeking to hold another party in contempt of court:

10

> To be held in civil contempt, a party must have violated an order that sets forth in specific detail an unequivocal command. Civil contempt proceedings are designed to be coercive and remedial, not punitive. The party asserting a violation of a judicial order has the burden of proving the violation by clear and convincing evidence – which is, of course, a substantially greater burden of proof than preponderance of the evidence.

F.T.C. v. Cleverlink Trading, Ltd., 2006 WL 3106448 (N.D.Ill. 2006), at *15 [internal citations omitted].

In the present case, the Realtors' Motion rests on claims with respect to two properties. Only one of the claims is even supported by a Declaration. During this same period of time, close to 1,000 properties have transferred without apparent incident. The City official in charge of administering this process has assured the Court that the City is abiding by the Injunction.

Under these circumstances, there is no basis for this Court to issue a Rule or order further proceedings. In order for the City to defend against a contempt citation, the proceedings will be expensive to all parties. Significant discovery will be required. The Realtors have not furnished a basis to set contempt proceedings into motion. The Motion should be denied.

In the event this Court does grant the Motion, the City will need adequate time to depose Houston, Mann, Sebok, the unidentified buyer of the Forsythe Property, Mrs. Tall, and any individual furnishing information to the Realtors upon which they have made the assertions in the Motion.

## IV.    Conclusion.

The Motion should be denied.  No Rule should be issued.

Respectfully submitted,

City of Calumet City

By:    /s/ John B. Murphey
One of its Attorneys

JOHN B. MURPHEY
ARDC #1992635
Rosenthal, Murphey & Coblentz
30 North LaSalle Street, Suite 1624
Chicago, Illinois 60602
Tel. (312) 541-1070/Fax (312) 541-9191

MARK STERK
ARDC #3125540
Odelson & Sterk, Ltd.
3318 West 95th Street
Evergreen Park, Illinois 60805

G:\rmcj\Calumet City\realtor Association\Response to Petition to Show Cause.doc

12

## CERTIFICATE OF SERVICE

I hereby certify that on December 5, 2006, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of said filing to all parties listed below:

Philip C. Stahl                   Mark H. Sterk
Maggie M. Hanel                   Amy Elaina Zale
Patrick Thomas Nash               Tiffany Nelson
Grippo & Elden                    Odelson & Sterk, Ltd.
111 South Wacker Drive            3318 West 95th Street
Chicago, Illinois 60606           Evergreen Park, IL 60805


        /s/     Douglas M. Doty
ROSENTHAL, MURPHEY & COBLENTZ
Attorney for Calumet City
30 North LaSalle Street, Suite 1624
Chicago, Illinois 60602
Tel. (312) 541-1070
Fax: (312) 541-1070

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Realtor Association of West/South )
Suburban Chicagoland, )  No.  06 C 2271
               Plaintiff, )
)  Judge Milton I. Shadur
v. )
)
Calumet City, Illinois )  Magistrate Judge Maria G. Valdez
            Defendants. )

**DECLARATION OF REBECCA WOJEWODA IN OPPOSITION
TO PLAINTIFFS' MOTION FOR ORDER TO SHOW CAUSE**

Rebecca Wojewoda declares as follows:

1.     My name is Rebecca Wojewoda.  I have been employed by the City of Calumet

City from 1986-1994 and 2003-present.  I am the City's Housing Administrator.

2.     I am commonly known as Becky.

3.     I have reviewed the Declaration of Ms. Houston.  In preparing this Declaration, I

have also reviewed the building files for the property at 514 Forsythe, as well as 514 Pulaski.  I

have also obtained data from the City Clerk's office.  I have also spoken with John Rodeck, one

of the City's Building Inspectors, as well as other members of the Department of Inspectional

Service.

4.     The property at 514 Forsythe (the "Forsythe Property") is a single-family home

approximately 95 years old.  The Forsythe Property is in the R-1 Single-Family Zoning District.

To the best of my knowledge, two-unit dwellings are not, and have never been listed as a

permitted use in the R-1 Zoning District.  In this declaration, I will call the improvements to the

property the "Forsythe House."

5.     The Forsythe House has what might generally be called a "second floor

apartment."  There is no exterior entrance to this apartment.  People must access   the second



floor apartment through one of the two exterior entrances to the house. There is a separate kitchen, bath and toilet facilities in the second floor apartment.

6.     Two family units are permitted in the R-2 Zoning District. Two family units are not permitted in the R-1 District. I do not know how long this house has been equipped with this second dwelling unit.

7.     In 1996, the City adopted an amendment to Section 6-308 of the City Code dealing with nonconforming structures that were converted to and were being used as multiple-family residences, in violation of the Zoning Ordinance.

8.     As set forth in Section 6-308, the Ordinance allowed properties such as the Forsythe House, which were not in conformity with the Zoning Ordinance, to be reconveyed in their nonconforming condition up to an additional two times. Under Section 6-308, the third such transfer had to be made in conformity with the existing zoning, which in the case of the Forsythe Property meant that upon the third conveyance the House could only be used for single-family and not R-2 purposes.

9.     In 1999, the Forsythe Property was sold by Zimmerman to Houston. This was the first sale of the Forsythe Property since the adoption of the 1996 Ordinance. As City Staff interpreted the 1996 Ordinance, the Forsythe Property could still be used for R-2 two family purposes, even though such use was prohibited in the R-1 District. The reason for this is because the 1999 conveyance to Houston was the first such transfer after the adoption of the 1996 Ordinance.

