**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HUSSEIN H. MANN and DEBRA HOUSTON-MANN, | ) ) ) | |
| Plaintiffs, | ) ) | No.  08 CV 555 |
| v. | ) ) | HONORABLE DAVID H. COAR |
| Calumet City, Illinois | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Hussein H. Mann and Debra Houston-Mann ("Plaintiffs" or "the Manns") bring an action against Defendant Calumet City ("Defendant" or "the City") for injunctive, declaratory, and other relief, pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201 and 2202, to redress alleged deprivations of rights guaranteed to Plaintiffs by the United States Constitution and under Illinois law.  In Counts I and II of the Complaint, Plaintiffs seek declarations that certain provisions of Chapter 14 of the Municipal Code of Calumet City, Illinois (the "Code") that forbid the sale of property without an inspection to determine whether it is in compliance with the City's building and zoning codes are facially unconstitutional.  In Count III, Plaintiffs seek a declaration that the City's conduct in refusing to issue "re-build" letters and/or confirm that property is legally nonconforming in connection with the sale of legal nonconforming property constitutes an unconstitutional and unreasonable restraint on the right to freely transfer property.  Finally, in Count IV, Plaintiffs seek an award of damages to compensate them for damages suffered as a result of the City's failure to comply with an order entered by Judge Milton Shadur in litigation captioned *Realtor Association of West/South Suburban Chicagoland*

1

*v. Calumet City II*, No. 06 C 2271 (N.D. Ill.), in which Judge Shadur ordered the City to compensate Plaintiffs for the damages they suffered as a result of the City's interference with the sale of property owned by Plaintiffs.

Before this Court now are Defendant's Motion to Dismiss First Amended Complaint, pursuant to Fed. R. Civ. P. 12(b)(6), and Plaintiff's Motion for Partial Summary Judgment on Count IV of the First Amended Complaint, pursuant to Fed. R. Civ. P. 56. For the reasons stated below, Defendant's Motion to Dismiss First Amended Complaint is **GRANTED**, Defendant's Motion to Dismiss Intervenors as Party-Plaintiffs is **GRANTED**, and Plaintiff's motion for partial summary judgment is **DENIED**.

## I.     BACKGROUND

### a.   The Parties

The Plaintiffs own property at 514 Forsythe Street in Calumet City, Illinois. Defendant Calumet City is a unit of local government incorporated under the laws of Illinois. The City is located in Cook County, Illinois.

### b.   The Point of Sale Inspection Ordinance

In Counts I and II of the Complaint, Plaintiffs seek a declaration that Section 14-1 of Article I of Chapter 14 of the Code, known as the Point of Sale Inspection Ordinance (the "Ordinance"), is unconstitutional because it restrains the right of property owners to sell their property without due process of law, and because it fails to provide adequate procedural due process.

In effect, the Ordinance prevents owners from selling their property until a city inspector has determined that the property is in compliance with municipal building ordinances. Section

82-322 of the Code requires property owners to pay a tax when transferring title to real property within city limits. These taxes are paid by the purchase of real estate transfer tax stamps from the city clerk. §§ 82-325, 82-327(a). The Ordinance amends Section 82-327(b) of the Code to require a "Point of Sale Inspection" ("POSI") for any transfer of any interest in property subject to Chapter 14 of the Code. § 14-1(a)(3). The POSI is an inspection of real property by the Department of Inspectional Services (the "Department") conducted in connection with a taxable transfer of real estate. The Ordinance prevents the city clerk from issuing real estate transfer tax stamps for the transfer of any property unless the grantor/seller presents the Certificate of Compliance or other evidence that the Department has determined the property to be in compliance, or if the property falls within certain exceptions to the POSI requirement. § 82-327(b). The purpose of the POSI is

> to determine whether such property is in compliance with the following specific requirements, which the corporate authorities of this City find are related to the public health, safety, and welfare:
>
> (1) Compliance with property maintenance codes. All structure shall be in compliance with article X, sections 14-691 and 14-692 of this chapter 14, "property maintenance code."
>
> (2) Inspection to determine possible illegal conversions . . . .

§ 14-1(c). The language of the Ordinance does not provide limitations on the duration or location of the POSIs, nor does it restrict the inspection to health and safety issues only. Sections 14-691 and 14-692, referenced above, adopt the "2006 International Property Maintenance Code" ("IPMC"), with minor modifications. Plaintiffs allege that because the IPMC contains provisions requiring the maintenance of property in "good repair," with what constitutes "good repair" left undefined, the Ordinance is unconstitutionally vague.

Plaintiffs also take issue with the provisions of the Ordinance that permit the City to order a deconversion of "illegally converted" property. The POSI includes a determination of whether structures on property have been illegally converted. § 14-1(c). "Illegal converted" is defined to mean that "the property was converted to another or additional use beyond that for which the property was originally permitted, and which [i] is in violation of the property's zoning limitations and [ii] is not a legal nonconforming use under section V of the City Zoning Ordinance." § 14-1(c). In the event the inspection reveals a structure which has been illegally converted, the Department issues a notice of deconversion, specifying the measures which must be taken in order to bring the illegally converted structure into compliance with applicable zoning regulations. § 14-1(g). Plaintiffs contend that the Ordinance "contains no due process protection against [the] City improperly ordering the deconversion of *legal nonconforming* property as a precondition of the right to sell the property." First Am. Compl. ("Compl.") ¶ 15 (emphasis in original). A "legal nonconforming" use of property is "any lawfully established use of a building or land, on the effective date of the ordinance or of amendments thereto, that does not conform to the use of regulations for the district in which it is located." Municipal Code of Calumet City, Appendix B ("Zoning Code") § 5.1. Generally, the code permits legal nonconforming use of property to be continued despite new zoning restrictions, *id.*, but Plaintiffs contend that the City may use the Ordinance's deconversion provision to force owners of legal nonconforming property to conform their property to current zoning laws.

The procedures for the POSI are as follows. If the owner consents to the POSI, or if the Department successfully obtains an administrative search warrant to allow the inspection of the

property of a nonconsenting owner within ten days of the nonconsent,[1] the Department conducts

a Compliance Inspection within 28 days.  § 14-1(e).  Within three days of the inspection, the

Department must issue a written notice of violations and the repairs necessary to bring the

property into compliance.  § 14-1(g).  The Department must conduct a reinspection within three

business days of the completed repairs.  § 14-1(h).  If the property is in compliance with these

requirements, the Department will issue a "Certification of Compliance" permitting the property

owner to purchase transfer tax stamps.  *Id.*

Additionally, the Ordinance requires that grantor/seller pay the water bill and other fees

owed by the seller to the City prior to the issuance of transfer tax stamps.  § 14-1(i).  If the seller

disputes any such obligation, the clerk will "provide the owner with a predeprivation due process

hearing consistent with the principles enunciated in *Memphis Light, Gas & Water Division v.