10.     The best of my knowledge, information and belief (based in part upon my discussions with John Rodeck), the inspectional notation found on page 2 of **Exhibit 3** attached hereto, which is also Exhibit 6 to the Realtors' Motion for Rule to Show Cause, that this was a

2

"legal nonconforming use," meant that this was the first transfer since the 1996 Ordinance. Based on my examination of the property records for the Forsythe Property, as well as my own familiarity with the Calumet City Zoning Ordinance, multi-family uses have never been permitted as a matter of right in an R-1 District. Therefore, to the best of my knowledge, information and belief, the Multi-Family Use of the Forsythe House was never permitted within the meaning of our Zoning Ordinance.

11.    Based on my review of the building file for the Forsythe Property, I am aware that Houston and her co-owner (Hussein Mann) rented out the upstairs apartment. I know this because the City has conducted rental property inspections from time to time.

12.    In 2004, the City amended the 1996 Ordinance. Among other things, the amendment to the Ordinance eliminated the "three transfer" rule from Section 6-308 and required that illegally converted properties would have to be deconverted at the time of transfer.

13.    During the course of two of the rental inspections for this property, City Inspectors noted that this property was subject to deconversion under current City Codes. See **Exhibits 5-6**. Someone also inquired as to the status of this property on or about 7-19-05, because City **Exhibit 7** indicates that City Staff provided someone with a copy of the Assessor's photo of the house with a handwritten "Must deconvert to Single Family" notation.

14.    On July 7, 2006, before the entry of this Court's injunction, the City records indicate that Hussein Mann filed an application for Point-of-Sale Inspection. I did not personally intake that application.

15.    The reviewing Inspector determined that the Forsythe Property was subject to deconversion because (i) the Forsythe Property has always been zoned R-1; (ii) conveyances of illegally unpermitted converted properties in the R-1 District were now prohibited by the City

3

Code; and (iii) the owners took no action to obtain any sort of zoning relief with respect to their unauthorized use of the Forsythe Property. It is the practice of my Department to provide individuals facing potential deconversion with forms and information describing how these individuals can seek a variance or zoning amendment to allow the continuation of the converted use.

16.     After the August 8th Preliminary Injunction Order was entered, its terms were explained to me by the City Attorneys. I have instructed clerical personnel regarding the terms of the Injunction Order. I understood that the Injunction Order did not affect the City's ability to pursue remedies against illegally converted properties.

17.     After the August 8th Order was explained to me, our Staff has discontinued doing any Point-of-Sale Inspections. City Staff has modified the form in accordance with **Exhibit 10**.

18.     Although the City has adopted a new Point-Of-Sale Ordinance, I have been instructed by the City Attorneys not to administer the new Ordinance until further notice because of the current litigation.

19.     Let me now turn to the Declaration of Ms. Houston. I have no recollection of any conversation since the August 8 Inspection Order with any person regarding the Forsythe Property. I take dozens of calls a day from sellers, contractors, appraisers, and real estate brokers. My duties go beyond the administration of the Point-of-Sale Ordinance. I am actively involved in general matters of Building Code Enforcement and Code Compliance, and I am in charge of Rental Inspections. The Department for which I work is responsible for approximately 5,000 Rental Inspections per year.

20.     To give the Court a further sense of our office activity, during the first seven months of 2006, there were approximately 658 transfers of real estate in Calumet City. Since the

4

date of the Order, there has been over 900 nonexempt real estate transfers. Based on information

provided by the City Clerk's office, this is the real estate transfer activity for the last four months,

excluding transfers not subject to the tax:

| Month | Number of Transfers |
|-------|---------------------|
| August, 2006 | 274 |
| September, 2006 | 216 |
| October, 2006 | 277 |
| November, 2006 | 214 |
| Total | 981 |

21.    A number of the statements set forth in Ms. Houston's Declaration do not ring

true; by that, I mean these statements do no reflect the kinds of things I would say in the

administration of the Point-of-Sale Ordinance. In particular:

A.    The City does not issue "Certificates of Occupancy" in connection with the

issuance of Transfer Stamps. Generally speaking, the Certificates of Occupancy are only issued

by the City in connection with new construction.

B.    After this Court's injunction, I never said to Houston or anybody else anything to

the effect that the City would "demand a deconversion" of this or any property. There is no

reason for me to have treated this particular transaction any differently than the hundreds of

similar transactions that have come before my Department since this Court's injunction.

22.    Since the August 8 Court Order, the City has not conducted any Point-of-Sale

Inspections. The City has not held up any closings to conduct such inspections. I have not

5

received any complaints or expressions of concern from anybody since 8-8-08 regarding my Department's compliance with the Injunction.

23. The City does not condition the issuance of Transfer Stamps on the payment of water bills.

24. Until recently, our Department was requiring surveys pursuant to Section 82-327(c) of the City Code. I did not understand that this Court's injunction applied to the survey requirement.

25. Turning to the Declaration of Richard Sebok, I disagree with his assertion in paragraph 4 that the City is continuing to use the "original Point-of-Sale Inspection Application form ..." As shown on **Exhibit 10**, we have modified the form substantially. We have clearly identified the document as a mere "Information Sheet." More importantly, the City is not telling any seller that the City "may inspect the property based upon the form and could demand repairs if the property is not in compliance." I have no way of checking the assertion made by Mr. Sebok in his Declaration because he does not identify whom he believes has made this statement and under what circumstances.