Craft*, 436 U.S. 1 (1978)."  *Id.*  "If the owner disputes the City's determination as to liability, the

owner may pay said bill under protest, and may pursue any remedies available to said seller to

recover the claimed overcharge."  *Id.*

### c.  The Zoning Code and Legally Nonconforming Property

Plaintiffs also raise a related claim regarding the City's Zoning Code.  The Zoning Code

provides that if any legal nonconforming property is damaged by less than 50%, it may be rebuilt

or repaired to its legal nonconforming use, even if current zoning restrictions would not permit

the prior/intended use.  Zoning Code § 5.5.  However, if legal nonconforming property is

damaged or destroyed by more than 50% of its replacement value at that time, the property can

---

[1] If the owner or occupant does not consent to the proposed inspection, the City may appear
before any judge in the Circuit Court of Cook County and seek an administrative search warrant
to allow an inspection.  § 14-1(e).  Any such application shall be made within ten calendar days
after the owner's nonconsent.  *Id.*  If the City does not seek a warrant, or if the application for a
warrant is refused by the court, the City must issue transfer stamps for the property.  § 14-1(f).

be rebuilt only for a conforming use and in compliance with the provisions of the district in which it is located.  *Id.*

Plaintiffs argue that when an owner of legal nonconforming property finds a buyer for his property, the buyer's lender almost uniformly asks the City to issue a letter that states that, should the legal nonconforming property be damaged, it can be rebuilt as legal nonconforming property.  Compl. ¶ 18.  Additionally, buyers and/or lenders seeking assurance that the property complies with zoning restrictions often ask the City to confirm that a given property is legal nonconforming.  Compl. ¶ 19.  However, Plaintiffs allege, the City has refused to provide either form of assurance.  Plaintiffs allege that the City's refusal to issue rebuild or confirmation letters in effect prohibits the sale of legal nonconforming property, because lenders will not loan money to buyers in the absence of such assurance.  Plaintiffs then ask for relief worded in the negative but actually seeking affirmative action by the city: a declaration that the city's refusal to issue rebuild or confirmation letters is unconstitutional, and an injunction "prohibiting [the] City from refusing to issue rebuild letters and/or confirmation regarding whether property is legal nonconforming."  Compl. ¶ 46.

### d.  Plaintiff's Request for Damages or Enforcement of Judge Shadur's March 14, 2007 Order

In a prior related litigation, *Realtor Association of West/South Suburban Chicagoland v. Calumet City II*, No. 06 C 2271 (N.D. Ill. dismissed Nov. 27, 2007), a local realtor association filed suit seeking an injunction against the City's enforcement of the Ordinance.  On August 8, 2006, Judge Milton Shadur entered a preliminary injunction which enjoined the City from enforcing the Ordinance and from ordering the deconversion of legal nonconforming property.  Compl., Ex. F.  In the fall of 2006, Plaintiffs listed their property for sale and entered into a

contract for the sale of their property. Compl. ¶ 50. Plaintiffs scheduled the closing of the sale

for October 30, 2006. *Id.* Prior to the closing, Plaintiff Houston-Mann and the buyer went to the

City's Department of Inspectional Services to purchase the necessary transfer stamps. *Id.* In

violation of the August 8 injunction, the City refused to issue transfer stamps until the water bill

was paid and the property deconverted. *Id.* After this incident, the buyer decided not to

purchase the property. *Id.*

On November 17, 2006, the plaintiff in the *Realtor Association* litigation filed a Motion

for Order to Show Cause Why Calumet City Should Not Be Held in Contempt for Violating the

Court's Order. On March 14, 2007, Judge Shadur granted the motion in part, and stated, with

respect to Plaintiffs:

> The owners of property at 514 Forsythe in Calumet City, along with the involved real
> estate brokers, are entitled to be compensated by Calumet City for the damages they
> incurred or will incur in the future in connection with their failed closing of the sale and
> transfer of the property on or about October 31, 2006 . . . [and] reasonable attorneys' fees
> and related costs incurred in enforcing their rights . . . .

*See* Compl., Ex. G. On June 22, 2007, Judge Shadur ordered the City to make specific payments

of $6,287.11 to two real estate brokers pursuant to the March 14, 2007 contempt order. The City

refused, however, to compensate Plaintiffs. Compl. ¶ 18. On October 17, 2007, the Seventh

Circuit held that the plaintiffs in *Realtor Association* did not have standing to sue the City,

vacated the preliminary injunction, and dismissed the suit. *Mainstreet Organization of Realtors*

*v. Calumet City, Illinois*, 505 F.3d 742 (7th Cir. 2007).[2]

Plaintiffs seek partial summary judgment that the March 14, 2007 contempt order is

enforceable by this Court, and that they are owed compensation for damages suffered as a result

---

[2] Realtor Association of West/South Suburban Chicago, the original plaintiff in the litigation,
had changed its name to MainStreet Organization of Realtors ("MainStreet") by the time the
Seventh Circuit decided the matter, and the caption was changed accordingly.

of the City's violation of Judge Shadur's August 8 preliminary injunction. Compl. ¶ 54. In the alternative, Plaintiff seeks an award of damages from this Court, independent of the contempt order, to compensate them for the alleged violation of their constitutional rights resulting from the City's refusal to issue transfer stamps in connection with the scheduled sale of Plaintiff's property in October 2006. *Id.*

## II.  STANDARD OF REVIEW

### a.  Standard for Motion to Dismiss

On a motion to dismiss for failure to state a claim upon which relief can be granted, the district court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff. Fed. R. Civ. P. 12(b)(6); *Gastineau v. Fleet Mortg. Corp.,* 137 F.3d 490, 493 (7th Cir. 1998) (citation omitted). The purpose of a 12(b)(6) motion is to decide the adequacy of the complaint, not to determine the merits of the case. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990) (citation omitted). A complaint should not be dismissed pursuant to Rule 12(b)(6) unless it fails it provide fair notice of what the claim is and the grounds upon which it rests or it is apparent from the face of the complaint that under no plausible facts may relief be granted. *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625. Although "[a]ll the complaint need do to withstand a motion to dismiss for failure to state a claim is outline or adumbrate a violation of the statute or constitutional provision upon which the plaintiff relies and connect the violation to the named defendants," *Christensen v. County of Boone, Illinois*, 483 F.3d 454, 459 (7th Cir. 2007) (quoting *Brownlee v. Conine,* 957 F.2d 353, 354 (7th Cir.1992) (internal citations and quotation marks omitted)), surviving a Rule 12(b)(6) motion "requires more than labels and conclusions . . . . Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Bell Atl. Corp. v. Twombly,* 127

S.Ct. 1955, 1965 (2007); *see also Pugh v. Tribune Co.*, 521 F.3d 686, 699 (7th Cir. 2008) (citing

*Twombly*).  Here, the factual allegations are the provisions of the Ordinance (attached as exhibits

to the Complaint), and are not in dispute.

A facial challenge to a legislatively-enacted ordinance is the most difficult challenge to

mount because the challenger must prove that no set of circumstances exists under which the

Ordinance would be valid. *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095 (1987);

*Doe v. Heck*, 327 F.3d 492, 528 (7th Cir. 2003).  Therefore, if there is even one set of

circumstances under which the Ordinance is valid, then there is no facial constitutional violation

and Plaintiffs have failed to state a claim under which relief can be granted.  Fed. R. Civ. P.

12(b)(6).