26. With respect to paragraph 5 of Mr. Sebok's Declaration, I believe that when Mr. Sebok uses the term "rebuild letter" he is referring to a letter which a municipality would give which would provide that if a structure is destroyed completely or to an extent greater than 50%, that structure may be "rebuilt" and used in the same manner and for the same purposes as it had been before the casualty.

27. The City has never issued such rebuild letters. The City does not require any owner "to agree to deconvert the property before the City will issue the letter," as the Realtors

6

DEC-04-2006(MON) 13:46    CORRECTIONAL SERVICES                    P. 002/002

Case 1:08-cv-00555    Document 63-2    Filed 08/07/2008    Page 25 of 44
Case 1:06-cv-02271    Document 59-2    Filed 12/05/2006    Page 36 of 36

claim in paragraph 7 (page 4) of their Motion. I have never heard of such a requirement being asserted by anyone in connection with the City.

28.    I have reviewed pages 3-4 (paragraph 5) of the Realtors' Motion with respect to property with an address of 514 Pulaski Street. . 514 Pulaski is a single-family dwelling which is located in the B Business District. There is a single-family house located on this property. There is a second apartment in this house.

29.    I cannot comment on the paragraph 5 recitation regarding a conversation because this paragraph does not identify who contacted the City, when that contact was made, who the individual at the City was that this individual spoke to, or any of the other circumstances regarding this conversation.

30.    According to the City records, the owner of this property is Josephine Tall. The City last performed an Inspection Report on this property on July 10, 2006. See **Exhibit 12**.

31.    I am quite certain that after this Court's order of August 8, 2006, neither I nor anybody in my Department told the owner of this property that the transfer of this property would in any way be impeded.

32.    As presently administered, the transfer tax process takes no more than an hour to complete. The applicant first comes to our department and completes the Information Sheet. We verify the information and then send the applicant to the City Clerk's Office, where the tax is paid and the stamps issued.

Dated December 5, 2006                          _____
                                                Rebecca Wojewoda

G:\rmcj\Calumet City\realtor Association\Wojewoda Declaration.doc

7

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Realtor Association of West/South Suburban Chicagoland, | ) | No. 06 C 2271 |
| Plaintiff, | ) | |
| v. | ) | Judge Milton I. Shadur |
| Calumet City, Illinois | ) | Magistrate Judge Maria G. Valdez |
| Defendants. | ) | |

**DEFENDANT CITY OF CALUMET CITY'S**
**MEMORANDUM ON NONCONFORMING USES**

At the December 8, 2006 hearing, this Court requested the parties to submit memoranda relating to the issue of legal nonconforming uses and illegal uses. The City's recollection of the discussion began with the City's discussion of our response to the matters raised by the Realtors relating to 514 Forsythe. The undersigned was describing the history of the Forsythe Property. Specifically, the Forsythe Property was in an R-1 District, where multi-family units were not allowed. The 1996 Ordinance provided for a period of time during which those "illegal" uses were to be converted to conforming uses. The City introduced this material in response to the Realtors' contempt motion. This material shows, among other things, that the multi-family use of the Forsythe Property was not a legal nonconforming use.

Citing Justice Cardozzo's famous phrase, the Court made reference to avoiding the "tyranny of labels" with reference to the issue of uses that are either "illegal," or "legal nonconforming."[1] The Court directed the parties to submit memoranda on the issues relating to Illinois law, the law of nonconforming uses, and the relation of nonconforming uses to illegal

---

[1] "A fertile source of perversion in Constitutional theory is the tyranny of labels. Out of the vague precepts of the Fourteenth Amendment, a court frames a rule which is general in form, though it has been wrought under the pressure of particular situations. Forthwith another situation is placed under the rule, because it is fitted to the words though related faintly, if at all, to the reasons that brought the rule into existence." Snyder v. Commonwealth of Massachusetts, 291 U.S. 97, 114 (1934).

uses. For the reasons set forth below, the City respectfully submits that "the tyranny of labels is not in issue here," Farrell v. Carol Stream School District No. 25, 1996 WL 364743 (N.D.Ill. 1996 at *4). Illinois law recognizes clear distinctions between what are considered legal nonconforming uses and illegal uses.

### A.    Zoning Enabling Statute.

The starting point of this analysis is the Zoning Enabling Statute. 65 ILCS 5/11-13-1. After setting forth the powers which municipalities may exercise in the field of land use and zoning, the Legislature constrains municipalities from exercising zoning powers "so as to deprive the owner of any existing property of its use or maintenance for the purpose to which it is then legally devoted, but provisions may be made for the gradual elimination of uses, building and structures which are incompatible with the districts in which they are made or located …" The Statute provides for elimination of such rights in a variety of ways: when the rights of persons in possession are terminated; when the uses to which they are currently devoted are discontinued; or the gradual elimination of such uses if these structures are adaptable for permitted uses.[2]

### B.    Illinois Case Law

Under Illinois law, the term "nonconforming use" is equated with the term" legal nonconforming use." See, e., Eleopoulos v. City of Chicago, 3 Ill.2d 247, 120 N.E.2d 555 (1954); Dube v. City of Chicago, 7 Ill.2d 313, 131 N.E.2d 9 (1956). The general definition of a "legal nonconforming use" is "a use that is not permitted under the current zoning ordinance, but is allowed to continue because it predates the ordinance. The right to a legal nonconforming use is a property right that cannot be taken away unreasonably or for reasons not based on public

---

[2] Of course, because Calumet City is a home rule municipality, the City is no longer constrained by the specifics of the enabling legislation.

welfare." City of Marengo v. Pollack, 335 Ill.App.3d 981, 270 Ill.Dec. 354, 358 (2nd Dist. 2002). See also 10 Illinois Law in Practice, Cities, Villages, etc., Sec. 769 (2006).