### b. Standard for Summary Judgment

Summary judgment is appropriate if "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists only if there is

sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant bears the burden of establishing that

no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If

the movant meets this burden, the non-movant must set forth specific facts (a "scintilla of

evidence" is insufficient) demonstrating that there is a genuine issue for trial.  Fed. R. Civ. P.

56(e); *Anderson*, 477 U.S. at 252; *see also Celotex*, 477 U.S. at 324.  When reviewing a motion

for summary judgment, the court must view the facts in the light most favorable to the

nonmoving party and draw all reasonable inferences in that party's favor. *See Schuster v. Lucent Tech., Inc.*, 327 F.3d 569, 573 (7th Cir. 2003).

## III.    ANALYSIS

### a.  Count I

Count I alleges that the Ordinance unreasonably restrains the right of property owners to transfer their property, in violation of the Constitution and of 42 U.S.C. § 1983.  It is a facial challenge to the constitutionality of the Ordinance.  This claim appears to be two different causes of action, the first a Fourteenth Amendment substantive due process challenge to the restrictions of the Ordinance, the second a Fourth Amendment challenge to the constitutionality of the POSI procedures.  Each will be addressed in turn.

### 1.  Substantive Due Process

Plaintiffs contend that provisions of the Ordinance violate their right to Fourteenth Amendment substantive due process rights.[3]  As the Supreme Court has noted,

> the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed . . . . Our Nation's history, legal traditions, and practices thus provide the crucial guideposts for responsible decisionmaking, that direct and restrain our exposition of the Due Process Clause. As we stated recently in [ Reno v.] Flores [507 U.S. 292, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993)], the Fourteenth Amendment forbids the government to infringe . . . fundamental liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.

Washington v. Glucksberg, 521 U.S. 702, 720-21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (internal citations and quotation marks omitted). The Supreme Court, however, has advised that the federal courts must be

_____

[3] Plaintiffs chose not to challenge the Ordinance as a regulatory taking in violation of the Fifth Amendment.

> reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and openended. By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action. We must therefore exercise the utmost care whenever we are asked to break new ground in this field . . . .

Id. at 720, 117 S.Ct. 2258 (internal citations and quotation marks omitted). As a result, there is only a narrow category of recognized "fundamental" rights. They include:

> the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion[.] We have also assumed, and strongly suggested, that the Due Process Clause protects the traditional right to refuse unwanted lifesaving medical treatment.

*Id.* (internal citations omitted). *See also Brown v. City of Michigan City, Indiana*, 462 F.3d 720, 732 (7th Cir. 2006) (citing above portions of Washington).

The right to sell one's property is not among this list, and is not a fundamental right for purposes of the Fourteenth Amendment due process analysis. As the Seventh Circuit observed in *Lee v. City of Chicago,* "[S]ubstantive due process is not 'a blanket protection against unjustifiable interferences with property.'" 330 F.3d 456, 461 (7th Cir.2003) (quoting *Schroeder v. City of Chicago,* 927 F.2d 957, 961 (7th Cir.1991)); *General Auto Service Station v. City of Chicago*, 526 F.3d 991, 1000 (7th Cir. 2008) (quoting *Lee*). It does not confer on federal courts a license to act as zoning boards of appeals. *Centres, Inc. v. Town of Brookfield, Wis.,* 148 F.3d 699, 704 (7th Cir.1998); *Albiero v. City of Kankakee,* 122 F.3d 417, 420 (7th Cir.1997). The cases Plaintiffs rely on for the proposition that the right to sell one's property is fundamental are not relevant to this case. *See U.S. v. James Daniel Good Real Property*, 510 U.S. 43, 54, 114 S.Ct. 492, 501 (1993) (procedures for forfeiture and seizure of property invalid under *procedural* due process analysis; describing right to sell property as a "valuable" right of ownership but not as fundamental right for purposes of substantive due process); *Linmark Associates, Inc. v.*

*Township of Willingboro*, 431 U.S. 85, 97 S.Ct. 1614 (1977) (township ordinance forbidding the posting of real estate "For Sale" and "Sold" signs violated First Amendment).

Because the Ordinance does not implicate a fundamental right, Plaintiffs' substantive due process claim is subject to highly-deferential rational basis review, which requires only that the statutory imposition not be completely arbitrary and lacking any rational connection to a legitimate government interest. *See Washington*, 521 U.S. at 722, 117 S.Ct. at 138; *Turner v. Glickman*, 207 F.3d 419, 426 (7th Cir. 2000). "Unless a governmental practice encroaches on a fundamental right, substantive due process requires only that the practice be rationally related to a legitimate governmental interest, or alternatively phrased, that the practice be neither arbitrary nor irrational." *Lee,* 330 F.3d at 467 (citing *Washington,* 521 U.S. at 728, 117 S.Ct. at 2271). While we therefore must take as true all of the complaint's allegations and reasonable inferences that follow, we apply the resulting "facts" in light of the deferential rational basis standard. To survive a motion to dismiss for failure to state a claim, a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government actions. *Wroblewski v. City of Washburn*, 965 F.2d 452, 460 (7th Cir. 1992).

Each of the complained-of provisions of the Ordinance passes the low threshold of rational basis review, as does the basic premise behind the POSI: that a municipality would "aim to prevent the surreptitious conversion of single-family homes to multi-family dwellings and to retard the physical deterioration of the housing stock," *Mainstreet Organization*, 505 F.3d at 742, through means of a moderately burdensome point-of-sale inspection regime. First, Plaintiffs allege a property owner can only pass a POSI if it completes all required repairs by using a licensed contractor. Compl. ¶ 30. This is not a constitutional issue, as Plaintiffs simply misstate the Ordinance, which actually states:

> *Licensed and bonded contractors.* All contractors performing repairs identified in the point-of-sale inspection, or issuing certifications shall be licensed by the city and bonded and shall make available, upon request, copies of their license(s), verification of their liability insurance, errors and omissions insurance policies, and surety bond.

§ 14-1(k). This provision does nothing more than require contractors performing repairs to be licensed in accordance with preexisting city laws. *See* § 14-931 (license requirement), which is neither arbitrary nor irrational. It does not prevent property owners from repairing their own homes. Second, Plaintiffs contend that a property owner has no meaningful right to a hearing to contest the inspector's decision to refuse to issue a Certificate of Compliance. Compl. ¶ 30. Again, this appears to be a misstatement of the Ordinance. Section 14-1(g) provides:

> (2)  In the event the owner disputes the determination of violations and repairs, the owner may file a request for administrative review on a form provided by the city. An independent administrative hearing officer appointed by the city shall convene an administrative hearing within five (5) business days from the date of appeal. Upon completion of the administrative hearing, the hearing officer will issue a final determination of violation and repairs.

> (3)  In the event an owner disagrees with an administrative issuance of a notice of deconversion, said owner may appeal to the zoning board of appeals in accordance with section 12.5 of the city's zoning ordinance.

This appeal scheme provides an opportunity for property owners to contest determinations of noncompliance, and is neither arbitrary nor irrational.