Illinois law is also clear that a "use that was not lawful at its inception does not constitute a legal nonconforming use and therefore cannot be protected from elimination for violation of present zoning ordinances." Wright v. County of DuPage, 316 Ill.App.3d 28, 249 Ill.Dec. 456, 465 (2nd Dist. 2000); Bainter v. Village of Algonquin, 285 Ill.App.3d 745, 221 Ill.Dec. 213, 218 (2nd Dist. 1996). The issue of whether a particular use of a particular property is legal nonconforming is a fact intensive inquiry. Id.; Village of Plainfield v. American Cedar Designs, 316 Ill.App.3d 130, 266 Ill.Dec. 930, 937 (3rd Dist. 2000) ("The facts of a particular case determine whether an owner is entitled to the protection of a legal nonconforming use.").

Under Illinois law, inaction by a municipality does not convert an illegal use into a legal nonconforming use. In Welch v. City of Evanston, 87 Ill.App.3d 1017, 42 Ill.Dec. 835 (1st Dist. 1980), an apartment building was zoned to allow 10 apartments. The property in question had an 11th apartment (used for a janitor), was cited by the City as a zoning violation. The owner responded first by arguing that there was a long-term custom excluding the janitor's apartment from the unit count. The court rejected the contention that a "custom" could be used to create a lawful nonconforming use. 42 Ill.Dec. at 840-1. The court also held that the city was not estopped from prosecuting the violation by virtue of the fact that the illegal apartment had existed for "almost 52 years from the start of the illegal use." 42 Ill.Dec. at 842. The court applied the general rule that estoppel cannot be invoked against a municipality unless there were some "positive acts by the municipal officers which may have induced the action of the adverse party. Mere inaction is not enough." Id. at 841-2, citing, inter alia, Gregory v. City of Wheaton, 23 Ill.2d 402, 178 N.E.2d 358 (1961).

3

Calumet City has defined "nonconforming use" in a manner which conforms to the Illinois Municipal Code and the applicable cases. See Section 5.1, previously cited in our response to the Realtors' Motion for Rule to Show Cause as Exhibit 11 thereto. This definition is substantially similar to that used by municipalities such the Village of Glencoe. See Glencoe Zoning Ordinance Section 8-302:

> [A nonconforming use is] any use lawfully being made of any land, building or structure … on the effective date of this Code or any amendment to it rendering such use nonconforming that does not comply with all of the regulations of this Code or any such amendment hereto governing use for the zoning district in which such land, building or structure is located.

In light of the statutory authorization allowing for the "gradual elimination" of nonconforming uses, courts have upheld various amortization ordinances against challenges by owners of nonconforming uses or structures. Village of Glenview v. Velasquez, 123 Ill.App.3d 806, 79 Ill.Dec. 319, 321 (1st Dist. 1984) (collecting cases). Like virtually everything else in matters dealing with land use law, the reasonableness of an amortization ordinance is to be determined on a case-by-case basis.

### C.   Applicability of These Principles to the Present Litigation.

The Ordinance which is the subject of the Court's Injunction specifically addresses the treatment of legal nonconforming uses. [insert discussion]. Subsection 14-1(c)(ii) provides that a compliance inspection is to determine, inter alia, whether the Subject Property has been "illegally converted." This subsection provides:

> All structures shall be inspected to determine whether they have been illegally converted. For purposes of this subsection "illegally converted" means that the property was converted to another or additional use beyond that for which the property was originally permitted and which [i] is in violation of the property zoning limitations and [ii] is not a legal nonconforming use under Section V of the City Zoning Ordinance.

4

As discussed above, Section V of the Zoning Ordinance (5.1) defines and protects legal nonconforming uses.

Calumet City's now repealed 1996 Ordinance called for amortization on a transactional rather than temporal basis. The Ordinance did not distinguish between illegal uses (subject to immediate termination) and legal nonconforming uses, uses for purposes of this transactional amortization. This additional background underscores the fact that the City did not engage in contemptuous conduct with respect to the handling of the Houston transaction. The thrust of the Realtors' motion is that the multi-family use of the Forsythe Property was a legal nonconforming use. There is no evidence in the record to support that contention. Under the 1996 Ordinance, the significance of the legal and conforming/illegal distinction was no longer of any relevance. The initial activity about which Houston complains took place prior to this Court's Preliminary Injunction Order of 8/8/06. The City did not violate the 8/8/06 Order. Finally, the Forsythe matter must be taken into context of the several hundred real estate transactions which have occurred without incident since the 8/8/06 Order.

### Summary and Conclusion

In summary:

1.      Illinois law recognizes a distinction between nonconforming uses (appropriately called legal nonconforming uses) and legal uses of land.

2.      A legal nonconforming use may be gradually eliminated by way of an amortization ordinance. The reasonableness of any particular ordinance is analyzed in a case-by-case basis for reasonableness, but is subject to a presumption of validity.