Third, Plaintiffs claim that even where the owner passes the POSI, the Ordinance prohibits sales of property for an unreasonably long time while inspections, repairs, and reinspections take place. Compl. ¶ 30. This is simply not true. If the owner consents to the POSI, or if the Department successfully obtains an administrative search warrant to allow the inspection of the property of a nonconsenting owner within ten days of the nonconsent, the Department conducts a Compliance Inspection within 28 days. § 14-1(e). Within three days of the inspection, the Department must issue a written notice of violations and the repairs necessary

to bring the property into compliance. § 14-1(g). The Department must conduct a reinspection within three business days of the completed repairs. § 14-1(h). If the property is in compliance with these requirements, the Department will issue a "Certification of Compliance" permitting the property owner to purchase transfer tax stamps. *Id.* These delays are not "unreasonably long," as Plaintiff contends. The Ordinance, which provides a relatively tight time frame for the inspection process, is neither irrational nor arbitrary in this respect.

Finally, Plaintiffs contend that the procedures for disputing the pre-transfer payment of the water bill are inadequate. Compl. ¶ 31. The Ordinance requires that grantor/seller pay the paid water bill and other fees owed by the seller to the City prior to the issuance of transfer tax stamps. § 14-1(i). If the seller disputes any such obligation, the clerk will "provide the owner with a predeprivation due process hearing consistent with the principles enunciated in *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1 (1978)." *Id.* "If the owner disputes the City's determination as to liability, the owner may pay said bill under protest, and may pursue any remedies available to said seller to recover the claimed overcharge." *Id.* The City has a legitimate financial interest in collecting water bills from property owners who are about to transfer their interest in property within the City, and these procedures are related to that interest.

Accordingly, Defendant's motion to dismiss Count I is GRANTED with respect to the Fourteenth Amendment due process cause of action.

### 2. Fourth Amendment

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S.

Const. amend. IV.  The purpose of the Fourth Amendment is to protect the privacy and security of individuals against arbitrary invasions by the government.  *New Jersey v. T.L.O.,* 469 U.S. 325, 335, 105 S.Ct. 733, 739 (1985).  The Fourth Amendment only proscribes searches that are unreasonable.  *Skinner v. Railway Labor Executives Ass'n,* 489 U.S. 602, 619, 109 S.Ct. 1402, 1414 (1989).  Except in certain carefully defined classes of cases, a search of private property without proper consent is "unreasonable" unless it has been authorized by a valid search warrant. *Camara v. Municipal Court of City of San Francisco*, 387 U.S. 523, 528, 87 S.Ct. 1727, 1731 (1967).  In cases in which the Fourth Amendment requires that a warrant to search be obtained, "probable cause" is the standard by which a particular decision to search is tested against the constitutional mandate of reasonableness.  *Id.*, 387 U.S. at 534, 87 S.Ct. at 1734.

Plaintiffs allege that their Fourth Amendment right to be free from unreasonable searches is infringed by the Ordinance.  Defendant does not contest that the POSI is a "search" within the meaning of the Fourth Amendment.  Unlike the litigants in *Makula v. Village of Schiller Park*, No. 95 C 2400, 1998 WL 246043 (N.D. Ill. April 30, 1998) (Coar, J.), a case in which the constitutionality of search provisions in a similar point-of-sale ordinance were upheld, Plaintiffs here do not argue that the *warrant procedures* under the Ordinance are insufficient to meet Fourth Amendment requirements.  Indeed, the Ordinance has Fourth Amendment protections, in the form of consent and warrant procedures codified in Sections 14-1(c)-(g), *see supra*, that appear more robust than those this Court approved in *Makula*.

Instead, Plaintiffs' only argument with regard to the Fourth Amendment is that "there are *no limitations* on the scope of searches required by the . . . Ordinance or the type of repair [the] City can require as a condition of the right to sell property."  Compl. ¶ 30; P.'s Mem. in Opposition to Mot. to Dismiss 2, 4 (emphasis added).  An examination of the language of the

Ordinance proves Plaintiffs' assertion to be an exaggeration.  The limitations on the scope of the

POSI are clearly delineated in the Ordinance:

> [The POSI is] to determine whether such property is in compliance with the following specific requirements, which the corporate authorities of the city find are related to the public health, safety and welfare:
>
> (1)  *Compliance with property maintenance code.*  All structure shall be in compliance with article X, sections 14-691 and 14-692 of this chapter 14, "property maintenance code."
>
> (2)  *Inspection to determine possible illegal conversions.*  All structures shall be inspected to determine whether they have been illegally converted. For purposes of this subsection, "illegally converted" means that the property was converted to another or additional use beyond that for which the property was originally permitted, and which [i] is in violation of the property's zoning limitations and [ii] is not a legal nonconforming use under section V of the City Zoning Ordinance.

§ 14-1(c).  Likewise Section 14-1(e), which establishes warrant procedures for inspections of

property for which the owners have refused to consent to a search, states that "[t]he application

for the warrant  . . . shall include a statement that the inspection will be limited to a determination

whether there are violations of the code provisions identified in this section, and whether there

have been any illegal conversions."  The POSI is only initiated when "an owner of real property

in the city proposes to engage in a transfer of real property in the city," § 14-1(b)—in other

words, the POSI is *not* a general inspection provision permitting the City to inspect property at

any given time or without notice to the property owners.  Section 14-1(h) provides for a

reinspection of the non-complying property once it has been brought into compliance, providing

that the reinspection happens within three days of the homeowner's notice to the City that the

repairs have been made.

It is apparent from the face of the complaint that under no plausible set of facts would the

Ordinance—with these limitations on the scope, purpose, and frequency of the POSI searches—

be a facial violation of the Fourth Amendment. A review of federal jurisprudence on the Fourth Amendment and municipal building inspections supports this conclusion. In *Camara v. Municipal Court of City of San Francisco*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), the plaintiff was charged with a crime for refusing to permit housing inspectors to enter his leasehold without a warrant. The Supreme Court held that San Francisco's municipal inspection scheme, which provided none of the consent and warrant provisions that the Ordinance does, violated the Fourth Amendment and that the plaintiff had a constitutional right to insist that the inspectors obtain a warrant to search upon a showing of probable cause. 387 U.S. at 540, 87 S.Ct. at 1737. While the predominant issue in *Camara* was the sufficiency of San Francisco's warrant procedure preceding the search (which, as noted above, Plaintiffs do not challenge here), the Supreme Court also hinted that municipal inspections must also be limited in scope to pass Fourth Amendment muster. *Id.*, 387 U.S. at 538, 87 S.C.t at 1735-36 ("'[P]robable cause' to issue a warrant to inspect must exist if *reasonable legislative or administrative standards for conducting an area inspection* are satisfied with respect to a particular dwelling.") (emphasis added).

The Supreme Court deliberately left the phrase "reasonable legislative or administrative standards" unclear, *id.* ("such standards . . . will vary with the municipal program being enforced"), but this Court agrees with Judge Gottschall's interpretation of the phrase as put forth in *Black v. Village of Park Forest*, 20 F.Supp.2d 1218 (N.D. Ill. 1998). There the district court interpreted the "reasonable legislative or administrative standards" requirement from *Camara* to "impose an obligation to limit the scope of the inspections to what is necessary to achieve the legitimate goals of the program." *Id.* at 1225-26. The court then invalidated a Park Forest ordinance that permitted the city to inspect single-family homes. The Park Forest ordinance can

be distinguished from the Ordinance in several important respects: the Park Forest ordinance did not limit the frequency (e.g., to annual inspections or inspections at the point of sale) nor the scope of the inspections (e.g., to search only for building code violations), nor specify that the inspections were for the purpose of enforcing any specified standards.  In contrast, the POSI is a one-time inspection made before an intended transfer of property, for the stated limited purposes of checking for compliance with municipal building codes and for illegal conversions.  These crucial differences safeguard Plaintiffs' Fourth Amendment rights by limiting the scope of the POSI to reasonable legislative and administrative standards, i.e., to searches for building code violations and illegal conversions only.