5

3.    Unless a property owner can affirmatively establish the elements of equitable estoppel, a municipality has the authority to immediately eliminate illegal uses of property regardless of the length of time the legal use was allowed to exist.

4.    The Amended Ordinance specifically exempts legal nonconforming uses from the deconversion requirements.

5.    This Court's Preliminary Injunction does not prevent the City from eliminating illegal conversions.

6.    There is insufficient evidence to set this matter down for hearing on the Rule to Show Cause.

Respectfully submitted,

City of Calumet City

By:___/s/ John B. Murphey___
One of its Attorneys

JOHN B. MURPHEY
ARDC #1992635
Rosenthal, Murphey & Coblentz
30 North LaSalle Street, Suite 1624
Chicago, Illinois 60602
Tel. (312) 541-1070/Fax (312) 541-9191

MARK STERK
ARDC #3125540
Odelson & Sterk, Ltd.
3318 West 95th Street
Evergreen Park, Illinois 60805

G:\rmcj\calumet City\realtor Association\Mem Nonconforming Uses.doc

6

## CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2006, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of said filing to all parties listed below:

Philip C. Stahl
Maggie M. Hanel
Patrick Thomas Nash
Grippo & Elden
111 South Wacker Drive
Chicago, Illinois 60606

Mark H. Sterk
Amy Elaina Zale
Tiffany Nelson
Odelson & Sterk, Ltd.
3318 West 95th Street
Evergreen Park, IL 60805

   /s/   Douglas M. Doty
ROSENTHAL, MURPHEY & COBLENTZ
Attorney for Calumet City
30 North LaSalle Street, Suite 1624
Chicago, Illinois 60602
Tel. (312) 541-1070
Fax: (312) 541-1070

7

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Realtor Association of West/South Suburban Chicagoland, | ) ) | No. 06 C 2271 |
| Plaintiff, | ) ) | |
| v. | ) ) | Judge Milton I. Shadur |
| Calumet City, Illinois | ) ) | Magistrate Judge Maria G. Valdez |
| Defendants. | ) | |

## MOTION FOR ENTRY OF ORDER DENYING
## REQUEST FOR RULE TO SHOW CAUSE

Now comes the defendant City of Calumet City by its attorney John B. Murphey and moves that this Court enter an Order with respect to the Realtors' Petition for Rule to Show Cause, substantially in the form of **Exhibit 1** attached hereto and made a part hereof. In support of this Motion, the City states:

1.     Following the status call on February 2, 2007, the City responded by sending a proposed redraft order in the form of **Exhibit 1**. A clean copy of the Order is attached as **Exhibit 1A**.

2.     By email dated February 15, 2007, copy of which is attached hereto as **Exhibit 2**, the Realtors responded.

3.     The Realtors' response takes the following positions:

A.     That notwithstanding this Court's comments at the February 2nd hearing, this Court has made a definitive ruling that the owners of property at 514 Forsythe "are entitled to be compensated."

B.     That the Realtors themselves are entitled to be compensated.

4.     With respect, the City submits that this Court did not intend to provide an entitlement to damages with respect to parties and claims not before this Court. Whether the owner of 514 Forsythe is entitled to be compensated depends on a lawsuit being filed, discovery

taking place, credibility assessed and a trial. This Court does not have the authority to make any sort of binding determination with respect to nonparties.

5.      The City further respectfully submits that this Court similarly did not intend to make any sort of binding determination that real estate brokers involved in this transaction have the right to receive any sort of compensation regarding the failed 514 transaction. To the extent the Realtor Association "believes that the right to damages recognized by Judge Shadur necessarily extends to the brokers", that determination awaits the actual filing of a lawsuit and the litigation of the claim.

6.      The City respectfully submits that the Order attached hereto as **Exhibit 1** accurately reflects the rulings of this Court insofar as they relate to this Court's Order denying the Motion for Rule to Show Cause.

WHEREFORE, the City respectfully prays that this Court enter an Order in the form of **Exhibit 1** attached hereto.

Respectfully submitted,

City of Calumet City

By:_____/s/ John B. Murphey_____

JOHN B. MURPHEY
ARDC #1992635
Rosenthal, Murphey & Coblentz
30 North LaSalle Street, Suite 1624
Chicago, Illinois 60602
Tel. (312) 541-1070/Fax (312) 541-9191

MARK STERK
ARDC #3125540
Odelson & Sterk, Ltd.
3318 West 95th Street
Evergreen Park, Illinois 60805

G:\rmcj\calumet City\realtor Association\MotionEntryOrder.doc

2

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2007, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of said filing to all parties listed below:

Philip C. Stahl
Maggie M. Hanel
Patrick Thomas Nash
Grippo & Elden
111 South Wacker Drive
Chicago, Illinois 6060

Mark H. Sterk
Amy Elaina Zale
Tiffany Nelson
Odelson & Sterk, Ltd.
3318 West 95th Street
Evergreen Park, Illinois 60805


_/s/_    Douglas M. Doty_____
ROSENTHAL, MURPHEY & COBLENTZ
Attorney City of Calumet City
30 North LaSalle Street, Suite 1624
Chicago, Illinois 60602
Tel. (312) 541-1070
Fax: (312) 541-9191

# EXHIBIT E

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 2203511 (N.D.Ill.), Comm. Fut. L. Rep. P 29,832
**2004 WL 2203511 (N.D.Ill.)**

**H**

Commodity Futures Commission v. Krysinski
N.D.Ill.,2004.