For the foregoing reasons, Defendant's motion to dismiss Count I is GRANTED with respect to the Fourth Amendment cause of action.  Count I is dismissed.

### b. Count II

Count II alleges that the Ordinance deprives Plaintiffs of property without due process of law, in violation of the Fourteenth Amendment, because it allegedly grants unfettered discretion to City building officials to "order repairs unrelated to conditions that affect the public health, safety, and welfare."  Compl. ¶ 35-39.  It is also a facial challenge to the constitutionality of the Ordinance.  There are three components to this challenge: first, Plaintiffs allege generally that there is insufficient predeprivation due process before the City effectively takes away the right of a property owner to sell his property; second, the Ordinance does not provide notice of how the City will determine whether a property has been legally or illegally converted, so the Ordinance permits the City to force the deconversion of legal nonconforming property; and third, the Ordinance should be void for vagueness because it fails to specify what being in "good repair" for purposes of passing the POSI means.

## 1. Predeprivation Due Process

To state a procedural due-process claim, a plaintiff must allege (1) deprivation of a protected interest, and (2) insufficient procedural protections surrounding that deprivation. *Michalowicz v. Village of Bedford Park*, 528 F.3d 530, 534 (7th Cir. 2008) (citations omitted); *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 428, 102 S.Ct. 1148, 1153-54, 71 L.Ed.2d 265 (1982). The parties do not dispute that a property owner's right to transfer his or her property is a protected property interest under the Fourteenth Amendment and is deprived by the City's inspection scheme. The dispute in this case concerns what process the property owners are due with respect to that deprivation. Plaintiffs allege that the Ordinance "immediately deprives a property owner of her right to sell property without first providing due process." Compl. ¶ 36.

What process is required in a particular context or a given set of circumstances depends upon balancing the factors laid out in *Mathews v. Eldridge:*

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976); *Michalowicz*, 93 F.3d at 306 (quoting *Mathews*). "The presumption is that an individual is entitled to notice and an opportunity for a hearing prior to the state's permanent deprivation of his property interest." *Porter v. DiBlasio*, 93 F.3d 301, 305 (7th Cir. 1996) (emphasis added) (quoting *Logan,* 455 U.S. at 434, 102 S.Ct. at 1156 ("the State may not finally destroy a property interest without first giving the putative owner an opportunity to present his claim of entitlement"); *Goss v. Lopez,*

419 U.S. 565, 579, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975) (due process requires "some kind of notice and . . . some kind of hearing")).

However, contrary to Plaintiffs' assertion that the Supreme Court has declared an "edict that a hearing must be provided *before* a property right . . . can be taken," Pl.'s Memo. in Response to Mot. to Dismiss 8 (emphasis in original), a predeprivation hearing is not required in all circumstances. *Michalowicz*, 93 F.3d at 306. The adequacy of predeprivation procedures is dependent upon the extent of post-deprivation procedures. *See, e.g., id.* at 534 (analyzing adequacy of procedures prior to employee's termination in light of post-termination procedures); *Swank v. Smart,* 898 F.2d 1247, 1256 (7th Cir.1990) (in the employment context, "[o]nly if there is no provision for a post-termination hearing must the pre-termination hearing provide all the procedural safeguards to which due process entitles a tenured public employee."). "For example, where the state must of necessity act quickly, *see Logan,* 455 U.S. at 436, 102 S.Ct. at 1158, or where the degree of the deprivation is not serious and the procedures underlying the decision to effect the deprivation are adequate to address the risk of an erroneous deprivation, *see Memphis Light, Gas, & Water Div. v. Craft,* 436 U.S. 1, 19, 98 S.Ct. 1554, 1565, 56 L.Ed.2d 30 (1978), a postdeprivation hearing or the availability of a common law tort remedy may satisfy due process. *See, e.g., Zinermon v. Burch,* 494 U.S. 113, 128, 110 S.Ct. 975, 984, 108 L.Ed.2d 100 (1990)." *Michalowicz*, 93 F.3d at 305-06.

As described above, the Ordinance provides multiple layers of procedural due process, before and after the deprivation of the right to transfer property, to property owners who dispute inspection scheme and its evaluations. Before the POSI, the City must first obtain the owner's consent to inspect the property. If the owner or occupant does not consent to the proposed inspection, the City may appear before any judge in the Circuit Court of Cook County and seek

an administrative search warrant to allow an inspection. § 14-1(e). Any such application must be made within ten calendar days after the owner's nonconsent, and must specify the basis upon which the warrant is being sought and include a statement that the inspection will be limited to a determination whether there are violations of the code provisions identified in this section, and whether there have been any illegal conversions. *Id.* The Ordinance lists twelve factors (including plain view violations, citizen complaints, and previous violations on the property) that the court may consider in its decision as to whether a warrant shall issue. *Id.* If the City does not seek a warrant, or if the application for a warrant is refused by the court, the City must issue transfer stamps for the property. § 14-1(f).

If the owner consents to the POSI, or if the Department obtains a search warrant, the Department conducts a Compliance Inspection within 28 days. § 14-1(e). Within three days of the inspection, the Department must issue a written notice of violations and the repairs necessary to bring the property into compliance. § 14-1(g). In the event the owner disputes the determination of violations and repairs, the owner may file a request for administrative review on a form provided by the city. *Id.* An independent administrative hearing officer appointed by the city shall convene an administrative hearing within five business days from the date of appeal. *Id.* Upon completion of the administrative hearing, the hearing officer will issue a final determination of violation and repairs. *Id.* In the event an owner disagrees with an administrative issuance of a notice of deconversion, said owner may appeal to the zoning board of appeals in accordance with section 12.5 of the city's zoning ordinance. *Id.*; Zoning Code § 12.5. In the event the owner disputes any obligation to pay the water bill, the office of city clerk shall promptly provide the owner with a predeprivation due process hearing consistent with the principles enunciated in *Memphis Light, Gas & Water Division v Craft*, 436 U.S. 1 (1978). § 14-

1(i).  The city clerk's office shall provide the hearing within three business days of a request.  *Id.*
If the owner disputes the city's determination as to liability, the owner may pay said bill under
protest, and may pursue any remedies available to said seller to recover the claimed overcharge.
*Id.*

These procedures provide ample procedural due process protections for property owners
both before and after the final determination of violations and repairs.  The risk of erroneous
deprivation under the Ordinance's procedures is small; if the Manns feel wronged by the
enforcement of the statute in their particular case, an as-applied challenge to the Ordinance
would be more appropriate than the facial unconstitutionality argument they assert here.