United States District Court,N.D. Illinois, Eastern Division.
COMMODITY FUTURES TRADING COMMISSION,
Plaintiff,
v.
Keith Wilson KRYSINSKI, Defendant.
**No. Civ.A.03-C-8571.**

Aug. 3, 2004.

Jennifer S. Diamond, Commodity Futures Trading
Commission, Chicago, Illinois, for the Plaintiff.
Robert Christie, Henderson & Lyman, Chicago, IL, for
Defendant.

CONSENT ORDER OF PERMANENT INJUNCTION
AND OTHER EQUITABLE RELIEF

ST. EVE, J.
*1 On November 26, 2003, plaintiff Commodity Fu-
tures Trading Commission ("Commission") filed a com-
plaint against defendant Keith Wilson Krysinski
("Defendant") seeking a civil monetary penalty, injunct-
ive, and other equitable relief for violations of the Com-
modity Exchange Act, as amended ("Act"), 7 U.S.C. §§
1*etseq.* (2001). The Court entered an *Ex Parte* Statutory
Restraining Order on that same day. The Court held a
Preliminary Injunction Hearing on December 15 and 16,
2003, and entered a Preliminary Injunction Order on
December 29, 2003.

I. Consents And Agreements

To effect settlement of the matters alleged in the Com-
plaint against Defendant without a trial on the merits or
any further judicial proceedings, Defendant:

1. Consents to the entry of this Consent Order of Per-
manent Injunction and Other Equitable Relief ("Order").

2. Affirms that he has agreed to this Order voluntarily,
and that no promise or threat has been made by the
Commission or any member, officer, agent or represent-
ative thereof, or by any other person, to induce consent
to this Order, other than as set forth specifically herein.

3. Acknowledges service of the Summons and Com-
plaint.

4. Admits jurisdiction of this Court over him, admits
that the Court has subject matter jurisdiction over this
action, and admits that venue properly lies with this
Court pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1.

5. Waives:

(a) the entry of findings of fact and conclusions of
law pursuant to Rule 52 of the Federal Rules of
Civil Procedure, except as set forth below;

(b) all claims which they may possess under the
Equal Access to Justice Act, 5 U.S.C. § 504 (2000)
and 28 U.S.C. § 2412 (2000), relating to, or arising
from, this action;

(c) any claim of double jeopardy based upon the in-
stitution of this proceeding or the entry in this pro-
ceeding of any order imposing a civil monetary
penalty or any other relief; and

(d) all rights of appeal from this Order.

6. Neither admits nor denies any findings of facts or
conclusions of law, except as set forth herein. No provi-
sion of this Order shall in any way limit or impair the
ability of any person, including those third-party benefi-
ciaries designated in Section V paragraph 1 herein, to
seek any legal or equitable remedy against the Defend-
ant or any other person in any other proceeding, includ-
ing any current or subsequent bankruptcy. Furthermore,
the allegations of the Complaint and the findings in this
Order shall be taken as true and be given preclusive ef-
fect without further proof for the purpose of any current
or subsequent bankruptcy proceeding filed by, or on be-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2203511 (N.D.Ill.), Comm. Fut. L. Rep. P 29,832
**2004 WL 2203511 (N.D.Ill.)**

half of, the Defendant. Defendant shall also provide immediate notice of any bankruptcy filed by, on behalf of, or against him in the manner required by paragraph 8 of Section V of this Order.

7. Agrees that neither he nor any of his agents or employees acting under his authority or control shall take any action or make any public statement denying, directly or indirectly, any allegation in the Complaint or findings or conclusions in this Order, or creating, or tending to create, the impression that the Complaint or this Order is without a factual basis; provided, however, that nothing in this provision shall affect Defendant's: i) testimonial obligations; or ii) rights to take legal positions in other proceedings to which the Commission is not a party. The Defendant shall take all necessary steps to ensure that all of his agents and employees understand and comply with this agreement.

**\*2** 8. Consents to the continued jurisdiction of this Court for the purpose of enforcing the terms and conditions of this Order and for any other purposes relevant to this case.

9. Agrees to comply with the following undertakings:

(a) For a minimum of 5-years from the date of this Order, Defendant will not trade commodity futures, security futures or commodity options for his personal commodity trading account on or subject to the rules of any registered entity. This five year personal trading ban will be followed by 5 years of supervised trading by a registered futures commission merchant ("FCM"), such that the FCM must verify that the source of funds deposited into Krysinski's personal trading account are his own personal funds, including inquiring into and verifying the original source of funds that were ultimately deposited in Krysinski's financial account that then funded the trading account. If full restitution, including pre- and postjudgment interest, is paid within 5 years of the date of this Order, then the personal trading ban will expire five years from the date of this Order, and the 5 year period of supervised trading from a registered FCM shall commence. If, after five years from the date of this Order, full

restitution has not been paid, the personal trading ban will stay in effect for ten years, or until restitution is fully paid, whichever occurs first, followed by 5 years of supervised trading by a registered FCM; and

(b) For a minimum of 7-years from the date of this Order, Defendant will not engage in, control, or direct the trading of any commodity futures, security futures or commodity options accounts for or on behalf of any other person or entity, whether by power of attorney or otherwise. If after seven years from the date of this Order full restitution, including pre- and postjudgment interest, has not been paid, this trading ban shall stay in effect for ten years, or until restitution is fully paid, whichever occurs first.