## 2.  Deconversion

Second, Plaintiffs argue that the Ordinance violates due process because it "does not
provide any notice of how the City will determine whether the property is 'legal' or 'illegal.'"
Compl. ¶ 38.  An examination of the Ordinance reveals Plaintiffs charges to be hyperbole.  The
Ordinance, on its own terms, requires the deconversion only of illegally nonconforming
property.   § 14-1(g).  An "illegal conversion" is defined for purposes of the Ordinance as
subsection, "property [which] was converted to another or additional use beyond that for which
the property was originally permitted, and which [i] is in violation of the property's zoning
limitations and [ii] is not a legal nonconforming use under section V of the City Zoning
Ordinance."  § 14-1(c).  Section V of the Zoning Code defines a "legal nonconforming use" with
clarity: "Any lawfully established use of a building or land, on the effective date of the ordinance
or of amendments thereto, that does not conform to the use of regulations for the district in which
it is located, shall be deemed to be a legal nonconforming use and may be continued, except as
otherwise provided herein."  The zoning regulations in the Zoning Code are 40,000 words of

very specific regulations of lot size, building height, satellite antenna usage, site treatments, special uses, und so weiter. These regulations provide sufficient notice of what uses of property of will constitute illegal conversions or legally nonconforming uses. Plaintiffs allegations do not stand up to a plain reading of the statute.

### 3. Vagueness

Next, Plaintiffs allege that the Ordinance should be declared void for vagueness because it uses terms like "good repair," which articulate "no standards to prevent arbitrary enforcement." Compl. ¶ 37. "The void for vagueness doctrine rests on the basic principle of due process that a law is unconstitutional 'if its prohibitions are not clearly defined.'" *Karlin v. Foust*, 188 F.3d 446, 458 (7th Cir. 1999) (quoting *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). *See also Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 44, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) ("Due process requires that a State provide meaningful standards to guide the application of its laws."). In *Grayned,* the Supreme Court explained the rationale underlying the void for vagueness doctrine:

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

408 U.S. at 108-09, 92 S.Ct. 2294 (footnotes omitted). These principles are not to be mechanically applied, however, as "[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489,

498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). The Constitution tolerates a lesser degree of vagueness in enactments "with criminal rather than civil penalties because the consequences of imprecision" are more severe. *Id.* at 498-99, 102 S.Ct. 1186.

However, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Anderson v. Milwaukee County*, 433 F.3d 975, 978 (7th Cir. 2006) (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 794, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)). In *United States Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548, 578-79, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), the Court remarked that "there are limitations in the English language with respect to being both specific and manageably brief . . . ." Looking at the Civil Service Rules interpreting the then-existing version of the Hatch Act, 5 U.S.C. § 7324(a)(2), the Court said the "ordinary person exercising ordinary common sense" knows perfectly well what they mean.

The Ordinance requires all structures to "be in compliance with article X, sections 14-691 and 14-692 of this chapter 14, 'property maintenance code.'" § 14-1(c). Sections 14-691 and 14-692 adopt the "2006 International Property Maintenance Code" ("IPMC"), with minor modifications irrelevant to the purposes of this analysis. Plaintiffs allege that because the IPMC contains provisions requiring the maintenance of property in "good repair," with what constitutes "good repair" left undefined, the Ordinance is unconstitutionally vague. The IPMC is thirty-six pages long, and provides property maintenance standards on a wide range of issues, including, *inter alia*, fire safety requirements, electrical facilities, sanitary drainage systems, exterior property areas, handrails and guardrails, light, ventilation, and occupancy limits. Compl. Ex. B. (complete text of IPMC). "Good repair" is not defined in the IPMC, but provides that terms not defined "shall have ordinarily accepted meanings such as the context implies." IPMC § 201.4.

Plaintiffs cite Sections 304 and 305 of the IPMC as examples of the vague use of the term "good repair." Compl. ¶ 8. IPMC § 304 regulates exterior structures:

> General. The exterior of a structure shall be maintained in good repair, structurally sound and sanitary so as not to pose a threat to public health, safety, or welfare.

IPMC § 304.1. In addition to this general regulation, this section of the IPMC goes on to list specific repairs for, e.g., the protective treatment of exterior surfaces ("All metal surfaces subject to rust or corrosion shall be stabilized and coated to inhibit future rust and corrosion."), foundation walls ("All foundation walls shall be free from open cracks and breaks and shall be kept in such condition so as to prevent the entry of rodents and other pests."), insect screens, overhanging extensions, chimneys and towers, etc. IPMC § 304.2-304.14. Section 305 proceeds similarly with a general regulation followed by specific regulations on interior structures.

There are, of course, limits to how precise language can be in the context of a housing ordinance. As other courts have recognized, specific regulations cannot begin to cover all the infinite variety of conditions that must be regulated. *See, e.g., Grayned,* 408 U.S. at 110, 92 S.Ct. at 2300 (indicating that regulations need not achieve "mathematical certainty" or "meticulous specificity," and may instead embody "flexibility and reasonable breadth"). Other courts have upheld regulations requiring properties to be maintained in "good repair." *See, e.g., Freeman United Coal Min. Co. v. Federal Mine Safety and Health Review Commission*, 108 F.3d 358, 362 (D.C. Cir. 1997) (rejecting void for vagueness challenge to regulation requiring "all mine structures . . . [to] be maintained in good repair"); *People v. Sarnoff*, 302 Mich. 266, 269, 4 N.W.2d 544, 545-06 (1942) ("The words 'good repair' have a well known and definite meaning . . . . They sufficiently inform the ordinary owner that his property must be fit for the habitation of those who would ordinarily use his dwelling. It would be difficult, if not

impossible, to lay down a rule of conduct in more exact terms which would at the same time cover the varying conditions presented in each individual case.") Generally, there are far fewer "good repair" regulations (e.g., "The interior of a structure shall be maintained in good repair, structurally sound and in a sanitary condition." IPMC § 305.1) in the IPMC than there are specific, precise regulations (e.g., "Habitable spaces, hallways, corridors, laundry areas, bathrooms, toilet rooms and habitable basement areas shall have a clear ceiling height of not less than 7 feet (2134 mm) . . . [except] [i]n one- and two-family dwellings, beams and girders spaced not less than 4 feet (1219 mm) on center and projecting not more than 6 inches (152 mm) below the required ceiling height." IPMC § 404.3). The Ordinance's use of terms such as "good repair" can be understood by a person of ordinary intelligence to refer to the conditions necessary for habitation and ordinary use, and the Ordinance is therefore not unconstitutionally vague.[4] If this Court required policymakers to document the precise requirements of every repair needed on a property, the City would drown in verbiage. This is not a situation the Fourteenth Amendment requires.

For the foregoing reasons, Defendant's motion to dismiss Count II is GRANTED.

### c. Count III

---

[4] Plaintiffs return several times to an example of the vagueness of the term "good repair"—that the use of that term might permit the City to order property owners to repair loose soap dishes before granting the Certificate of Compliance. *See, e.g.* Compl. ¶ 13, 37; Pl.'s Memorandum in Resp. to Mot. to Dismiss 10. Plaintiffs do not allege that the Ordinance will produce this draconian result; instead they allege that such results occurred under a "similar prior ordinance (which was amended during the pendency of related litigation)." Compl. ¶ 13. The Ordinance, not the similar prior ordinance (whatever that may be), is what is being challenged here. The Court repeats what it said above: the Ordinance is not unconstitutionally vague on its face, and if the Manns have been denied a Certificate of Compliance because martinet inspectors wanted their soap dishes fixed, an as-applied challenge to the City's actions would be the more appropriate vehicle for their claim.