## II. Findings of Fact

The Court hereby makes the following findings of fact:

1. This Court has jurisdiction over the subject matter of this action and all parties hereto pursuant to Section 6c of the Act, 7 U .S.C. § 13a-1.

2. Venue properly lies with this Court pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, in that Defendant is found in, inhabits, or transacts business in this district, and the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this district, among other places.

3. From at least May 2002 to October 2003 ("relevant time period"), Defendant solicited potential customers to provide funds to be used to trade commodity futures contracts in accounts held in the Defendant's name.

4. During the relevant time period, Defendant made oral misrepresentations when he misrepresented his past trading profits in the solicitation of potential customers for use in trading commodity futures contracts. At least two potential customers relied on these misrepresentations.

**\*3** 5. During the relevant time period, Defendant soli-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2004 WL 2203511 (N.D.Ill.), Comm. Fut. L. Rep. P 29,832
**2004 WL 2203511 (N.D.Ill.)**

cited and accepted over $200,000 from one member of the public to trade commodity futures contracts when he was not registered as a futures commission merchant and then commingled that customer's funds with his own funds.

6. During the relevant time period, Defendant misappropriated the funds of at least one customer entrusted to him for trading.

7. During the relevant time period, Defendant created and showed a false trading account statement representing the value of the commodity futures trading account that purportedly contained customer funds to at least one customer.

### III. Conclusions of Law

1. From at least May 2002 to October 2003, Defendant violated Section 4b(a)(2)(i) of the Act, 7 U.S.C. § 6b(a)(2)(i) (2001), by, among other things: (1) soliciting investments through fraudulent misrepresentations about Defendant's past performance results when trading his own or others' funds; (2) making material misrepresentations and omitting material facts, including misrepresentations of each customer's profits and account balances; and (3) misappropriating customer funds.

2. During the relevant time period, Defendant violated Section 4b(a)(2)(ii) of the Act by, among other things, making or causing to be made false reports and false statements issued or communicated to at least one customer who invested money with Krysinski to trade commodity futures contracts.

3. During the relevant time period, Defendant violated Section 4d(a) of the Act by, among other things: (1) acting as a FCM without registering as such when he solicited and accepted customer funds to trade commodity futures; (2) failing to treat and deal with all customer money and property received in order to trade commodity futures contracts as belonging to such customer; and (3) failing to separately account for and commingling his own funds with that of his customers when he deposited customer funds into his personal bank account.

### IV. Order For Permanent Injunction

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

1. Defendant is permanently restrained, enjoined and prohibited from directly or indirectly

(a) cheating or defrauding or attempting to cheat or defraud such other persons in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery made, or to be made, for or on behalf of any other person where such contracts for future delivery were or may have been used for (a) hedging any transaction in interstate commerce in such commodity, or the products or byproducts thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped or received in interstate commerce for the fulfillment thereof, in violation of Section 4b(a)(2)(i) of the Act, 7 U.S.C. § 6b(a)(2)(i) (2001);

(b) willfully making or causing to be made to other persons false reports or statements, or willfully entering or causing to be entered for other persons false records in or in connection with orders to make, or the making of, contracts of sale of commodities, for future delivery, made, or to be made, for or on behalf of such other persons where such contracts for future delivery were or may have been used for (a) hedging any transaction in interstate commerce in such commodity, or the products or byproducts thereof, or (b) determining the price basis of any transaction in interstate commerce in such commodity, or (c) delivering any such commodity sold, shipped or received in interstate commerce for the fulfillment thereof, in violation of Section 4b(a)(2)(ii) of the Act, 7 U.S.C. § 6b(a)(2)(ii) (2001);

**\*4** (c) soliciting and accepting orders for the purchase or sale of any commodity for future delivery, or accepting money, securities, or property of any person to margin, guarantee, or secure the futures

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 4
Not Reported in F.Supp.2d, 2004 WL 2203511 (N.D.Ill.), Comm. Fut. L. Rep. P 29,832
**2004 WL 2203511 (N.D.Ill.)**

trades or contracts of any person or engaging in any other act involving any contracts of sale of any commodity for future delivery, as a futures commission merchant in violation of Section 4d(a) of the Act, 7 U.S.C. § 6d(a) (2001).

V. Order For Other Equitable Relief

IT IS FURTHER ORDERED THAT:

1. *Restitution:* Defendant shall pay and be liable for restitution to customers/creditors in the amount of $333,509 plus pre- and post-judgment interest. Pre-judgment interest is calculated from the date the funds were deposited to Defendant to the date of this Order calculated at the underpayment rate established by the

Internal Revenue Service, pursuant to 26 U.S.C. § 6621, minus any amounts paid to customer/creditor as of the date of those payments. *See* Schedule A for a list of dates of deposits and payments. Interest after the date of this Order until the restitution is paid in full shall be paid at the post-judgment interest rate set forth in 28 U.S.C. § 1961. Listed in the table below are the names of the customers/creditors to whom restitution shall be made pursuant to this paragraph, together with the amount of restitution payable by Defendant to each of them (not including required interest) and the *prorata* distribution percentage by which each customer/creditor shall be paid:

| Restitution Payable to Customer/ Creditor | Amount of Restitution | Pro Rata Distribution Percentage |
|---|---|---|
| Curt Hartig | $183,509 | 55% |
| William Thomas | $150,000 | 45% |

All payments made pursuant to this Order by Defendant shall first be made to the customer/creditors for restitution on a *prorata* basis until those amounts (including interest) are fully satisfied. All payments after satisfaction of the restitution shall be applied to the civil monetary penalty described below. Defendant's payments made to Curt Hartig pursuant to this Order shall serve as a set-off to outstanding principal and interest payments due pursuant to a Secured Promissory Note for $200,000 dated November 3, 2003 executed by Keith Krysinski as debtor in favor of Curt Hartig as payee. Nothing in this Order shall affect the validity or enforcement of the aforementioned promissory note, except the set-off as stated herein.