Plaintiffs' property at 514 Forsythe Street is legal nonconforming. Compl. ¶ 7. Apparently, Plaintiffs have sought confirmation of their property's legal nonconforming status from the City, in the form of a letter from the City, but the City has refused to provide this reassurance. The City apparently also refuses to provide "rebuild" letters for owners of partially damaged legal nonconforming property declaring the owner's right to rebuild the property and continue its previous legal nonconforming use. The purpose of these letters is only to serve as assurance that the City will, in fact, obey its laws—the Zoning Code clearly protects the continuing use of legal nonconforming property in § 5.1[5] and the rebuilding of partially damaged legal nonconforming property for the continuation its prior use in § 5.5.[6] Plaintiffs' third cause of action seeks a declaration that the City's refusal to issue rebuild or confirmation letters for legal nonconforming property violates the Constitution and 65 ILCS 5/11-13-1,[7] and also seeks an injunction "prohibiting [the] City from refusing to issue rebuild letters and/or confirmation regarding whether property is legal nonconforming. Compl. ¶ 46.

While phrased in the negative, Plaintiffs' demands would actually impose upon the City an affirmative duty under the Constitution and Illinois law to issue such letters. As the Seventh Circuit has repeated in many occasions, the Constitution "is a charter of negative liberties; it tells

[5] Section 5.1 of the Zoning Code provides that "Any lawfully established use of a building or land, on the effective date of the ordinance or of amendments thereto, that does not conform to the use of regulations for the district in which it is located, shall be deemed to be a legal nonconforming use and may be continued . . . ."

[6] Section 5.5 of the Zoning Code provides that "[i]n the event the damage or destruction is less than fifty (50) percent of its replacement value, based upon prevailing costs, the [legal nonconforming] building may then be restored to its original condition and the occupancy or use of such building may be continued which existed at the time of such partial destruction."

[7] 65 ILCS 5/11-13-1 is a general zoning statute that provides certain general protections for owners of legal nonconforming ("existing use") property: "The powers conferred by this Division 13 shall not be exercised so as to deprive the owner of any existing property of its use or maintenance for the purpose to which it is then lawfully devoted, but provisions may be made for the gradual elimination of uses, buildings and structures which are incompatible with the character of the districts in which they are made or located . . . ."

the state to let people alone; it does not require the federal government or the state to provide services, even so elementary a service as maintaining law and order." *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982) (state has no constitutional duty to protect citizen from dangerous madman); *Smith v. City of Chicago*, 457 F.3d 643, 655 (7th Cir. 2006) (municipality has no First or Fourteenth Amendment duty to finance litigation of aldermen seeking to challenge redistricting plan) (quoting *Bowers*); *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000) (municipal police have no affirmative duty under the Constitution to enforce discretionary minor public nuisance laws against feuding neighbors) (quoting *Bowers*); *see generally DeShaney v. Winnebago County Dept. of Social Services,* 489 U.S. 189, 195-97 (1989).

The Constitution creates areas in which the government has to let people alone. *Hilton*, 209 F.3d at 1006-07. The Constitution does not entitle them to demand services such as the rebuild and confirmation letters that Plaintiffs demand here. Likewise, the Illinois statute imposes no affirmative duty upon municipalities to issue rebuild or conformation letters for legal nonconforming properties. The City's Zoning Code leaves people alone—indeed the Zoning Code explicitly protects legal nonconforming property—and the City has no duty under the Constitution or Illinois law to provide the letters Plaintiffs demand. As such, Count III also fails to state a claim under the Constitution or Illinois law, and Defendant's motion to dismiss Count III is GRANTED.

### d. Count IV

As summarized above, Plaintiffs seek partial summary judgment that Judge Shadur's March 14, 2007 contempt order is enforceable by this Court, and that they are owed compensation for damages suffered as a result of the City's violation of Judge Shadur's August 8 preliminary injunction. Compl. ¶ 54. In the alternative, Plaintiffs seeks an award of damages

from this Court, independent of the contempt order, to compensate them for the alleged violation of their constitutional rights resulting from the City's refusal to issue transfer stamps in connection with the scheduled sale of Plaintiffs' property in October 2006.  *Id.*

Defendant argues, inter alia, that the contempt order is invalid because the district court did not have subject matter jurisdiction in the first instance to issue the preliminary injunction, the violation of which led to the March 14 contempt order.  In most circumstances, the validity of an order is not an appropriate consideration on a contempt motion, as a court order ordinarily must be obeyed unless and until it is stayed pending appeal, reversed or vacated.  *See, e.g.*, *Pasadena City Bd. of Ed. v. Spangler*, 427 U.S. 424, 439 (7th Cir. 1976) ("Because . . . outstanding injunctive orders of courts be obeyed until modified or reversed by a court having the authority to do so, this Court has held that even though the constitutionality of the Act under which the injunction issued is challenged, disobedience of such an outstanding order of a federal court subjects the violator to contempt even though his constitutional claim might be later upheld. *United States v. Mine Workers*, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947)."); *Alexander v. Chicago Park Dist.*, 927 F.2d 1014, 1025 (7th Cir. 1991) ("Parties must obey court orders regardless of their validity, unless the orders are stayed pending appeal.").  The principle that a party may not challenge a district court's order by violating it is known as the "collateral bar doctrine."  However, the collateral bar doctrine does not apply if the court lacks subject-matter jurisdiction.  *United States Catholic Conference v. Abortion Rights Mobilization, Inc.,* 487 U.S. 72, 108 S.Ct. 2268, 101 L.Ed.2d 69 (1988) (If district court does not have subject-matter jurisdiction over underlying action, and subpoena was not issued in aid of determining that jurisdiction, then subpoena is void and order of civil contempt based on refusal to honor it must

be reversed); *Mid-American Waste Systems, Inc. v. City of Gary, Ind.*, 49 F.3d 286, 292 (7th Cir. 1995) (citing *United States Catholic Conference*).

The threshold issue, then, is whether the Seventh Circuit's decision on *standing* means that the district court did not have *subject matter jurisdiction* to issue the preliminary injunction order. On October 17, 2007, the Seventh Circuit vacated Judge Shadur's preliminary injunction order and dismissed MainStreet's case. The Seventh Circuit held that MainStreet had demonstrated its likelihood of suffering a tangible economic loss sufficient to meet the minimum requirements for *Article III* standing, but that prudential limitations precluded the district court from exercising jurisdiction over its challenge to the Ordinance (so-called "prudential standing"). *Mainstreet Organization*, 505 F.3d at 742. Defendant argues that prudential standing and standing generally are prerequisites for a district court's subject matter jurisdiction. Plaintiffs argue that that a district court that has Article III standing but not prudential standing may still have subject matter jurisdiction over a claim, relying primarily on the Seventh Circuit's notation in *MainStreet Organization* that prudential limitations on standing "[are] not jurisdictional in the sense that Article III standing is . . . ." *Id.* at 747.