2. *Civil Monetary Penalty:* Defendant Krysinski shall pay a civil monetary penalty of $60,000 plus post-judgment interest. Interest after the date of this Order until the civil monetary penalty is paid in full shall be paid at the post-judgment interest rate set forth in 28 U.S.C. § 1961. Defendant shall pay such civil monetary penalty by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's check, or

bank money order, made payable to the Commodity Futures Trading Commission, and sent to Dennese Posey, or her successor, Division of Enforcement, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581, under cover of a letter that identifies Defendant and the name and docket number of the proceeding; Defendant shall simultaneously transmit a copy of the cover letter and the form of payment to the Director, Division of Enforcement, Commodity Futures Trading Commission, at the following address: 1155 21st Street, NW, Washington, D.C. 20581.

**\*5** 3. *Third-Party Beneficiaries:* Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each of the customers/creditors identified in the table in number 1 above is explicitly made an intended third-party beneficiary of this Order and may seek to enforce obedience of this Order to obtain satisfaction of any portion of the restitution amount which has not been paid by Defendant.

4. *Collateral Agreements:* Defendant shall immediately notify the Commission if he makes any agreement with

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 5
Not Reported in F.Supp.2d, 2004 WL 2203511 (N.D.Ill.), Comm. Fut. L. Rep. P 29,832
**2004 WL 2203511 (N.D.Ill.)**

any customer/creditor obligating him to make payments outside of this Order. Defendant shall also provide immediate evidence to the Court and to the Commission of any payments made pursuant to such agreement.

5. *Freeze Orders Dissolved:* All prior freeze orders are dissolved.

6. *Withdraw Appeal:* Defendant agrees to withdraw his appeal in case No. 04-1185, *Keith Krysinski v. Commodity Futures Trading Commission,* before the Court of Appeals for the Seventh Circuit.

7. *Scope of Injunctive Relief:* The injunctive provisions of this Order shall be binding on the Defendant, upon any person insofar as he or she is acting in the capacity of officer, agent, servant, employee or attorney of the Defendant, and upon any person who receives actual notice of this Order by personal service, facsimile or otherwise insofar as he or she is acting in active concert or participation with the Defendant.

8. *Notices:* All notices required to be given by any provision in this Consent Order shall be sent certified mail, return receipt requested, as follows:

Notice to Commission:

Regional Counsel

Division of Enforcement-Central Region

Commodity Futures Trading Commission

525 West Monroe Street, Suite 1100

Chicago, Illinois 60661

Notice to Defendants:

Jeffry M. Henderson, Esq. and/or

Robert Christie, Esq.

Henderson & Lyman

174 West Jackson Blvd., Suite 240

Chicago, IL 60604

(312) 986-6960

In the event that the Defendant changes his residential or business telephone number(s) and/or address(es) at any time, he shall provide written notice of his new number(s) and/or address(es) to the Commission within twenty (20) calendar days thereof.

9. *Entire Agreement and Amendments:* This Order incorporates all of the terms and conditions of the settlement among the parties hereto. Nothing shall serve to amend or modify this Consent Order in any respect whatsoever, unless: (1) reduced to writing; (2) signed by all parties hereto; and (3) approved by order of this Court.

10. *Waiver:* The failure of any party hereto at any time or times to require performance of any provision hereof shall in no manner affect the right of such party at a later time to enforce the same or any other provision of this Order. No waiver in one or more instances of the breach of any provision contained in this Order shall be construed as a further or continuing waiver of a breach of any other provision of this Order.

**\*6** 11. The Court enters judgment in the amount of *$413,821.28,* plus postjudgment interest, against the Defendant and in favor of the Commission.

IT IS SO ORDERED.

*Schedule A to CONSENT ORDER OF PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF*

Dates of Deposit of Funds to Krysinski

| Customer/ Creditor | Date of Deposit | Amount |
|---|---|---|
| Curt Hartig | May 24, 2002 | $20,000 |

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2203511 (N.D.Ill.), Comm. Fut. L. Rep. P 29,832
**2004 WL 2203511 (N.D.Ill.)**

| | | |
|---|---|---|
| Curt Hartig | August 1, 2002 | $4,000 |
| Curt Hartig | September 3, 2002 | $186,000 |
| William Thomas | June 12, 2003 | $150,000 |

Dates of Payments Received by Curt Hartig from Krys-
inski

| Customer/ Creditor | Date of Payment | Set-Off Amount |
|---|---|---|
| Curt Hartig | November 7, 2002 | $9,324 |
| Curt Hartig | December 16, 2002 | $16,000 |
| Curt Hartig | December 16, 2003 | $1,167 |

Pre-Judgment Interest for Curt Hartig = $14,093.53

Pre-Judgment Interest for William Thomas = $6,218.75

N.D.Ill.,2004.
Commodity Futures Commission v. Krysinski
Not Reported in F.Supp.2d, 2004 WL 2203511
(N.D.Ill.), Comm. Fut. L. Rep. P 29,832

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.