Plaintiffs reliance on this passage from *MainStreet Organization* is misplaced. The Seventh Circuit was merely differentiating Article III standing from prudential standing in that the absence of the former *obliged* a dismissal of the suit, while the latter could be waived or forfeited. *MainStreet Organization*, 505 F.3d at 747 ("And because the remoteness doctrine [a part of the prudential standing analysis] is not jurisdictional in the sense that Article III standing is—if there is no Article III standing, the court is obliged to dismiss the suit even if the standing issue has not been raised—it may seem that it can be waived or forfeited just like any other nonjurisdictional defense to a suit."). The Seventh Circuit went on to note that a court can

nonetheless invoke prudential standing limitations it on its own initiative, *id.* at 478 (collecting

cases), and that "both Article III standing and prudential standing 'are threshold determinants of

the propriety of judicial intervention.'" *Id.* at 478-479 (quoting *Warth v. Seldin*, 422 U.S. 490,

498-99 (1975). Indeed, as the Seventh Circuit has previously held, the Supreme Court has

directed that questions of standing be resolved "according to a two-part inquiry that considers

'both constitutional limitations of federal-court jurisdiction and prudential limitations in its

exercise.'" *Family & Children's Center, Inc. v. School City of Mishawaka*, 13 F.3d 1052,

1058 (7th Cir. 1994) (quoting *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99 (1979)

and *Warth,* 422 U.S. at 498).

> In both dimensions—Article III and prudential—the test for standing "is founded in
> concern about the proper-and properly limited-role of the courts in a democratic society."
> *Id.* Ordinarily, "a litigant seeking relief in federal court must satisfy *both* constitutional
> and prudential limitations in order to have standing to sue." *Locals 666 and 780 v. United*
> *States Dept. of Labor,* 760 F.2d 141, 143 (7th Cir.) (emphasis in original), *cert. denied,*
> 474 U.S. 901, 106 S.Ct. 227, 88 L.Ed.2d 227 (1985).

*Family & Children's Center*, 13 F.3d at 1058. Thus the Seventh Circuit's jurisprudence is clear:

if a party has Article III standing but not prudential standing, it nonetheless does not have

standing to sue.

Next, despite the confusing use of the term "jurisdiction" to encompass both

broader concepts of justiciability and the narrower requirements subject matter jurisdiction, the

Seventh Circuit's jurisprudence also makes clear that a case in which the plaintiff does not have

standing to sue may be dismissed for lack of subject matter jurisdiction. *See, e.g.*, *Massey v.*

*Wheeler*, 221 F.3d 1030 (7th Cir. 2000) (upholding district court's dismissal for lack of subject

matter jurisdiction based on, inter alia, litigant's failure to meet prudential standing

requirements); *Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856, 862 (7th Cir. 1996)

(same); *Perkins v. Neal*, No. 07 C 841, 2007 WL 3087201 (N.D. Ill. October 19, 2007) (dismissing case for lack of subject matter jurisdiction where plaintiff could not meet Article III standing requirements). Thus, because prudential standing is a prerequisite for standing, and standing is a prerequisite for subject matter jurisdiction, and MainStreet did not have prudential standing to challenge the Ordinance, Judge Shadur's preliminary injunction was invalid, as was the contempt order arising from its violation. As such, the Court needs not address Defendant's other arguments against the enforcement of the contempt order. Defendant's motion to dismiss Count IV is GRANTED with respect to the contempt order, and Plaintiffs' Motion for Summary Judgment on Count IV is DENIED.

Furthermore, because the other claims in the Complaint have also been dismissed, Plaintiffs' alternative cause of action for damages for the alleged violation of their constitutional rights is also dismissed. Count IV is dismissed.

### e. Motion to Dismiss Intervenors as Party-Plaintiffs

On March 26, 2008, this Court granted motions by MainStreet and Ayanna Walker to intervene as party-plaintiffs. In its Motion to Dismiss Intervenors as Party-Plaintiffs, Defendant moves pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) to dismiss the claims of MainStreet and Walker, and also moves that this Court vacate its March 26 orders granting leave for MainStreet and Walker to intervene.

Permissive intervention is allowed, upon timely application, "when an applicant's claim or defense and the main action have a question of law or fact in common." Fed. R. Civ. P. 24(b)(1)(B). Permissive intervention under Rule 24(b) is wholly discretionary. *Sokaogon Chippewa Community v. Babbitt*, 214 F.3d 941, 949 (7th Cir. 2000). It seems strange to the Court that MainStreet would seek to intervene in this case when the Seventh Circuit has sent a

clear message that its interests are too remote to justify its standing to litigate.  In *Mainstreet*, the

Seventh Circuit held that the district court was precluded from exercising jurisdiction over

MainStreet's challenge to the Ordinance because it lacked prudential standing, a

nonconstitutional standing requirement that precludes the federal courts from exercising

jurisdiction over some types of case that Article III would not forbid the courts to adjudicate.

*MainStreet Organization of Realtors v. Calumet City, Ill.*, 505 F.3d 742, 745 (7th Cir. 2007).  In

describing the insufficiency of MainStreet's potential injury, the Seventh Circuit raised concerns

about judicial economy:

> [A]nything that impedes the sale of property . . . harms other people besides the owners.
> It harms real estate brokers, sure, but it also harms title insurance companies, mortgage
> lenders, termite inspectors, moving companies, interior decorators, renovators,
> prospective home buyers, sellers of "for sale" signs, suppliers of paint for the "for sale"
> signs, lessors of real estate brokers' offices, colleges that the children of real estate
> brokers can no longer afford to attend because the brokers' incomes have declined (and
> the children themselves, of course), and so on ad infinitum, or at least ad nauseam. If all
> these incidental victims could sue, the courts would be overwhelmed.

505 F.3d at 745-46.  The Seventh Circuit concluded that "there is no reason to allow the brokers

into the litigation arena . . . [because] there is no hindrance to the primary victims' enforcing

their rights."  *Id.* at 747.  It suggested instead that the challenge to the Ordinance could be

litigated by "the individual homeowner who encounters delay and expense in selling his house

because of the ordinance" or a class of "all the homeowners in Calumet City."  *Id.* at 746-47.

This Court likewise sees no reason to allow the brokers (back) into the litigation arena.

MainStreet alleges no new theory of injury that would justify this Court's reexamination of the

sound logic upon which the Seventh Circuit's decision to dismiss MainStreet's first challenge to

the Ordinance was based.  Accordingly, Defendant's motion to dismiss MainStreet as a party-

plaintiff is also GRANTED.  Plaintiffs do not oppose the dismissal of Walker as a participant in the litigant; Defendant's motion to dismiss Walker as a party-plaintiff is therefore GRANTED.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss First Amended Complaint is **GRANTED**, Defendant's Motion to Dismiss Intervenors as Party-Plaintiffs is **GRANTED**, and Plaintiff's motion for partial summary judgment is **DENIED**.

Enter:

<u>/s/ David H. Coar</u>
David H. Coar
United States District Judge

**Dated:** February 17, 2009